COPY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Ramzi Abadou (222567)
rabadou@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Fax: (415) 400-3001

-and-

Eric L. Zagar (250519)
ezagar@ktmc.com
Robin Winchester
rwinchester@ktmc.com
Kristen L. Ross
kross@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Fax: (267) 948-2512

*Counsel for Plaintiff*

FILED
CLERK, U.S. DISTRICT COURT

OCT 29 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PATRICIA STOCKMAN-SANN,
Derivatively on Behalf of
QUIKSILVER, INC.

Plaintiff,

v.

ROBERT B. MCKNIGHT, JR., PIERRE
AGNES, CRAIG STEVENSON,
WILLIAM M. BARNUM, JR., JOSEPH
F. BERARDINO, JAMES G. ELLIS,
CHARLES S. EXON, M. STEVEN
LANGMAN, ROBERT L. METTLER,
PAUL C. SPEAKER, ANDREW W.
SWEET, DOUGLAS K. AMMERMAN

Defendants,

and

QUIKSILVER, INC., a Delaware
Corporation

Nominal Defendant.

Case No.: **SACV12 1882** AG (JPRx)

**VERIFIED SHAREHOLDER**
**DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Patricia Stockman-Sann ("Plaintiff"), by her undersigned attorneys, submits this Verified Shareholder Derivative Complaint against the defendants named herein, and alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, an investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.     Plaintiff brings this action derivatively for the benefit of nominal defendant Quiksilver, Inc. ("Quiksilver" or the "Company") against certain of its executive officers and members of its Board of Directors (the "Board") seeking to remedy defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, federal statutory violations, and other violations of law that have caused Quiksilver, the real party in interest, to sustain damages.

2.     In gross breach of their fiduciary duties as directors of the Company, the members of the Board's Compensation Committee (the "Compensation Committee") knowingly granted restricted stock units to three Quiksilver executive officers in deliberate violation of the Company's 2000 Stock Incentive Plan (as amended and restated, the "2000 Plan", attached hereto as Exhibit A).

3.     The 2000 Plan allows the Compensation Committee to grant equity awards such as stock options, restricted stock and restricted stock units to executive officers, employees and directors of the Company.  While the Compensation Committee has been delegated the authority to administer the 2000 Plan, its discretion in exercising such authority is not unlimited.  Rather, the 2000 Plan, as approved by Quiksilver's shareholders,  specifically prohibits the  Compensation Committee from granting any one person more than 800,000 shares of Quiksilver common stock in any calendar year.

4.     In blatant violation of this limit, in 2011, the Compensation Committee, comprised of defendants Douglas K. Ammerman ("Ammerman"), William M.

Barnum, Jr. ("Barnum"), Joseph F. Berardino ("Berardino") and Robert L. Mettler ("Mettler"), granted each of three Quiksilver executive officers equity awards for more than 800,000 shares of Quiksilver common stock. Specifically, on June 13, 2011, the Compensation Committee granted Quiksilver's President and Chief Executive Officer ("CEO"), defendant Robert B. McKnight, Jr. ("McKnight") 2,000,000 restricted stock units and defendants Pierre Agnes ("Agnes") and Craig Stevenson ("Stevenson"), then Presidents of Quiksilver Europe and Quiksilver Americas, respectively, 1,000,000 restricted stock units each. These awards were *ultra vires*, a waste of Quiksilver's assets and constituted a flagrant breach of the Compensation Committee members' fiduciary duties owed to the Company and its shareholders.

5.     In addition to the foregoing, on February 8, 2012, the Board, as a further and separate breach of fiduciary duties and in violation of Section 14(a) of the Securities Exchange Act of 1934 ("Section 14(a)"), filed with the Securities and Exchange Commission ("SEC") and disseminated to Quiksilver shareholders a Form DEF 14A proxy statement (the "2012 Proxy") containing false and misleading statements and omitting material information regarding the awards of restricted stock units in excess of the 2000 Plan's limitations. The 2012 Proxy's representation that the Compensation Committee had "complete discretion" to determine the amount of equity awards that could be granted to the Company's executive officers, as well as its failure to disclose that the June 2011 restricted stock unit grants to McKnight, Agnes and Stevenson violated the 2000 Plan, were material misrepresentations in the solicitation of votes for the election of Quiksilver's directors, including several of the Compensation Committee members and McKnight.

6.     Through this derivative action, Plaintiff seeks to recover for the Company the damages caused by the misconduct alleged herein and to compel defendants McKnight, Agnes and Stevenson to disgorge to the Company the improper benefits they received.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 2 -

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the allegations contained herein state a federal question relating to the submission and dissemination of false proxy statements in violation of Section 14(a). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(3), in that Plaintiff and Defendants are citizens of different states and, with respect to certain Defendants, of foreign states, and the matter in controversy exceeds $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States which it would not otherwise have.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because nominal defendant Quiksilver is headquartered in this District.  In addition, a substantial portion of the occurrences complained of herein occurred in this District and one or more of the Defendants either resides in, or maintains offices in, this District.

## PARTIES

9.      Plaintiff is a shareholder of Quiksilver, was a shareholder of Quiksilver at the time of the wrongdoing alleged herein, and has been a shareholder of Quiksilver continuously since that time.  Plaintiff is a citizen of the State of Iowa.

10.      Nominal defendant Quiksilver is a Delaware corporation with its principal place of business located at 15202 Graham Street, Huntington Beach, California, and thus is a citizen of Delaware and California.  Shares of Quiksilver's common stock are traded on the NYSE under the ticker symbol "ZQK."  According to its public filings, Quiksilver is "a globally diversified company that designs, develops and distributes branded apparel, footwear, accessories and related products, catering to the casual, youthful lifestyle associated with the sports of surfing, skateboarding and snowboarding."  Its major brands are Quiksilver, Roxy and DC.

11.     Defendant McKnight co-founded Quiksilver in 1976 and has served as CEO and Chairman of the Board since 1976.   He has served as Quiksilver's President from 1979 to July 1991 and from February 2008 to the present.   On June 13, 2011, defendant McKnight received an award of 2,000,000 restricted stock units, which exceeded the limits set forth in the 2000 Plan by 1,200,000 units.   Upon information and belief, defendant McKnight is a citizen of the State of California.

12.     Defendant Agnes has served as President of Quiksilver Europe since June 2005.   From December 2003 to June 2005 defendant Agnes served as Managing Director of Quiksilver Europe; from 1992 to 2002 as founder and operator of Omareef Europe, a licensee of Quiksilver purchased by the Company in November 2002; and beginning in 1988 as a team manager and in other capacities throughout Quiksilver's European marketing operations.   On June 13, 2011, defendant Agnes received an award of 1,000,000 restricted stock units, which exceeded the limits set forth in the 2000 Plan by 200,000 units.   Upon information and belief, defendant Agnes is a citizen of France.

13.     Defendant Stevenson has served as Global Brand President and Chief Operating Officer ("COO") of the Company since November 2011.   He previously served as President of Quiksilver Americas from January 2009 to November 2011. He has served in various other capacities with Quiksilver since 1992.   On June 13, 2011, defendant Stevenson received an award of 1,000,000 restricted stock units, which exceeded the limits set forth in the 2000 Plan by 200,000 units.   Upon information and belief, defendant Stevenson is a citizen of Australia.

14.     Defendant Barnum has served as a director of Quiksilver since 1991. He served on the Compensation Committee during 2011 and made the *ultra vires* restricted stock unit awards complained of herein.   Upon information and belief, defendant Barnum is a citizen of the State of California.

15.     Defendant Berardino has served as a director of Quiksilver since May 13, 2011.   He served on the Compensation Committee during 2011 and made the

*ultra vires* restricted stock unit awards complained of herein. Upon information and belief, defendant Berardino is a citizen of the State of Connecticut.

16. Defendant James G. Ellis ("Ellis") has served as a director of Quiksilver since 2009. Upon information and belief, defendant Ellis is a citizen of the State of California.

17. Defendant Charles S. Exon ("Exon") has served as Quiksilver's Chief Administrative Officer ("CAO") since February 2008 and as Secretary and General Counsel since August 2000. He has served as a director of the Company since 2005. Upon information and belief, defendant Exon is a citizen of the State of California.

18. Defendant M. Steven Langman ("Langman") has served as a director of Quiksilver since 2009. He was appointed to the Board as a designee of entities affiliated with private equity firm Rhône, which own approximately 29.8% of Quiksilver's outstanding common stock. Defendant Langman co-founded Rhône in 1996. Upon information and belief, defendant Langman is a citizen of the State of New York.

19. Defendant Mettler has served as a director of Quiksilver since 2010. He served on the Compensation Committee during 2011 and made the *ultra vires* restricted stock unit awards complained of herein. Upon information and belief, defendant Mettler is a citizen of the State of California.

20. Defendant Paul C. Speaker ("Speaker") has served as a director of Quiksilver since 2010. Upon information and belief, defendant Speaker is a citizen of the State of California.

21. Defendant Andrew W. Sweet ("Sweet") has served as a director of Quiksilver since 2009. He was appointed to the Board as a designee of entities affiliated with Rhône and is a Managing Director of Rhône. Upon information and belief, defendant Sweet is a citizen of the State of Connecticut.

22. Defendant Ammerman served as a director of Quiksilver from 2005 to March 20, 2012. He served on the Compensation Committee during 2011 and made

the *ultra vires* restricted stock unit awards complained of herein.  Upon information and belief, defendant Ammerman is a citizen of the State of California.

23.     Defendants Agnes, Ammerman, Barnum, Berardino, Ellis, Exon, Langman, McKnight, Mettler, Speaker, Stevenson and Sweet are referred to collectively herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

24.     By reason of their positions as officers and/or directors of Quiksilver and because of their ability to control the business and corporate affairs of Quiksilver, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Quiksilver and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of Quiksilver owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

25.     To discharge their duties, the Individual Defendants, as officers and directors of the Company, were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

        a.      exercise good faith to ensure that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business;

        b.      exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules and regulations and requirements and the Company's governing documents, *e.g.*, the

2000 Plan, including acting only within the scope of their legal authority;

c.     refrain from wasting the Company's assets or otherwise unduly benefiting themselves and other Company insiders at the expense of the Company; and

d.     make full, fair, and accurate disclosures to shareholders.

26.     The Individual Defendants, as well as all employees of Quiksilver, were and are required to comply with the Company's Code of Business Conduct and Ethics ("Code of Conduct").   According to the Code of Conduct, "[s]ince its founding, [Quiksilver] has insisted that all its employees act with honesty, fairness and integrity in their dealings with and on behalf of the Company."  The Code of Conduct further requires that directors, officers and employees "comply in all material respects with all applicable laws, rules and regulations" and with "all other policies applicable to them that are adopted by the Company from time to time."

27.     Quiksilver also maintains a "Code of Ethics for Senior Financial Officers" which applies to defendant McKnight as President and CEO.   Article V thereof, entitled "Full, Fair, Accurate and Timely Disclosure for SEC Filings; Record Keeping," requires that defendant McKnight, as well as other senior officers, review the Company's SEC filings and press releases before they are filed and/or issued to the public:

> ***The Company requires full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the SEC and in other public communications.*** Unrecorded or "off the book" funds or assets should not be maintained unless permitted by applicable laws or regulations.  In addition, no undisclosed or unrecorded fund or asset shall be maintained for any improper purpose and no transaction shall be carried out in a manner intended to obscure the substance of the transaction, nor shall any transaction be recorded in violation of applicable legal and accounting requirements.  If a material mistake in any information previously disclosed in any such filing or submission is discovered, such mistake should immediately be brought to the attention of the Audit Committee.

> ***The Chief Executive Officer, Chief Financial Officer and, when appropriate, other Senior Financial Officers, shall read each SEC report and press release prior to the time it is filed, furnished or issued to the SEC or public, as applicable. Any inaccuracy or material misstatement in, or the omission of any information necessary to make the statements made not misleading from, any SEC filing or press release shall be immediately disclosed to the Audit Committee and, if applicable, the Company's auditors.***

(Emphasis added).

28.　　Additionally, the members of the Compensation Committee, defendants Ammerman, Berardino, Barnum and Mettler, were responsible for properly administering the 2000 Plan and were required to comply with the obligations set forth in the Charter for Compensation Committee (the "Charter"). According to the Charter, "the primary purpose of the Compensation Committee is to (i) assist the Board of Directors in discharging its responsibilities in respect of compensation of the Company's executive officers and directors; and (ii) produce an annual report on executive compensation for inclusion in the Company's proxy statement."

29.　　The Charter further provides that the Compensation Committee members have the following duties and responsibilities:

- Review and approve the Company's goals and objectives, relevant to CEO compensation, evaluate the CEO's performance in light of those goals and objectives, and have sole authority to/together with the other independent directors determine the CEO's compensation level based on this evaluation.

- Consider the Company's performance and relative shareholder return, the value of similar incentive awards to CEO's at comparable companies, and the awards given to the Company's CEO in past years when determining the long-term component of the CEO's compensation.

- Make recommendations to the Board with respect to non-CEO executive compensation, incentive-compensation plans and equity based plans.

- Review and approve on behalf of the full Board, the annual salary, bonus and other benefits, direct and indirect, of executive officers. This authority extends to the approval of employment agreements between the Company and such employees.

- Review and approve individual stock option grants for employees pursuant to plans approved by the Board.

- Review periodically and administer the Company's existing stock option, stock incentive, stock purchase and stock bonus plans or arrangements and make recommendations to the full Board for changes, if any, to such plans.

- Review periodically and submit to the full Board recommendations concerning existing or new executive compensation, employee benefits, stock plans or management perquisites.

- Produce an annual report on executive compensation for inclusion in the proxy statement as the Compensation Committee Report.

- Conduct an annual review of non-employee director compensation and, if appropriate, recommend any changes in the type or amount of non-employee director compensation. The Committee should consider that directors' independence may be jeopardized if director compensation and perquisites exceed customary levels, if the Company makes substantial contributions to organizations with which a director is affiliated, or if the Company enters into consulting contracts with (or provides other indirect forms of compensation to) a director or an organization with which a director is affiliated. Compensation of nonemployee directors should be comparable to that offered by other companies of similar size and scope and a portion of director compensation should be in the form of stock or stock options.

- Make regular reports to the Board and propose any necessary action to the Board.

- Review and reassess the adequacy of this charter annually and recommend any proposed changes to the Board for approval.

- Evaluate its performance as the Compensation Committee on an annual basis.

- Perform such other specific functions as the Company's Board of Directors may from time to time direct.

(Emphasis added).

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

## SUBSTANTIVE ALLEGATIONS

31.    The 2000 Plan was originally adopted by the Board on February 15, 2000 and approved by the Company's shareholders at its annual meeting on March 31, 2000.   The stated purpose of the 2000 Plan is "to promote the interests of [Quiksilver] by providing eligible persons in the Corporation's service with the opportunity to acquire a proprietary interest, or otherwise increase their proprietary interest, in the Corporation as an incentive for them to remain in such service."

32.    The 2000 Plan provides for several types of equity awards under four separate programs:

- the Discretionary Option Grant Program, under which eligible persons may, at the discretion of the Plan Administrator, be granted options to purchase shares of Common Stock,

- the Restricted Stock Program, under which eligible persons may be awarded restricted shares of Common Stock by and at the discretion of the Plan Administrator, that vest upon, among other things, the completion of a designated service period and/or the attainment of pre-established performance milestones or other criteria,

- the Restricted Stock Unit Program, under which eligible persons may be awarded restricted stock units by and at the discretion of the Plan Administrator, that vest upon, among other things, the completion of a designated service period and/or the attainment of pre-established performance milestones or other criteria, and

- the Director Automatic Grant Program under which Eligible Directors shall automatically receive option grants and restricted shares of Common Stock at designated intervals over their period of Board service.

33.    According to the Compensation Committee Charter and the Company's SEC filings, the Compensation Committee has been delegated the authority to administer the 2000 Plan.

34.    The 2000 Plan expressly limits the equity awards that may be granted thereunder, stating that "[n]o one person participating in the Plan may receive Awards for more than 800,000 shares of Common Stock in the aggregate per calendar year."   The 2000 Plan defines "Award" as "any of the following stock or stock-based awards authorized for issuance or grant under the Plan:  stock option,

stock appreciation right, Restricted Stock or Restricted Stock Unit award." Thus, an award of more than 800,000 restricted stock units to any one person during a calendar year necessarily violates the express terms of the 2000 Plan.

35. On February 8, 2011, just four months before the *ultra vires* awards were granted, the Compensation Committee and the full Board approved an amendment to the 2000 Plan that increased the reserve of common stock available for issuance thereunder. In soliciting shareholder approval of the amendment, the Board reiterated the 800,000 share limit in its proxy materials:

> No participant in the 2000 Plan may receive Equity Awards under the 2000 Plan for more than 800,000 shares of common stock in the aggregate per calendar year. Stockholder approval of this Proposal will also constitute a re-approval of the 800,000 share-limitation for purposes of Section 162(m) of the Code.

Form DEF 14A proxy statement filed on February 9, 2011 ("2011 Proxy").

36. The amended plan, including the 800,000 per person per year limit, was approved by the Company's shareholders at the annual meeting on March 22, 2011.

37. Despite this clear limitation, the 2012 Proxy disclosed that on June 13, 2011, the Compensation Committee (defendants Ammerman, Berardino, Barnum and Mettler) awarded restricted stock units to Quiksilver's Section 16 officers as follows:

| Name | Title at Time of Grant | Restricted Stock Units |
|---|---|---|
| Robert B. McKnight, Jr. | Chairman, CEO and President | 2,000,000 |
| Joseph Scirocco | Chief Financial Officer | 700,000 |
| Charles S. Exon | Chief Administrative Officer and General Counsel | 700,000 |
| Craig Stevenson | President – Quiksilver Americas | 1,000,000 |
| Pierre Agnes | President – Quiksilver Europe | 1,000,000 |

38. The award of 2,000,000 restricted stock units to defendant McKnight exceeded the 800,000 limit by 1,200,000 restricted stock units and each award of

1,000,000 million restricted stock units granted to defendants Agnes and Stevenson exceeded the 800,000 limit by 200,000 restricted stock units. Thus, the Compensation Committee violated the 2000 Plan by making these improper and wasteful awards.

39.     The members of the Compensation Committee, defendants Ammerman, Berardino, Barnum and Mettler, knew that the 2000 Plan limited awards to Plan participants to 800,000 per person per calendar year, yet they deliberately violated the limit by granting the excessive awards to McKnight, Agnes and Stevenson.

40.     Indeed, the 800,000 share limit had been in place since March 24, 2006, when the Company's shareholders approved various amendments to the 2000 Plan, including an increase from the previous limit of 400,000 shares.

41.     Awards of compensation to Quiksilver officers are entitled to tax deductibility pursuant to section 162(m) of the Internal Revenue Code only if the awards comply with the terms of the shareholder-approved 2000 Plan. By violating the 800,000 share limit, the members of the Compensation Committee, defendants Ammerman, Berardino, Barnum and Mettler, put at risk the tax deductibility of the 2011 awards of restricted stock units to defendants McKnight, Agnes and Stevenson.

42.     Previous awards granted by the Compensation Committee, which included defendants Barnum and Ammerman, who served on the Compensation Committee since at least 1996 and 2006, respectively, did not violate the 800,000 share limit:

| Year | Executive | Options | Restricted Stock | Restricted Stock Units | Total |
|------|-----------|---------|------------------|------------------------|-------|
| 2010 | McKnight | 250,000 | 0 | 0 | 250,000 |
| | Scirocco | 100,000 | 0 | 0 | 100,000 |
| | Exon | 100,000 | 0 | 0 | 100,000 |
| | Agnes | 100,000 | 0 | 0 | 100,000 |
| | Stevenson | 100,000 | 0 | 0 | 100,000 |
| 2009 | McKnight | 645,000 | 120,000 | 0 | 765,000 |
| | Scirocco | 540,000 | 90,000 | 0 | 630,000 |
| | Exon | 540,000 | 90,000 | 0 | 630,000 |

| | Agnes | 625,000 | 75,000 | 0 | 700,000 |
| | Stevenson | 570,000 | 75,000 | 0 | 645,000 |

43.    Notwithstanding the clear violation of the 2000 Plan, nowhere in the 2012 Proxy (nor in any other public filing) does the Board or the Compensation Committee disclose that the Compensation Committee violated the 2000 Plan or that the violation put at risk the tax deductibility of the 2011 awards to defendants McKnight, Agnes and Stevenson.

44.    Quiksilver stockholders are entitled to rely on the truth of representations made in the proxy materials relating to executive compensation mandates.  At all relevant times, the Board had control over statements made in annual proxy materials sent to Quiksilver's stockholders and had actual knowledge of statements made in those proxy materials.

45.    The 2012 Proxy was false and misleading in that it falsely stated that the Compensation Committee had complete and unfettered discretion regarding the number of equity awards that could be granted thereunder, when in fact the committee's discretion was limited by the terms of the 2000 Plan.  The 2012 Proxy falsely stated:

> *Equity Based Compensation*
>
> The compensation committee believes that the use of equity-based awards very closely aligns executive compensation with the value to be received by our stockholders during the same period, as well as provides an opportunity for increased equity ownership by our executive officers.
>
> *Discretionary Option Grant Program.* Under the discretionary option grant program of our 2000 Stock Incentive Plan, ***the committee has complete discretion to determine*** which executive officers are to receive stock option grants, the time or times when those stock option grants are to be made (typically during the first quarter of the fiscal year), ***the number of shares subject to each such grant***, the time or times when each grant is to vest and become exercisable, the maximum term for which the grant is to

remain outstanding, and the status of any granted option as either an incentive stock option or a non-statutory option under federal tax laws….

\*      \*      \*

*Restricted Stock Program.* Shares of common stock may be issued under the restricted stock program of our 2000 Stock Incentive Plan.…***The committee has complete discretion under the restricted stock program to determine*** which executive officers are to receive restricted stock awards, the time or times when those restricted stock awards are to be made, ***the number of shares subject to each such award***, the vesting schedule for each award and the purchase price (if any) payable per share….

\*      \*      \*

*Restricted Stock Unit Program.*…***The committee has complete discretion under the restricted stock unit program to determine*** which executive officers are to receive RSU awards, the time or times when those RSU awards are to be made, ***the number of shares subject to each such award***, the vesting schedule for each award and the purchase price (if any) payable per unit.

2012 Proxy at 21-22 (emphasis added).

46.     Moreover, the 2012 Proxy failed to disclose that the June 13, 2011 restricted stock unit awards to McKnight, Agnes and Stevenson each violated the shareholder-approved 2000 Plan and that the violations put at risk the tax deductibility of the 2011 awards to defendants McKnight, Agnes and Stevenson.

47.     In short, the 2012 Proxy contained material misstatements and omissions of material fact concerning the restricted stock unit awards to the Company's executives and the discretion of the Compensation Committee to make such awards.  Accordingly, the 2012 Proxy was materially false and misleading and unlawfully deprived Quiksilver stockholders of their right to cast a fully informed vote at the annual meeting, especially with respect to the reelection of defendants Barnum, Berardino and Mettler, who granted the *ultra vires* awards, and defendant McKnight, who received the *ultra vires* awards and who, upon information and

belief, had input into the number of restricted stock units to award to defendants Agnes and Stevenson.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

48.    Defendants Ammerman, Barnum, Berardino and Mettler, the members of the Compensation Committee, exceeded the bounds of the law and legitimate business judgment by granting restricted stock units in excess of the 800,000 share limit, thereby violating the 2000 Plan.

49.    Defendants Ammerman, Barnum, Berardino and Mettler, as members of the Compensation Committee; defendants Ammerman, Barnum, Berardino, Ellis, Exon, Langman, McKnight, Mettler, Speaker and Sweet, as members of the Board; and defendant McKnight, as a senior financial officer of the Company, knowingly caused and allowed the Company to file the 2012 Proxy, which contained materially false and misleading statements and omissions, as alleged herein.

50.    The foregoing misconduct was unjustifiable and constituted a gross breach of such Individual Defendants' fiduciary duties as directors and/or officers of the Company.  The foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit defendants McKnight, Agnes and Stevenson at the expense of the Company.

51.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained damages, including, but not limited to, the award of *ultra vires* restricted stock units in violation of the 2000 Plan.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

52.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, federal statutory violations and unjust enrichment.

53.    Plaintiff is a shareholder of Quiksilver, was a shareholder of Quiksilver at the time of the wrongdoing alleged herein, and has been a shareholder of Quiksilver continuously since that time.

54.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

55.   As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

56.   The Board currently consists of nine directors:  defendants Barnum, Berardino, Ellis, Exon, Langman, McKnight, Mettler, Speaker and Sweet.   The following directors are incapable of independently and disinterestedly considering a demand to vigorously prosecute this action:

  a.   Defendants Barnum, Berardino and Mettler, because they granted the *ultra vires* awards of restricted stock units in violation of the 2000 Plan, which was not the product of a valid exercise of business judgment, was a waste of Quicksilver's assets and for which they face a substantial likelihood of liability;

  b.   Defendant McKnight, because he is directly interested in his *ultra vires* award of restricted stock units in violation of the 2000 Plan. In addition, because defendant McKnight's principal professional occupation is his employment as President and CEO of the Company, pursuant to which he stands to earn millions of dollars in salary, bonuses and other compensation, all of which must be approved by the Compensation Committee, currently comprised of defendants Barnum, Berardino and Mettler.  Specifically in fiscal years 2011, 2010 and 2009, defendant McKnight received total compensation of $10,203,200, $2,913,830, and $2,027,189, respectively.   Moreover, according to the 2012 Proxy, the Compensation Committee requests defendant McKnight's input regarding his assessment of each individual executive officer's performance during the year and a recommendation regarding the amount of restricted stock unit awards to each executive officer; thus, defendant McKnight had input resulting in the *ultra vires* awards of restricted stock units to Agnes and Stevenson in violation of the 2000 Plan, which was not a valid exercise of business judgment, was a waste of Quiksilver's assets, and for which he faces a substantial likelihood of liability;

  c.   Defendant Exon, because his principal professional occupation is his employment as CAO, Secretary and General Counsel of the Company, pursuant to which he reports directly to CEO and Chairman of the Board McKnight and stands to earn millions of dollars in salary, bonuses and other compensation, all of which must be approved by the Compensation Committee, currently

comprised of defendants Barnum, Berardino and Mettler. Specifically in fiscal years 2011, 2010 and 2009, defendant Exon received total compensation of $4,134,000, $1,253,120, and $1,289,030, respectively;

d.  Defendants Langman and Sweet, because they are Managing Directors of Rhône and are on the boards of managers of various Rhône affiliates, and as such they cannot disinterestedly and independently consider a demand to institute litigation against one another;

e.  Defendants McKnight, Exon, Langman and Sweet, because as disclosed in Quiksilver's SEC filings, the Company does not consider them to be independent pursuant to the listing standards of the NYSE and the Company's corporate governance guidelines; and

f.  Defendants Barnum, Berardino, Ellis, Exon, Langman, McKnight, Mettler, Speaker and Sweet (*i.e.*, the entire Board), because they approved and disseminated the false 2012 Proxy, which is likewise not protected by the business judgment rule and subjects all of the directors to a substantial likelihood of liability for breaching their fiduciary duties of loyalty and good faith and violating Section 14(a).

57.   Demand is also excused because the misconduct complained of herein was not, and could not have been, the product of a good faith exercise of business judgment.  On the contrary, defendants engaged in *ultra vires* conduct that is not and cannot be protected by the business judgment rule.

## COUNT I

**Against Defendants Ammerman, Barnum, Berardino and Mettler**
**For Breach of Fiduciary Duties of Loyalty and Good Faith**
**in Connection with Violating the 2000 Plan**

58.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

59.   As alleged in detail herein, each of the Individual Defendants, by reason of their positions as fiduciaries of the Company, owed to the Company the duties of undivided loyalty and good faith, and had a fiduciary duty to, among other things, exercise in good faith in ensuring that the Company complied with all applicable federal and state laws, rules, regulations and requirements and the Company's

governing documents, *e.g.*, the 2000 Plan, including acting only within the scope of their legal authority.

60.     Defendants Ammerman, Barnum, Berardino and Mettler breached their fiduciary duties of loyalty and good faith by granting 1.6 million restricted stock units in excess of the 800,000 per person per year limit and in deliberate violation of the 2000 Plan, as alleged herein.

61.     The Company was damaged as a direct and proximate result of defendants Ammerman, Barnum, Berardino and Mettler's foregoing breaches of fiduciary duties, as alleged herein.

## COUNT II

**Against Defendants Barnum, Berardino, Ellis,
Exon, Langman, McKnight, Mettler, Speaker and Sweet
For Breach of Fiduciary Duties of Loyalty and Good Faith
for Disseminating False and Misleading Statements**

62.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

63.     As alleged in detail herein, defendants Barnum, Berardino, Ellis, Exon, Langman, McKnight, Mettler, Speaker and Sweet Defendants owed the Company the fiduciary duties of loyalty, good faith and candor.

64.     Defendants Barnum, Berardino, Ellis, Exon, Langman, McKnight, Mettler, Speaker and Sweet breached their fiduciary duties of loyalty, good faith and candor, as alleged herein, by disseminating the 2012 Proxy, which contained false and misleading statements regarding the Compensation Committee's discretion to grant equity awards under the 2000 Plan and material omissions regarding the violation of the 2000 Plan in connection with the June 13, 2011 restricted stock unit awards to defendants McKnight, Agnes and Stevenson.

65.     As a direct and proximate result of the foregoing breaches of fiduciary duties, Quiksilver is entitled to equitable and injunctive relief, including, but not

1   limited to, an order invalidating the shareholder vote on the election of defendants

2   Barnum, Berardino, McKnight and Mettler.

### COUNT III

**Against Defendants Ammerman, Barnum, Berardino and Mettler**
**For Waste of Corporate Assets**

66.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

67.   Defendants Ammerman, Barnum, Berardino and Mettler, as members of the Compensation Committee, had a duty to ensure that their compensation decisions did not create an unwarranted risk of non-compliance with the law and the Company's governing documents.   Nevertheless, fully aware of the 800,000 share limit, they granted restricted stock units to defendants McKnight, Agnes and Stevenson in excess thereof and in violation of the 2000 Plan.

68.   Ammerman, Barnum, Berardino and Mettler wasted corporate assests in the form of *ultra vires* restricted stock units, as alleged herein.

69.   As a direct and proximate result of the foregoing waste of corporate assets, Quiksilver has sustained damages, as alleged herein.

### COUNT IV

**Against Defendants Barnum, Berardino, Ellis,**
**Exon, Langman, McKnight, Mettler, Speaker and Sweet**
**For Violation of Section 14(a) of the Securities Exchange Act**

70.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

71.   Rule 14-A-9, promulgated pursuant to Section 14(a), provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."   17 C.F.R. § 240.14-A-9.

72.   The 2012 Proxy violated Section 14(a) and Rule 14-A-9 because it contained false and misleading statements regarding the Compensation Committee's discretion to make equity awards under the 2000 Plan and omitted material information necessary in order to make the statements therein not false or misleading, specifically, that the 2000 Plan limited awards to 800,000 shares per person per calendar year and the June 13, 2011 restricted stock unit awards to defendants McKnight, Agnes and Stevenson violated that limit.

73.   The misrepresentations and omissions in the 2012 Proxy were material, and were an essential link in the election of defendants Barnum, Berardino, McKnight and Mettler as directors of the Company.

74.   As a direct and proximate result of the foregoing statutory violations, Quiksilver is entitled to equitable and injunctive relief, including but not limited to an order invalidating the shareholder vote on the election of defendants Barnum, Berardino, McKnight and Mettler.

## COUNT V

### Against Defendants McKnight, Agnes and Stevenson
### For Unjust Enrichment

75.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

76.   Defendants McKnight, Agnes and Stevenson received excessive and unwarranted grants of restricted stock units in excess of the 800,000 share limit and in violation of the 2000 Plan, as alleged herein.

77.   It would be unconscionable and against the fundamental principles of justice, equity and good conscience for defendants McKnight, Agnes and Stevenson to retain the excessive, unwarranted and *ultra vires* restricted stock units and any other equity awards they have received in violation of the 2000 Plan.

78.   To remedy McKnight, Agnes and Stevenson's unjust enrichment, the Court should enter an order compelling them to disgorge to the Company the

excessive and unwarranted restricted stock units and any other equity awards they have received in violation of the 2000 Plan, as well as any proceeds they have derived therefrom.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Awarding the Company the amount of damages it sustained as a result of the Individual Defendants' breaches of fiduciary duties and waste of corporate assets;

B.   Ordering defendants McKnight, Agnes and Stevenson to disgorge to the Company the restricted stock units and any other benefits they received in violation of the Plan, as well as any proceeds they have derived therefrom;

C.   Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and statutory violations;

D.   Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: October 29, 2012

KESSLER TOPAZ
MELTZER & CHECK, LLP

Ramzi Abadou (222567)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Fax: (415) 400-3001

KESSLER TOPAZ
MELTZER & CHECK, LLP
Eric L. Zagar (250519)
Robin Winchester
Kristen L. Ross
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Fax: (267) 948-2512

*Attorneys for Plaintiff*

## VERIFICATION

I, Patty Stockman-Sann, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

DATE: _____10-20-12_____            _____
                                   Patty Stockman-Sann

# *Exhibit "A"*

**Exhibit 10.1**

QUIKSILVER, INC.
2000 STOCK INCENTIVE PLAN[1]
(As Amended and Restated through March 22, 2011)
ARTICLE ONE
<u>GENERAL PROVISIONS</u>

1.1. PURPOSE OF THE PLAN

This amended and restated 2000 Stock Incentive Plan is intended to promote the interests of Quiksilver, Inc., a Delaware corporation, by providing eligible persons in the Corporation's service with the opportunity to acquire a proprietary interest, or otherwise increase their proprietary interest, in the Corporation as an incentive for them to remain in such service.

Capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the attached Appendix.

1.2. STRUCTURE OF THE PLAN

A. The Plan as hereby amended and restated is divided into four separate equity incentive programs:

– the Discretionary Option Grant Program, under which eligible persons may, at the discretion of the Plan Administrator, be granted options to purchase shares of Common Stock,

– the Restricted Stock Program, under which eligible persons may be awarded restricted shares of Common Stock by and at the discretion of the Plan Administrator, that vest upon, among other things, the completion of a designated service period and/or the attainment of pre–established performance milestones or other criteria,

– the Restricted Stock Unit Program, under which eligible persons may be awarded restricted stock units by and at the discretion of the Plan Administrator, that vest upon, among other things, the completion of a designated service period and/or the attainment of pre–established performance milestones or other criteria, and

– the Director Automatic Grant Program under which Eligible Directors shall automatically receive option grants and restricted shares of Common Stock at designated intervals over their period of Board service.

---

[1]    All share amounts in this document have been revised to reflect a 2 for 1 stock split effected through a stock dividend on April 30, 2003 and a 2 for 1 stock split effected through a stock dividend on April 27, 2005.

B. The provisions of Articles One and Six shall apply to all equity programs under the Plan and shall govern the interests of all persons under the Plan.

1.3. ADMINISTRATION OF THE PLAN

A. The Primary Committee shall have sole and exclusive authority to administer the Discretionary Option Grant, Restricted Stock and Restricted Stock Unit Programs with respect to Section 16 Insiders. Administration of the Discretionary Option Grant, Restricted Stock and Restricted Stock Unit Programs with respect to all other persons eligible to participate in those programs may, at the Board's discretion, be vested in the Primary Committee or a Secondary Committee, or the Board may retain the power to administer those programs with respect to all such persons. However, any discretionary Awards to members of the Primary Committee must be authorized and approved by a disinterested majority of the Board.

B. Members of the Primary Committee or any Secondary Committee shall serve for such period of time as the Board may determine and may be removed by the Board at any time. The Board may also at any time terminate the functions of any Secondary Committee and reassume all powers and authority previously delegated to such committee.

C. Each Plan Administrator shall, within the scope of its administrative functions under the Plan, have full power and authority (subject to the provisions of the Plan) to establish such rules and regulations as it may deem appropriate for proper administration of the Discretionary Option Grant, Restricted Stock and Restricted Stock Unit Programs and to make such determinations under, and issue such interpretations of, the provisions of those programs and any outstanding Awards thereunder as it may deem necessary or advisable. Decisions of the Plan Administrator within the scope of its administrative functions under the Plan shall be final and binding on all parties who have an interest in the Discretionary Option Grant, Restricted Stock and Restricted Stock Unit Programs under its jurisdiction or any Award thereunder.

D. Service on the Primary Committee or the Secondary Committee shall constitute service as a Board member, and members of each such committee shall accordingly be entitled to full indemnification and reimbursement as Board members for their service on such committee. No member of the Primary Committee or the Secondary Committee shall be liable for any act or omission made in good faith with respect to the Plan or any Award under the Plan.

E. Administration of the Director Automatic Grant Program shall be self–executing in accordance with the terms of that program, and no Plan Administrator shall exercise any discretionary functions with respect to any Award under that program.

1.4. ELIGIBILITY

A. The persons eligible to participate in the Discretionary Option Grant, Restricted Stock and Restricted Stock Unit Programs are as follows:

(i) Employees,

(ii) non–employee members of the Board or the board of directors of any Parent or Subsidiary, and

2

(iii) consultants and other independent advisors who provide services to the Corporation (or any Parent or Subsidiary).

B. Each Plan Administrator shall, within the scope of its administrative jurisdiction under the Plan, have full authority to determine (i) with respect to Awards made under the Discretionary Option Grant Program, which eligible persons are to receive such Awards, the time or times when those Awards are to be made, the number of shares to be covered by each such Award, the status of any awarded option as either an Incentive Option or a Non–Statutory Option, the exercise price per share in effect for each Award (subject to the limitations set forth in Article Two), the time or times when each Award is to vest and become exercisable and the maximum term for which the Award is to remain outstanding and (ii) with respect to Awards under the Restricted Stock and Restricted Stock Unit Programs, which eligible persons are to receive such Awards, the time or times when the Awards are to be made, the number of shares subject to each Award, the vesting schedule applicable to the shares subject to such Award, and the cash consideration, if any, payable for such shares.

C. The Plan Administrator shall have the absolute discretion to grant options, Restricted Stock and Restricted Stock Units in accordance with the Discretionary Option Grant Program, the Restricted Stock Program and the Restricted Stock Unit Program.

D. Eligible Directors for purposes of the Director Automatic Grant Program shall be limited to members of the Board who are not, at the time of such determination, employees of the Corporation (or any Parent or Subsidiary).

1.5. STOCK SUBJECT TO THE PLAN

A. The stock issuable under the Plan shall be shares of authorized but unissued or reacquired Common Stock, including shares repurchased by the Corporation on the open market. The number of shares of Common Stock reserved for issuance over the term of the Plan shall not exceed 43,744,836 shares. Such share reserve consists of (i) the number of shares estimated to remain available for issuance, as of the Plan Effective Date, under the Predecessor Plans as last approved by the Corporation's stockholders, including the shares subject to outstanding options under those Predecessor Plans, (ii) an increase of 2,000,000 shares approved by the Corporation's stockholders in connection with the adoption of this Plan, (iii) an increase of 2,800,000 shares approved by the Corporation's stockholders on March 30, 2001, (iv) an increase of 2,400,000 shares approved by the Corporation's stockholders on March 26, 2002 (v) an increase of 3,200,000 shares approved by the Corporation's stockholders on March 28, 2003, (vi) an increase of 5,600,000 shares approved by the Corporation's stockholders on March 26, 2004, (vii) an increase of 1,500,000 shares approved by the Corporation's stockholders on March 24, 2005, (viii) an increase of 1,000,000 shares approved by the Corporation's stockholders on March 24, 2006, (ix) an increase of 2,000,000 shares approved by the Corporation's stockholders on March 16, 2007, (x) an increase of 300,000 shares approved by the Corporation's stockholders on March 26, 2010 and (xi) an increase of 10,000,000 shares approved by the Corporation's stockholders on March 22, 2011.

B. No one person participating in the Plan may receive Awards for more than 800,000 shares of Common Stock in the aggregate per calendar year. To the extent required by

3

Section 162(m) of the Code, shares subject to options or stock appreciation rights which are canceled shall continue to be counted against the limit.

    C. The maximum number of shares of Common Stock reserved for issuance pursuant to Awards of Restricted Stock and Restricted Stock Units under the Plan is 11,100,000.

    D. Shares of Common Stock subject to outstanding Awards under the Plan (including options incorporated into this Plan from the Predecessor Plans) shall be available for subsequent issuance under the Plan to the extent those Awards expire or terminate for any reason prior to the issuance of the shares of Common Stock subject to those Awards. Unvested shares issued under the Plan and subsequently canceled or repurchased by the Corporation at the original exercise or issue price paid per share pursuant to the Corporation's repurchase rights under the Plan shall be added back to the number of shares of Common Stock reserved for issuance under the Plan and shall accordingly be available for subsequent reissuance under the Plan. However, should the exercise price of an option under the Plan be paid with shares of Common Stock or should shares of Common Stock otherwise issuable under the Plan be withheld by the Corporation in satisfaction of the withholding taxes incurred in connection with the exercise of an option or the issuance of shares under the Plan, then the number of shares of Common Stock available for issuance under the Plan shall be reduced by the gross number of shares for which the option is exercised or the gross number of shares issued under the Plan, and not by the net number of shares of Common Stock issued to the holder of such option or stock issuance. Shares of Common Stock underlying one or more stock appreciation rights exercised under the Plan shall NOT be available for subsequent issuance under the Plan. Notwithstanding the foregoing, the number of shares of Common Stock subject to Surrendered Options in excess of the number of shares of Common Stock subject to Replacement Options shall not be available for subsequent issuance under the Plan. For this purpose, the term "Surrendered Options" means the options that are surrendered to the Corporation in connection with the one–time stock option exchange described in Section 2.5 below, and the term "Replacement Options" means the options which are issued by the Corporation in exchange for the Surrendered Options in connection with such exchange.

    E. If any change is made to the Common Stock by reason of any stock split, stock dividend, recapitalization, combination of shares, exchange of shares or other change affecting the outstanding Common Stock as a class without the Corporation's receipt of consideration, appropriate adjustments shall be made by the Plan Administrator to (i) the maximum number and/or class of securities issuable under the Plan, (ii) the maximum number and/or class of securities for which any one person may be granted Awards under the Plan per calendar year, (iii) the number and/or class of securities for which grants are subsequently to be made under the Director Automatic Grant Program to new and continuing Eligible Directors, (iv) the number and/or class of securities and the exercise or base price per share (or any other cash consideration payable per share) in effect under each outstanding Award under the Discretionary Option Grant and Director Automatic Grant Programs, (v) the number and/or class of securities and exercise price per share in effect under each outstanding option incorporated into this Plan from the Predecessor Plans, (vi) the number and/or class of securities subject to each outstanding Award under the Restricted Stock and Restricted Stock Unit Programs and the cash consideration (if any) payable per share thereunder, and (vii) the maximum number of shares which may be issued pursuant to Awards of Restricted Stock and Restricted Stock Units under the Plan. Such

adjustments to the outstanding Awards are to be effected in a manner which shall preclude the enlargement or dilution of rights and benefits under those Awards. The adjustments determined by the Plan Administrator shall be final, binding and conclusive.

ARTICLE TWO

<u>DISCRETIONARY OPTION GRANT PROGRAM</u>

2.1. OPTION TERMS

Each option shall be evidenced by one or more documents in the form approved by the Plan Administrator; provided, however, that each such document shall comply with the terms specified below. Each document evidencing an Incentive Option shall, in addition, be subject to the provisions of the Plan applicable to such options.

A. EXERCISE PRICE.

1. The exercise price per share shall be fixed by the Plan Administrator but shall not be less than one hundred percent (100%) of the Fair Market Value per share of Common Stock on the option grant date. The Plan Administrator may not reset the exercise price of outstanding options or stock appreciation rights and may not grant new options or stock appreciation rights in exchange for the cancellation of outstanding options or stock appreciation rights with a higher exercise price.

2. The exercise price shall become immediately due upon exercise of the option and shall be payable in one or more of the forms specified below:

(i) cash or check made payable to the Corporation,

(ii) shares of Common Stock valued at Fair Market Value on the Exercise Date and held for the period (if any) necessary to avoid any additional charges to the Corporation's earnings for financial reporting purposes, or

(iii) to the extent the option is exercised for vested shares, through a special sale and remittance procedure pursuant to which the Optionee shall concurrently provide irrevocable instructions to (a) a Corporation–designated brokerage firm to effect the immediate sale of the purchased shares and remit to the Corporation, out of the sale proceeds available on the settlement date, sufficient funds to cover the aggregate exercise price payable for the purchased shares plus all applicable federal, state and local income and employment taxes required to be withheld by the Corporation by reason of such exercise and (b) the Corporation to deliver the certificates for the purchased shares directly to such brokerage firm in order to complete the sale.

Except to the extent such sale and remittance procedure is utilized, payment of the exercise price for the purchased shares must be made on the Exercise Date.

B. EXERCISE AND TERM OF OPTIONS. Each option shall be exercisable at such time or times, during such period and for such number of shares as shall be determined by the

5

Plan Administrator and set forth in the documents evidencing the option. However, no option shall have a term in excess of ten (10) years measured from the option grant date.

C. EFFECT OF TERMINATION OF SERVICE.

1. The following provisions shall govern the exercise of any options held by the Optionee at the time of cessation of Service or death:

(i) Any option outstanding at the time of the Optionee's cessation of Service for any reason shall remain exercisable for such period of time thereafter as shall be determined by the Plan Administrator and set forth in the documents evidencing the option or otherwise specifically authorized by the Plan Administrator in its sole discretion pursuant to an express written agreement with Optionee, but no such option shall be exercisable after the expiration of the option term.

(ii) Any option held by the Optionee at the time of death and exercisable in whole or in part at that time may be subsequently exercised by the personal representative of the Optionee's estate or by the person or persons to whom the option is transferred pursuant to the Optionee's will or the laws of inheritance or by the Optionee's designated beneficiary or beneficiaries of that option.

(iii) Should the Optionee's Service be terminated for Misconduct or should the Optionee otherwise engage in Misconduct while holding one or more outstanding options under this Article Two, then all those options shall terminate immediately and cease to be outstanding.

(iv) During the applicable post–Service exercise period, the option may not be exercised in the aggregate for more than the number of vested shares for which that option is at the time exercisable. No additional shares shall vest under the option following the Optionee's cessation of Service, except to the extent (if any) specifically authorized by the Plan Administrator in its sole discretion pursuant to an express written agreement with the Optionee. Upon the expiration of the applicable exercise period or (if earlier) upon the expiration of the option term, the option shall terminate and cease to be outstanding for any shares for which the option has not been exercised.

2. The Plan Administrator shall have complete discretion, exercisable either at the time an option is granted or at any time while the option remains outstanding, to:

(i) extend the period of time for which the option is to remain exercisable following the Optionee's cessation of Service from the limited exercise period otherwise in effect for that option to such greater period of time as the Plan Administrator shall deem appropriate, but in no event beyond the expiration of the option term, and/or

(ii) permit the option to be exercised, during the applicable post– Service exercise period, not only with respect to the number of vested shares of Common Stock for which such option is exercisable at the time of the Optionee's cessation of Service but also with respect to one or more additional installments in which the Optionee would have vested had the Optionee continued in Service.

6

D. STOCKHOLDER RIGHTS. The holder of an option shall have no stockholder rights with respect to the shares subject to the option until such person shall have exercised the option, paid the exercise price and become a holder of record of the purchased shares.

E. REPURCHASE RIGHTS. The Plan Administrator shall have the discretion to grant options which are exercisable for unvested shares of Common Stock. Should the Optionee cease Service while holding such unvested shares, the Corporation shall have the right to repurchase, at the exercise price paid per share, any or all of those unvested shares. The terms upon which such repurchase right shall be exercisable (including the period and procedure for exercise and the appropriate vesting schedule for the purchased shares) shall be established by the Plan Administrator and set forth in the document evidencing such repurchase right.

F. TRANSFERABILITY OF OPTIONS. The transferability of options granted under the Plan shall be governed by the following provisions:

(i) Incentive Options. During the lifetime of the Optionee, Incentive Options shall be exercisable only by the Optionee and shall not be assignable or transferable other than by will or the laws of inheritance following the Optionee's death.

(ii) Non–Statutory Options. Non–Statutory Options shall be subject to the same limitation on transfer as Incentive Options, except that the Plan Administrator may structure one or more Non–Statutory Options so that the option may be assigned in whole or in part during the Optionee's lifetime by gift or pursuant to a domestic relations order to one or more Family Members of the Optionee or to a trust established exclusively for Optionee and/or one or more such Family Members. The assigned portion may only be exercised by the person or persons who acquire a proprietary interest in the option pursuant to the assignment. The terms applicable to the assigned portion shall be the same as those in effect for the option immediately prior to such assignment and shall be set forth in such documents issued to the assignee as the Plan Administrator may deem appropriate.

(iii) Beneficiary Designation. Notwithstanding the foregoing, the Optionee may designate one or more persons as the beneficiary or beneficiaries of his or her outstanding options under this Article Two (whether Incentive Options or Non–Statutory Options), and those options shall, in accordance with such designation, automatically be transferred to such beneficiary or beneficiaries upon the Optionee's death while holding those options. Such beneficiary or beneficiaries shall take the transferred options subject to all the terms and conditions of the applicable agreement evidencing each such transferred option, including (without limitation) the limited time period during which the option may be exercised following the Optionee's death.

2.2. INCENTIVE OPTIONS

The terms specified below, together with any additions, deletions or changes thereto imposed from time to time pursuant to the provisions of the Code governing Incentive Options, shall be applicable to all Incentive Options. Except as modified by the provisions of this Section 2.2, all the provisions of Articles One, Two and Six shall be applicable to Incentive Options.

7

Options which are specifically designated as Non–Statutory Options when issued under the Plan shall not be subject to the terms of this Section 2.2.

    A. ELIGIBILITY. Incentive Options may only be granted to Employees.

    B. DOLLAR LIMITATION. The aggregate Fair Market Value of the shares of Common Stock (determined as of the respective date or dates of grant) for which one or more options granted to any Employee under the Plan (or any other option plan of the Corporation or any Parent or Subsidiary) may for the first time become exercisable as Incentive Options during any one calendar year shall not exceed the sum of One Hundred Thousand Dollars ($100,000). To the extent the Employee holds two (2) or more such options which become exercisable for the first time in the same calendar year, then for purposes of the foregoing limitation on the exercisability of those options as Incentive Options, such options shall be deemed to become first exercisable in that calendar year on the basis of the chronological order in which they were granted, except to the extent otherwise provided under applicable law or regulation.

    C. 10% STOCKHOLDER. If any Employee to whom an Incentive Option is granted is a 10% Stockholder, then the exercise price per share shall not be less than one hundred ten percent (110%) of the Fair Market Value per share of Common Stock on the option grant date, and the option term shall not exceed five (5) years measured from the option grant date.

2.3. CORPORATE TRANSACTION/CHANGE IN CONTROL/HOSTILE TAKE–OVER

    A. No Award outstanding under the Discretionary Option Grant Program at the time of a Corporate Transaction shall vest and become exercisable on an accelerated basis if and to the extent that (i) such Award is, in connection with the Corporate Transaction, assumed by the successor corporation (or parent thereof) or otherwise continued in full force and effect pursuant to the express terms of the Corporate Transaction or (ii) such Award is replaced with a cash incentive program of the successor corporation which preserves the spread (the excess of the Fair Market Value of those shares over the exercise price in effect for the shares) existing at the time of the Corporate Transaction on the shares of Common Stock as to which the Award is not otherwise at that time vested and exercisable and provides for subsequent payout in accordance with the same exercise/vesting schedule applicable to those shares or (iii) the acceleration of such Award is subject to other limitations imposed by the Plan Administrator. However, if none of the foregoing conditions are satisfied, each Award outstanding under the Discretionary Option Grant Program at the time of the Corporate Transaction shall automatically accelerate so that each such Award shall, immediately prior to the effective date of the Corporate Transaction, vest and become exercisable as to all shares of Common Stock at the time subject to such Award and may be exercised for any or all of those shares as fully vested shares of Common Stock.

    B. All outstanding repurchase rights under the Discretionary Option Grant Program shall automatically terminate, and the shares of Common Stock subject to those terminated rights shall immediately vest in full, in the event of any Corporate Transaction, except to the extent: (i) those repurchase rights are to be assigned to the successor corporation (or parent thereof) in connection with the Corporate Transaction or otherwise continue in full force and effect pursuant to the express terms of the Corporate Transaction or (ii) such accelerated vesting is precluded by other limitations imposed by the Plan Administrator.

C. Immediately following the consummation of the Corporate Transaction, all outstanding Awards under the Discretionary Option Grant Program shall terminate and cease to be outstanding, except to the extent assumed by the successor corporation (or parent thereof) in connection with the Corporate Transaction or otherwise expressly continued in full force and effect pursuant to the express terms of the Corporate Transaction.

D. Each Award which is assumed in connection with a Corporate Transaction or otherwise continued in effect shall be appropriately adjusted, immediately after such Corporate Transaction, to apply to the number and class of securities which would have been issuable to the Optionee in consummation of such Corporate Transaction had the Award been exercised immediately prior to such Corporate Transaction. Appropriate adjustments to reflect such Corporate Transaction shall also be made to (i) the exercise price payable per share under each outstanding Award, provided the aggregate exercise price payable for such securities shall remain the same, (ii) the maximum number and/or class of securities available for issuance over the remaining term of the Plan, and (iii) the maximum number and/or class of securities for which any one person may be granted Awards under the Plan per calendar year. To the extent the actual holders of the Corporation's outstanding Common Stock receive cash consideration for their Common Stock in consummation of the Corporate Transaction, the successor corporation may, in connection with the assumption of the outstanding Awards under the Discretionary Option Grant Program, substitute one or more shares of its own common stock with a fair market value equivalent to the cash consideration paid per share of Common Stock in such Corporate Transaction.

E. The Plan Administrator shall have the discretionary authority to structure one or more outstanding Awards under the Discretionary Option Grant Program so that those Awards shall, immediately prior to the effective date of such Corporate Transaction, vest and become exercisable for all the shares of Common Stock at the time subject to those Awards and may be exercised for any or all of those shares as fully vested shares of Common Stock, whether or not those Awards are to be assumed or otherwise continued in full force and effect pursuant to the terms of the Corporate Transaction. In addition, the Plan Administrator shall have the discretionary authority to structure one or more of the Corporation's repurchase rights under the Discretionary Option Grant Program so that those rights shall immediately terminate at the time of such Corporate Transaction and shall not be assignable to the successor corporation (or parent thereof), and the shares subject to those terminated rights shall accordingly vest in full at the time of such Corporate Transaction.

F. The Plan Administrator shall have full power and authority to structure one or more outstanding Awards under the Discretionary Option Grant Program so that those Awards shall immediately vest and become exercisable for all the shares of Common Stock at the time subject to those Awards in the event the Optionee's Service is subsequently terminated by reason of an Involuntary Termination within a designated period (not to exceed eighteen (18) months) following the effective date of any Corporate Transaction in which those Awards do not otherwise vest on an accelerated basis. Any Awards so accelerated shall remain exercisable as to fully vested shares until the expiration or sooner termination of their term. In addition, the Plan Administrator may structure one or more of the Corporation's repurchase rights under the Discretionary Option Grant Program so that those rights shall immediately terminate with respect

9

to any shares held by the Optionee at the time of his or her Involuntary Termination, and the shares subject to those terminated repurchase rights shall accordingly vest in full at that time.

G. The Plan Administrator shall have the discretionary authority to structure one or more outstanding Awards under the Discretionary Option Grant Program so that those Awards shall, immediately prior to the effective date of a Change in Control or Hostile Take–Over, as the case may be, vest and become exercisable for all the shares of Common Stock at the time subject to those Awards and may be exercised for any or all of those shares as fully vested shares of Common Stock. In addition, the Plan Administrator shall have the discretionary authority to structure one or more of the Corporation's repurchase rights under the Discretionary Option Grant Program so that those rights shall terminate automatically upon the consummation of such Change in Control or Hostile Take–Over, as the case may be, and the shares subject to those terminated rights shall thereupon vest in full. Alternatively, the Plan Administrator may condition the automatic acceleration of one or more outstanding Awards under the Discretionary Option Grant Program and the termination of one or more of the Corporation's outstanding repurchase rights under such program upon the Involuntary Termination of the Optionee's Service within a designated period (not to exceed eighteen (18) months) following the effective date of such Change in Control or Hostile Take–Over, as the case may be. Each Award so accelerated shall remain exercisable for fully vested shares until the expiration or sooner termination of their term.

H. The portion of any Incentive Option accelerated in connection with a Corporate Transaction or Change in Control or Hostile Take–Over shall remain exercisable as an Incentive Option only to the extent the applicable One Hundred Thousand Dollar ($100,000) limitation is not exceeded. To the extent such dollar limitation is exceeded, the accelerated portion of such option shall be exercisable as a Nonstatutory Option under the Federal tax laws.

I. Awards outstanding shall in no way affect the right of the Corporation to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate or sell or transfer all or any part of its business or assets.

2.4. STOCK APPRECIATION RIGHTS

A. The Plan Administrator shall have full power and authority to grant to selected Optionees tandem stock appreciation rights and/or limited stock appreciation rights.

B. The following terms shall govern the grant and exercise of tandem stock appreciation rights:

(i) One or more Optionees may be granted the right, exercisable upon such terms as the Plan Administrator may establish, to elect between the exercise of the underlying option for shares of Common Stock and the surrender of that option in exchange for a distribution from the Corporation in an amount equal to the excess of (a) the Fair Market Value (on the option surrender date) of the number of shares in which the Optionee is at the time vested under the surrendered option (or surrendered portion thereof) over (b) the aggregate exercise price payable for such shares.

10

(ii) No such option surrender shall be effective unless it is approved by the Plan Administrator, either at the time of the actual option surrender or at any earlier time. If the surrender is so approved, then the distribution to which the Optionee shall be entitled may be made in shares of Common Stock valued at Fair Market Value on the option surrender date, in cash, or partly in shares and partly in cash, as the Plan Administrator shall in its sole discretion deem appropriate.

(iii) If the surrender of an option is not approved by the Plan Administrator, then the Optionee shall retain whatever rights the Optionee had under the surrendered option (or surrendered portion thereof) on the option surrender date and may exercise such rights at any time prior to the later of (a) five (5) business days after the receipt of the rejection notice or (b) the last day on which the option is otherwise exercisable in accordance with the terms of the documents evidencing such option, but in no event may such rights be exercised more than ten (10) years after the option grant date.

C. The following terms shall govern the grant and exercise of limited stock appreciation rights:

(i) One or more Section 16 Insiders may be granted limited stock appreciation rights with respect to their outstanding options.

(ii) Upon the occurrence of a Hostile Take–Over, each individual holding one or more options with such a limited stock appreciation right shall have the unconditional right (exercisable for a thirty (30)–day period following such Hostile Take–Over) to surrender each such option to the Corporation. In return for the surrendered option, the Optionee shall receive a cash distribution from the Corporation in an amount equal to the excess of (A) the Take–Over Price of the shares of Common Stock at the time subject to such option (whether or not the option is otherwise at that time exercisable for those shares) over (B) the aggregate exercise price payable for those shares. Such cash distribution shall be paid within five (5) days following the option surrender date.

(iii) At the time such limited stock appreciation right is granted, the Plan Administrator shall pre–approve any subsequent exercise of that right in accordance with the terms of this Paragraph C. Accordingly, no further approval of the Plan Administrator or the Board shall be required at the time of the actual option surrender and cash distribution.

2.5. ONE–TIME EXCHANGE.

Notwithstanding any other provision of the Plan to the contrary, upon approval of the Corporation's stockholders, the Plan Administrator may provide for, and the Corporation may implement, a one–time only option exchange offer, pursuant to which certain outstanding Non–Statutory Options could, at the election of the person holding such Non–Statutory Option, be tendered to the Corporation for cancellation in exchange for the issuance of a lesser amount of Non–Statutory Options with a lower exercise price, provided that such one–time only option exchange offer is commenced within twelve (12) months of the date of such stockholder approval.

11

ARTICLE THREE
RESTRICTED STOCK PROGRAM

3.1. RESTRICTED STOCK TERMS

A. ISSUANCES. Shares of Restricted Stock may be issued under the Restricted Stock Program at the discretion of the Plan Administrator through direct and immediate issuances without any intervening option grants. Each such issuance of Restricted Stock shall be evidenced by a Restricted Stock Agreement that complies with the terms specified below and such other provisions as the Plan Administrator shall determine. Participants shall have no rights with respect to the shares of Restricted Stock covered by a Restricted Stock Agreement until the Participant has paid the full purchase price, if any, to the Corporation and has executed and delivered to the Corporation the applicable Restricted Stock Agreement.

B. PURCHASE PRICE.

1. The purchase price per share of Restricted Stock issued under the Restricted Stock Program shall be fixed by the Plan Administrator in its sole discretion, including no consideration or such minimum consideration as may be required by applicable law.

2. Shares of Restricted Stock may be issued under the Restricted Stock Program for any of the following items of consideration that the Plan Administrator may deem appropriate in each individual instance:

(i) cash or check made payable to the Corporation; or

(ii) any other valid form of consideration permissible under the Delaware General Corporation Law at the time such shares are issued.

C. VESTING PROVISIONS

1. Shares of Restricted Stock issued under the Restricted Stock Program may, in the discretion of the Plan Administrator, vest in one or more installments over the Participant's period of Service and/or upon attainment of specified performance objectives or such other criteria as the Plan Administrator shall determine. The elements of the vesting schedule applicable to any unvested shares of Restricted Stock issued under the Restricted Stock Program shall be determined by the Plan Administrator and incorporated into the Restricted Stock Agreement. Notwithstanding the foregoing, Awards of Restricted Stock issued subject to time–based vesting under the Restricted Stock Program may not be made with a vesting schedule providing for full vesting in less than three years from the date awarded. Awards of Restricted Stock issued subject to performance–based vesting, as provided in Section 3.1.C.2 below, may not vest unless the Participant remains in the Corporation's Service for at least one year following the date awarded.

2. The Plan Administrator shall also have the discretionary authority, consistent with Code Section 162(m), to structure one or more Awards under the Restricted Stock Program so that the shares of Restricted Stock subject to those Awards shall vest upon the

12

achievement of certain pre–established corporate performance goals based on one or more of the following criteria: (i) return on total shareholder equity; (ii) earnings or net income per share of Common Stock; (iii) net income or operating income; (iv) earnings before interest, taxes, depreciation, amortization and stock–based compensation costs, or operating income before depreciation and amortization; (v) sales or revenue targets; (vi) return on assets, capital or investment; (vii) cash flow; (viii) market share; (ix) cost reduction goals; (x) budget comparisons; (xi) implementation or completion of projects or processes strategic or critical to the Corporation's business operations; (xii) measures of customer satisfaction; (xiii) any combination of, or a specified increase in, any of the foregoing; and (xiv) the formation of joint ventures, research and development collaborations, marketing or customer service collaborations, or the completion of other corporate transactions intended to enhance the Corporation's revenue or profitability or expand its customer base; provided, however, that for purposes of items (ii), (iii), (iv) and (vii) above, the Plan Administrator may, at the time the Awards under the Restricted Stock Program are made, specify certain adjustments to such items as reported in accordance with generally accepted accounting principles in the U.S. ("GAAP"), which will exclude from the calculation of those performance goals one or more of the following: certain charges related to acquisitions, stock–based compensation, employer payroll tax expense on certain stock option exercises, settlement costs, restructuring costs, gains or losses on strategic investments, non–operating gains or losses, certain other non–cash charges, valuation allowance on deferred tax assets, and the related income tax effects, purchases of property and equipment, and any extraordinary non–recurring items as described in Accounting Principles Board Opinion No. 30, provided that such adjustments are in conformity with those reported by the Corporation on a non–GAAP basis. In addition, such performance goals may be based upon the attainment of specified levels of the Corporation's performance under one or more of the measures described above relative to the performance of other entities and may also be based on the performance of any of the Corporation's business groups or divisions or any Parent or Subsidiary. Performance goals may include a minimum threshold level of performance below which no award will be earned, levels of performance at which specified portions of an award will be earned and a maximum level of performance at which an award will be fully earned. The Plan Administrator may provide that, if the actual level of attainment for any performance objective is between two specified levels, the amount of the Award attributable to that performance objective shall be interpolated on a straight–line basis.

3. Any new, substituted or additional securities or other property (including money paid other than as a regular cash dividend) which the Participant may have the right to receive with respect to the Participant's unvested shares of Restricted Stock by reason of any stock dividend, stock split, recapitalization, combination of shares, exchange of shares or other change affecting the outstanding Common Stock as a class without the Corporation's receipt of consideration shall be issued subject to (i) the same vesting requirements applicable to the Participant's unvested shares of Restricted Stock and (ii) such escrow arrangements as the Plan Administrator shall deem appropriate.

4. The Participant shall have full voting rights with respect to any shares of Restricted Stock issued to the Participant under the Restricted Stock Program, whether or not the Participant's interest in those shares is vested. Unless otherwise provided by the Plan Administrator in the Restricted Stock Agreement, Participant shall also have the right to receive any regular cash dividends paid on such shares. The Plan Administrator may apply any

13

restrictions to the dividends that the Plan Administrator deems appropriate. Without limiting the generality of the preceding sentence, if the grant or vesting of shares of Restricted Stock is designed to comply with the requirements of the performance–based exception from the tax deductibility limitations of Code Section 162(m), the Plan Administrator may apply any restrictions it deems appropriate to the payment of dividends declared with respect to such shares of Restricted Stock, such that the dividends and/or the shares of Restricted Stock maintain eligibility for such exception.

     5. The effect which death, Permanent Disability, termination of Service (other than for Misconduct) or other event designated by the Plan Administrator is to have upon the vesting schedule of a Restricted Stock Award shall be determined by the Plan Administrator and incorporated into the Restricted Stock Agreement.

     6. Should the Participant's Service be terminated for Misconduct or should the Participant otherwise engage in Misconduct while holding one or more unvested shares of Restricted Stock, then all such unvested shares of Restricted Stock shall be immediately surrendered to the Corporation for cancellation, and the Participant shall have no further stockholder rights with respect to those shares. To the extent the surrendered shares of Restricted Stock were previously issued to the Participant for consideration paid in cash, cash equivalent or otherwise, the Corporation shall repay to the Participant the same form of consideration as the Participant paid for the surrendered shares.

     7. Should the Participant cease to remain in Service while holding one or more unvested shares of Restricted Stock issued under the Restricted Stock Program or should the performance objectives or other criteria not be attained with respect to one or more such unvested shares of Restricted Stock, then those shares shall be immediately surrendered to the Corporation for cancellation, and the Participant shall have no further stockholder rights with respect to those shares. To the extent the surrendered shares were previously issued to the Participant for consideration paid in cash, cash equivalent or otherwise, the Corporation shall repay to the Participant the same form of consideration as the Participant paid for the surrendered shares.

     8. In the event of the Participant's death, Permanent Disability, termination of Service (other than for Misconduct), retirement or a Corporate Transaction or Change in Control, the Plan Administrator may in its discretion waive the surrender and cancellation of one or more unvested shares of Restricted Stock (or other assets attributable thereto) which would otherwise occur upon the cessation of the Participant's Service or the non–attainment of the performance objectives or other criteria applicable to those shares. The Plan Administrator shall not otherwise have discretion to waive the surrender and cancellation of unvested shares of Restricted Stock (or other assets attributable thereto) which would otherwise occur pursuant to a previously determined vesting schedule. Any such waiver shall result in the immediate vesting of the Participant's interest in the shares of Restricted Stock as to which the waiver applies. Such waiver may be effected at any time, whether before or after the Participant's cessation of Service or the attainment or non–attainment of the applicable performance objectives or other criteria. However, no vesting requirements tied to the attainment of performance objectives may be waived with respect to shares that were intended at the time of issuance to qualify as

14

performance–based compensation under Code Section 162(m), except as otherwise provided in Section 3.2.D of this Article Three.

3.2. CORPORATE TRANSACTION/CHANGE IN CONTROL

A. No shares of Restricted Stock shall vest at the time of a Corporate Transaction on an accelerated basis if and to the extent that (i) the Restricted Stock Agreement is, in connection with the Corporate Transaction, continued or assumed by the successor corporation (or parent thereof) or otherwise continued in full force and effect pursuant to the express terms of the Corporate Transaction, (ii) substitution of new agreements of comparable value covering shares of the successor corporation (or parent thereof) in exchange for such shares of Restricted Stock, with appropriate adjustments as to the number and kind of shares and purchase price, is provided for pursuant to the express terms of the Corporate Transaction or (iii) such accelerated vesting is precluded by other limitations imposed by the Plan Administrator. However, if none of the foregoing conditions are satisfied, immediately prior to the effective date of the Corporate Transaction, all the shares of Restricted Stock shall automatically vest in full.

B. The Plan Administrator shall have the discretionary authority, exercisable either at the time the unvested shares of Restricted Stock are issued or at any time while they remain outstanding under the Plan, to provide that the unvested shares of Restricted Stock shall immediately vest upon a Corporate Transaction or Change in Control or upon an event or events associated with or following such transactions, including termination of Service.

C. If the Restricted Stock Agreement is continued or assumed by a successor corporation (or parent thereof) or otherwise continued in full force and effect pursuant to the terms of the Corporate Transaction or such accelerated vesting is precluded by other limitations imposed by the Plan Administrator, each outstanding Award under the Restricted Stock Program in effect shall be adjusted immediately after the consummation of that Corporate Transaction to apply to the number and class of securities into which the shares of Restricted Stock subject to the Award immediately prior to the Corporate Transaction would have been converted upon consummation of such Corporate Transaction had those shares actually been outstanding and vested at that time, and appropriate adjustments shall also be made to the consideration (if any) payable per share thereunder, *provided* that the aggregate amount of such consideration shall remain the same.

D. The Plan Administrator's authority under Paragraph B of this Section 3.2 shall also extend to any Awards intended to qualify as performance–based compensation under Code Section 162(m), even though the automatic vesting of those Awards pursuant to Paragraph B of this Section 3.2 may result in their loss of performance–based status under Code Section 162(m).

3.3. TRANSFERABILITY OF RESTRICTED STOCK

Unvested shares of Restricted Stock may not be assigned, transferred, pledged or otherwise encumbered or disposed of other than by will or the laws of inheritance following the Participant's death. Upon vesting, and after all other conditions and restrictions applicable to such shares of Restricted Stock have been satisfied or lapse (including satisfaction of any applicable Withholding Tax) pursuant to the applicable Restricted Stock Agreement, such shares

15

of Restricted Stock shall become freely transferable (subject to any restrictions under applicable securities laws) by Participant.

3.4. DELIVERY OF SHARES/LEGENDS

Unvested shares of Restricted Stock may, in the Plan Administrator's discretion, be issued in book entry or certificate form and shall remain in the possession or control of the Corporation until such shares have vested, and all other conditions and restrictions applicable to such shares have been satisfied or lapse (including satisfaction of any applicable Withholding Tax), in accordance with the terms of the Restricted Stock Agreement. If issued in certificate form, such certificates shall include such restrictive legends as deemed appropriate by the Plan Administrator. The Plan Administrator may require a stock power endorsed in blank with respect to shares of Restricted Stock.

ARTICLE FOUR

RESTRICTED STOCK UNIT PROGRAM

4.1. RESTRICTED STOCK UNIT TERMS

A. ISSUANCES. Restricted Stock Units which entitle the Participant to receive shares of Common Stock underlying those units over the Participant's period of Service and/or upon attainment of specified performance objectives or such other criteria as the Plan Administrator shall determine may be issued under the Restricted Stock Unit Program at the discretion of the Plan Administrator. Each such issuance of Restricted Stock Units shall be evidenced by a Restricted Stock Unit Agreement that complies with the terms specified below and such other provisions as the Plan Administrator shall determine. Participants shall have no rights with respect to the Restricted Stock Units covered by a Restricted Stock Unit Agreement until the Participant has paid the full purchase price, if any, to the Corporation and has executed and delivered to the Corporation the applicable Restricted Stock Unit Agreement.

B. PURCHASE PRICE.

1. The purchase price for Restricted Stock Units issued under the Restricted Stock Unit Program shall be fixed by the Plan Administrator in its sole discretion, including no consideration or such minimum consideration as may be required by applicable law.

2. Restricted Stock Units may be issued under the Restricted Stock Unit Program for any of the following items of consideration that the Plan Administrator may deem appropriate in each individual instance:

(i) cash or check made payable to the Corporation; or

(ii) any other valid form of consideration permissible under the Delaware General Corporation Law at the time such units are issued.

16

## C. VESTING PROVISIONS

1. Restricted Stock Units issued under the Restricted Stock Unit Program may, in the discretion of the Plan Administrator, vest in one or more installments over the Participant's period of Service and/or upon attainment of specified performance objectives or such other criteria as the Plan Administrator shall determine. The elements of the vesting schedule applicable to any unvested Restricted Stock Units issued under the Restricted Stock Unit Program shall be determined by the Plan Administrator and incorporated into the Restricted Stock Unit Agreement. Notwithstanding the foregoing, Awards of Restricted Stock Units issued subject to time–based vesting under the Restricted Stock Unit Program may not be made with a vesting schedule providing for full vesting in less than three years from the date awarded. Awards of Restricted Stock Units issued subject to performance–based vesting, as provided in Section 4.1.C.2 below, may not vest unless the Participant remains in the Corporation's Service for at least one year following the date awarded.

2. The Plan Administrator shall also have the discretionary authority, consistent with Code Section 162(m), to structure one or more Awards under the Restricted Stock Unit Program so that the Restricted Stock Units subject to those Awards shall vest upon the achievement of certain pre–established corporate performance goals based on one or more of the following criteria: (i) return on total shareholder equity; (ii) earnings or net income per share of Common Stock; (iii) net income or operating income; (iv) earnings before interest, taxes, depreciation, amortization and stock–based compensation costs, or operating income before depreciation and amortization; (v) sales or revenue targets; (vi) return on assets, capital or investment; (vii) cash flow; (viii) market share; (ix) cost reduction goals; (x) budget comparisons; (xi) implementation or completion of projects or processes strategic or critical to the Corporation's business operations; (xii) measures of customer satisfaction; (xiii) any combination of, or a specified increase in, any of the foregoing; and (xiv) the formation of joint ventures, research and development collaborations, marketing or customer service collaborations, or the completion of other corporate transactions intended to enhance the Corporation's revenue or profitability or expand its customer base; provided, however, that for purposes of items (ii), (iii), (iv) and (vii) above, the Plan Administrator may, at the time the Awards under the Restricted Stock Unit Program are made, specify certain adjustments to such items as reported in accordance with GAAP, which will exclude from the calculation of those performance goals one or more of the following: certain charges related to acquisitions, stock–based compensation, employer payroll tax expense on certain stock option exercises, settlement costs, restructuring costs, gains or losses on strategic investments, non–operating gains or losses, certain other non–cash charges, valuation allowance on deferred tax assets, and the related income tax effects, purchases of property and equipment, and any extraordinary non–recurring items as described in Accounting Principles Board Opinion No. 30, provided that such adjustments are in conformity with those reported by the Corporation on a non–GAAP basis. In addition, such performance goals may be based upon the attainment of specified levels of the Corporation's performance under one or more of the measures described above relative to the performance of other entities and may also be based on the performance of any of the Corporation's business groups or divisions or any Parent or Subsidiary. Performance goals may include a minimum threshold level of performance below which no award will be earned, levels of performance at which specified portions of an award will be earned and a maximum level of performance at which an award will be fully earned. The Plan Administrator may provide that, if the actual level of attainment for any performance objective is between two specified levels, the

17

amount of the Award attributable to that performance objective shall be interpolated on a straight–line basis.

    3. The Participant shall not have any stockholder rights with respect to the shares of Common Stock subject to a Restricted Stock Unit until that Award vests, all other conditions and restrictions applicable to such Restricted Stock Unit have been satisfied or lapsed (including satisfaction of any applicable Withholding Tax) pursuant to the applicable Restricted Stock Unit Agreement, and the shares of Common Stock are actually issued thereunder. However, dividend–equivalent units may be paid or credited, either in cash or in actual or phantom shares of Common Stock, on outstanding Restricted Stock Unit Awards, subject to such terms and conditions as the Plan Administrator may deem appropriate.

    4. The effect which death, Permanent Disability, termination of Service (other than for Misconduct) or other event designated by the Plan Administrator is to have upon the vesting schedule of a Restricted Stock Unit Award shall be determined by the Plan Administrator and incorporated into the Restricted Stock Unit Agreement.

    5. Should the Participant's Service be terminated for Misconduct or should the Participant otherwise engage in Misconduct while holding one or more unvested Restricted Stock Units, then all such unvested Restricted Stock Units shall be immediately and automatically canceled, no shares of Common Stock will be issued in satisfaction of those units, and the Participant shall have no further rights with respect to those units. To the extent the canceled Restricted Stock Units were previously issued to the Participant for consideration paid in cash, cash equivalent or otherwise, the Corporation shall repay to the Participant the same form of consideration as the Participant paid for the canceled units.

    6. Should the Participant cease to remain in Service while holding one or more unvested Restricted Stock Units issued under the Restricted Stock Unit Program or should the performance objectives not be attained with respect to one or more such unvested Restricted Stock Units, then those units shall be immediately and automatically canceled, no shares of Common Stock will be issued in satisfaction of those units, and the Participant shall have no further rights with respect to those units. To the extent the canceled Restricted Stock Units were previously issued to the Participant for consideration paid in cash, cash equivalent or otherwise, the Corporation shall repay to the Participant the same form of consideration as the Participant paid for the canceled units.

    7. Outstanding Restricted Stock Units under the Restricted Stock Unit Program shall automatically terminate, and no shares of Common Stock shall actually be issued in satisfaction of those units, if the performance goals or other criteria established for such units or the Service requirements established for such units are not attained or satisfied. The Plan Administrator, however, shall have the discretionary authority to issue vested shares of Common Stock under one or more outstanding Restricted Stock Units as to which the designated performance goals or other criteria or Service requirements have not been attained or satisfied, but only in the event of the Participant's death, Permanent Disability, termination of Service (other than for Misconduct), retirement or a Corporate Transaction or Change in Control. The Plan Administrator shall not otherwise have discretion to waive the surrender and cancellation of unvested Restricted Stock Units (or other assets attributable thereto) which would otherwise

occur pursuant to a previously determined vesting schedule. However, no vesting requirements tied to the attainment of performance goals may be waived with respect to Awards of Restricted Stock Units which were at the time of grant intended to qualify as performance–based compensation under Code Section 162(m), except as otherwise provided in Section 4.2.D of this Article Four.

4.2.   CORPORATE TRANSACTION/CHANGE IN CONTROL

A. No Restricted Stock Units shall vest at the time of a Corporate Transaction on an accelerated basis if and to the extent that (i) the Restricted Stock Unit Agreement is, in connection with the Corporate Transaction, continued or assumed by the successor corporation (or parent thereof) or otherwise continued in full force and effect pursuant to the express terms of the Corporate Transaction, (ii) substitution of new agreements of comparable value covering shares of the successor corporation (or parent thereof) in exchange for such Restricted Stock Units, with appropriate adjustments as to the number and kind of shares and purchase price, is provided for pursuant to the terms of the Corporate Transaction or (iii) such accelerated vesting is precluded by other limitations imposed by the Plan Administrator. However, if none of the foregoing conditions are satisfied, immediately prior to the effective date of the Corporate Transaction, all the unvested Restricted Stock Units shall automatically vest in full.

B. The Plan Administrator shall have the discretionary authority, exercisable either at the time the unvested Restricted Stock Units are issued or at any time while they remain outstanding under the Plan, to provide that the unvested Restricted Stock Units shall immediately vest upon a Corporate Transaction or Change in Control or upon an event or events associated with or following such transactions, including termination of Service.

C. If the Restricted Stock Unit Agreement is continued or assumed by a successor corporation (or parent thereof) or otherwise continued in full force and effect pursuant to the express terms of the Corporate Transaction or such accelerated vesting is precluded by other limitations imposed by the Plan Administrator, each outstanding Award under the Restricted Stock Unit Program in effect shall be adjusted immediately after the consummation of that Corporate Transaction to apply to the number and class of securities into which the shares of Common Stock underlying those Restricted Stock Units subject to the Award immediately prior to the Corporate Transaction would have been converted in consummation of such Corporate Transaction had those units actually been outstanding and vested at that time, and appropriate adjustments shall also be made to the consideration (if any) payable per unit thereunder, *provided* that the aggregate amount of such consideration shall remain the same.

D. The Plan Administrator's authority under Paragraph B of this Section 4.2 shall also extend to any Awards intended to qualify as performance–based compensation under Code Section 162(m), even though the automatic vesting of those Awards pursuant to Paragraph B of this Section 4.2 may result in their loss of performance–based status under Code Section 162(m).

4.3.   TRANSFERABILITY OF RESTRICTED STOCK UNITS

Until vested, Restricted Stock Units may not be assigned, transferred, pledged or otherwise encumbered or disposed of other than by will or the laws of inheritance following the

19

Participant's death. Upon vesting, and after all other conditions and restrictions applicable to such Common Stock subject to such Restricted Stock Units have been satisfied or lapse (including satisfaction of any applicable Withholding Tax) pursuant to the applicable Restricted Stock Unit Agreement, the shares of Common Stock subject to such Restricted Stock Unit shall become freely transferable (subject to any restrictions under applicable securities laws) by Participant.

4.4.   DELIVERY OF SHARES/COMPLIANCE WITH SECTION 409A

A. Upon vesting and satisfaction of all other conditions and restrictions applicable to the Restricted Stock Units (including satisfaction of any applicable Withholding Tax) pursuant to the applicable Restricted Stock Unit Agreement, certificates representing the shares of Common Stock underlying such Restricted Stock Units shall be issued to Participant.

B. Notwithstanding the foregoing, the Plan Administrator may permit or require a Participant to defer such Participant's delivery of shares of Common Stock that would otherwise be due to such Participant with respect to the Restricted Stock Units. If any such deferral or election is required or permitted, the Plan Administrator shall, in its sole discretion, establish rules and procedures for such delivery deferrals which shall be consistent with the requirements of Code Section 409A and the Treasury regulations and rules promulgated thereunder, and including the requirement that the deferral election be entered into at the time of the grant and that the delivery date thereof be consistent with a permissible distribution date under Code Section 409A.

ARTICLE FIVE

DIRECTOR AUTOMATIC GRANT PROGRAM

5.1.   TERMS

This Article Five of the Plan was amended and restated effective as of March 26, 2010. All options outstanding under the Automatic Option Grant Program on March 26, 2010 continued in full force and effect in accordance with the existing terms of the agreements evidencing those options, and no change in this Article Five affected those options.

A. GRANT/ISSUANCE DATES. Grants and issuances under this amended and restated Article Five shall be made on the dates specified below:

1. On the date of each annual meeting of stockholders, beginning with the 2010 Annual Meeting of Stockholders, each individual who is to continue to serve as an Eligible Director, whether or not that individual is standing for re–election to the Board at that particular annual meeting, shall automatically be issued 15,000 shares of Restricted Stock and granted a Non–Statutory Option to purchase 25,000 shares of Common Stock, provided that such individual has served as an Eligible Director for at least six (6) months. There shall be no limit on the number of such annual option grants and Restricted Stock Awards any one Eligible Director may receive over his or her period of Board Service.

20

2. Each individual who is first elected or appointed as an Eligible Director at any time on or after the 2010 Annual Meeting of Stockholders, other than at an annual meeting of stockholders, shall, on the date he or she commences Service as an Eligible Director, automatically be issued 15,000 shares of Restricted Stock and granted a Non–Statutory Option to purchase 25,000 shares of Common Stock.

3. Each such issuance of Restricted Stock pursuant to the Director Automatic Grant Program shall be evidenced by a Restricted Stock Agreement that complies with the terms specified below. Participants shall have no rights with respect to the shares of Restricted Stock covered by a Restricted Stock Agreement until the Participant has executed and delivered to the Corporation the applicable Restricted Stock Agreement.

B. OPTION EXERCISE PRICE

1. The exercise price per share for each option granted under this Article Five shall be equal to one hundred percent (100%) of the Fair Market Value per share of Common Stock on the option grant date.

2. The exercise price shall be payable in one or more of the alternative forms authorized under the Discretionary Option Grant Program. Except to the extent the sale and remittance procedure specified thereunder is utilized, payment of the exercise price for the purchased shares must be made on the Exercise Date.

C. OPTION TERM. Each option shall have a term of seven (7) years measured from the option grant date.

D. EXERCISE AND VESTING OF OPTIONS. Each option shall be immediately exercisable and fully vested as of the grant date for any or all of the option shares.

E. TRANSFERABILITY OF OPTIONS. Each option granted under the Director Automatic Grant Program may be assigned in whole or in part during the Optionee's lifetime by gift or pursuant to a domestic relations order to one or more Family Members of the Optionee or to a trust established exclusively for Optionee and/or one or more such Family Members. The assigned portion may only be exercised by the person or persons who acquire a proprietary interest in the option pursuant to the assignment. The terms applicable to the assigned portion shall be the same as those in effect for the option immediately prior to such assignment and shall be set forth in such documents issued to the assignee as the Plan Administrator may deem appropriate. The Optionee may also designate one or more persons as the beneficiary or beneficiaries of his or her outstanding options under this Article Five, and those options shall, in accordance with such designation, automatically be transferred to such beneficiary or beneficiaries upon the Optionee's death while holding those options. Such beneficiary or beneficiaries shall take the transferred options subject to all the terms and conditions of the applicable agreement evidencing each such transferred option, including (without limitation) the limited time period during which the option may be exercised following the Optionee's death.

F. TERMINATION OF BOARD SERVICE. The following provisions shall govern the exercise of any outstanding options under the Director Automatic Grant Program held by the Optionee at the time the Optionee ceases to serve as a Board member:

21

(i) Subject to (ii) below, the Optionee (or, in the event of Optionee's death, the personal representative of the Optionee's estate or the person or persons to whom the option is transferred pursuant to the Optionee's will or the laws of inheritance or the designated beneficiary or beneficiaries of such option) shall have a twelve (12)–month period following the date of such cessation of Board service in which to exercise each such option.

(ii) In no event shall the option remain exercisable after the expiration of the option term. Upon the expiration of the twelve (12)–month exercise period or (if earlier) upon the expiration of the option term, the option shall terminate and cease to be outstanding for any shares for which the option has not been exercised.

G. VESTING OF RESTRICTED STOCK. Each Restricted Stock Award under the Director Automatic Grant Program shall vest in a series of three successive annual installments over the three–year period measured from the grant date of such Award.

1. The annual vesting dates for Restricted Stock Awards pursuant to Section 5.1.A.1 shall be as follows:

(i) 5,000 shares of Restricted Stock shall vest on the earlier of (i) the first anniversary of the grant date of such Award or (ii) the day immediately preceding the date of the first annual meeting of stockholders following the grant date of such Award;

(ii) 5,000 shares of Restricted Stock shall vest on the earlier of (i) the second anniversary of the grant date of such Award or (ii) the day immediately preceding the date of the second annual meeting of stockholders following the grant date of such Award; and

(iii) 5,000 shares of Restricted Stock shall vest on the earlier of (i) the third anniversary of the grant date of such Award or (ii) the day immediately preceding the date of the third annual meeting of stockholders following the grant date of such Award.

2. The annual vesting dates for Restricted Stock Awards pursuant to Section 5.1.A.2 shall be as follows:

(i) 5,000 shares of Restricted Stock shall vest on the first anniversary of the grant date of such Award;

(ii) 5,000 shares of Restricted Stock shall vest on the second anniversary of the grant date of such Award; and

(iii) 5,000 shares of Restricted Stock shall vest on the third anniversary of the grant date of such Award.

The Board member shall not vest in any additional shares of Restricted Stock following his or her cessation of Service as a Board member; provided, however, that each Restricted Stock Award held by an Eligible Director under the Director Automatic Grant Program will immediately vest in full upon his or her cessation of Board Service by reason of death or Permanent Disability. Upon the cessation of Service of any Board member while holding one or more unvested shares of Restricted Stock issued under the Director Automatic Grant Program,

22

those unvested shares of Restricted Stock shall be immediately surrendered to the Corporation for cancellation, and the Board member shall have no further stockholder rights with respect to those shares.

    3. Unvested shares of Restricted Stock may be issued in book entry or certificate form and shall remain in the possession or control of the Corporation until such shares have vested, and all other conditions and restrictions applicable to such shares have been satisfied or lapse (including satisfaction of any applicable Withholding Tax), in accordance with the terms of the Restricted Stock Agreement. If issued in certificate form, such certificates shall include restrictive legends. A stock power endorsed in blank with respect to shares of Restricted Stock whether or not certificated will be required.

    H. TRANSFERABILITY OF RESTRICTED STOCK. Unvested shares of Restricted Stock may not be assigned, transferred, pledged or otherwise encumbered or disposed of other than by will or the laws of inheritance following the Participant's death. Upon vesting, and after all other conditions and restrictions applicable to such shares of Restricted Stock have been satisfied or lapse (including satisfaction of any applicable Withholding Tax) pursuant to the applicable Restricted Stock Agreement, such shares of Restricted Stock shall become freely transferable (subject to any restrictions under applicable securities laws) by Participant.

5.2.  CORPORATE TRANSACTION/CHANGE IN CONTROL/HOSTILE TAKE–OVER

    A. In the event of a Corporate Transaction while the Eligible Director remains a Board member, the following provisions shall apply:

    (i) Immediately following the consummation of the Corporate Transaction, each automatic option grant shall terminate and cease to be outstanding, except to the extent assumed by the successor corporation (or parent thereof) or otherwise continued in full force and effect pursuant to the express terms of the Corporate Transaction.

    (ii) The shares of Restricted Stock subject to any outstanding Restricted Stock Award made to such Eligible Director under the Director Automatic Grant Program which remain unvested at the time of such Corporate Transaction shall, immediately prior to the effective date of the Corporate Transaction, automatically vest in full.

    B. In the event of a Change in Control while the Eligible Director remains a Board member, the following provisions shall apply:

    (i) Each automatic option grant to such Eligible Director under the Director Automatic Grant Program shall remain exercisable for such option shares until the expiration or sooner termination of the option term or the surrender of the option in connection with a Hostile Take–Over.

    (ii) The shares of Restricted Stock subject to any outstanding Restricted Stock Award made to such Eligible Director under the Director Automatic Grant Program which remain unvested at the time of such Change in Control shall, immediately prior to the effective date of the Change in Control, automatically vest in full.

23

C. Upon the occurrence of a Hostile Take–Over while the Eligible Director remains a Board member, the Eligible Director shall have a thirty (30)–day period in which to surrender to the Corporation each of his or her outstanding option grants under the Director Automatic Grant Program. The Eligible Director shall in return be entitled to a cash distribution from the Corporation in an amount equal to the excess of (i) the Take–Over Price of the shares of Common Stock at the time subject to each surrendered option (whether or not the Eligible Director is otherwise at the time vested in those shares) over (ii) the aggregate exercise price payable for such shares. Such cash distribution shall be paid within five (5) days following the surrender of the option to the Corporation. No approval or consent of the Board or any Plan Administrator shall be required at the time of the actual option surrender and cash distribution.

D. Each option which is assumed in connection with a Corporate Transaction or otherwise continued in full force or effect shall be appropriately adjusted, immediately after such Corporate Transaction, to apply to the number and class of securities which would have been issuable to the Eligible Director in consummation of such Corporate Transaction had the option been exercised immediately prior to such Corporate Transaction. Appropriate adjustments to reflect such Corporate Transaction shall also be made to (i) the exercise price payable per share under each outstanding option, provided the aggregate exercise price payable for such securities shall remain the same and (ii) the number and/or class of securities for which grants are subsequently to be made under the Director Automatic Grant Program to new and continuing Eligible Directors. To the extent the actual holders of the Corporation's outstanding Common Stock receive cash consideration for their Common Stock in consummation of the Corporate Transaction, the successor corporation may, in connection with the assumption of the outstanding options under the Director Automatic Grant Program, substitute one or more shares of its own common stock with a fair market value equivalent to the cash consideration paid per share of Common Stock in such Corporate Transaction.

E. The existence of any Awards under the Director Automatic Grant Program shall in no way affect the right of the Corporation to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate or sell or transfer all or any part of its business or assets.

5.3.   REMAINING TERMS

A. The remaining terms of each option granted under the Director Automatic Grant Program shall be the same as the terms in effect for option grants made under the Discretionary Option Grant Program.

B. The remaining terms of each Restricted Stock Award under the Director Automatic Grant Program shall be the same as the terms in effect for Restricted Stock Awards under the Restricted Stock Program.

24

# ARTICLE SIX
## MISCELLANEOUS

6.1.  TAX WITHHOLDING

A. The Corporation's obligation to deliver shares of Common Stock upon the issuance, exercise or vesting of Awards under the Plan shall be subject to the satisfaction of all applicable federal, state and local income and employment tax withholding requirements.

B. The Plan Administrator may, in its discretion, provide any or all Optionees or Participants to whom Awards are made under the Plan (other than Awards made under the Director Automatic Grant Program) with the right to use either or both of the following methods to satisfy all or part of the Withholding Taxes to which those holders may become subject in connection with the issuance, exercise or vesting of those Awards:

Stock Withholding: The election to have the Corporation withhold, from the shares of Common Stock otherwise issuable upon the issuance, exercise or vesting of those Awards, a portion of those shares with an aggregate Fair Market Value equal to the percentage of the Withholding Taxes (not to exceed one hundred percent (100%)) designated by the Optionee or Participant and make a cash payment equal to such Fair Market Value directly to the appropriate taxing authorities on such individual's behalf.

Stock Delivery: The election to deliver to the Corporation, at the time the Award is issued, exercised or vests, one or more shares of Common Stock previously acquired by such Optionee or Participant (other than in connection with the option issuance, exercise or vesting triggering the Withholding Taxes) with an aggregate Fair Market Value equal to the percentage of the Withholding Taxes (not to exceed one hundred percent (100%)) designated by such holder. The shares of Common Stock so delivered shall not be added to the shares of Common Stock authorized for issuance under the Plan.

6.2.  EFFECTIVE DATE AND TERM OF THE PLAN

A. The Plan became effective on the Plan Effective Date. Awards may be granted under the Discretionary Option Grant Program, the Restricted Stock Program, the Restricted Stock Unit Program and the Director Automatic Grant Program.

B. The Plan shall serve as the successor to the Predecessor Plans, and no further option grants shall be made under the Predecessor Plans after the Plan Effective Date. All options outstanding under the Predecessor Plans on the Plan Effective Date were incorporated into the Plan at that time and shall be treated as outstanding options under the Plan. However, each outstanding option so incorporated shall continue to be governed solely by the terms of the documents evidencing such option, and no provision of the Plan shall be deemed to affect or otherwise modify the rights or obligations of the holders of such incorporated options with respect to their acquisition of shares of Common Stock.

C. One or more provisions of the Plan, including (without limitation) the option/vesting acceleration provisions of Article Two relating to Corporate Transactions, Change

in Control and Hostile Take–Over may, in the Plan Administrator's discretion, be extended to one or more options incorporated from the Predecessor Plans which do not otherwise contain such provisions.

D. The Plan was restated by the Board on March 26, 2010 to reflect all prior amendments.

E. The Plan shall terminate upon the earliest to occur of (i) February 5, 2019, (ii) the date on which all shares available for issuance under the Plan shall have been issued as fully–vested shares or (iii) the termination of all outstanding Awards in connection with a Corporate Transaction. Should the Plan terminate on February 5, 2019, then all Awards outstanding at that time shall continue to have force and effect in accordance with the provisions of the documents evidencing such Awards.

6.3.   AMENDMENT OF THE PLAN.

Except as provided below, the Board shall have complete and exclusive power and authority to amend, modify, suspend or terminate the Plan in any or all respects. However, no such amendment, modification, suspension or termination shall adversely affect the rights and obligations with respect to Awards at the time outstanding under the Plan unless the Optionee or the Participant consents to such amendment or modification or, unless approved by the stockholders, permit the Plan Administrator to reset the exercise price of outstanding options or grant new Awards in exchange for the cancellation of outstanding options with a higher exercise price. In addition, stockholder approval will be required for any amendment to the Plan that would (i) materially increase the benefits accruing to the Optionees and Participants under the Plan or materially reduce the price at which shares of Common Stock may be issued or purchased under the Plan, (ii) materially increase the aggregate number of securities that may be issued under the Plan, (iii) materially modify the requirements as to eligibility for participation in the Plan, (iv) materially extend the term of the Plan or (v) expand the type of awards available for issuance under the Plan, then to the extent required by applicable law, or deemed necessary or advisable by the Plan Administrator or the Board of Directors, such amendment shall be subject to stockholder approval.

6.4.   USE OF PROCEEDS

Any cash proceeds received by the Corporation from the sale of shares of Common Stock under the Plan shall be used for general corporate purposes.

6.5.   REGULATORY APPROVALS

A. The implementation of the Plan, the grant of any Award and the issuance of shares of Common Stock in connection with the issuance, exercise or vesting of any Award shall be subject to the Corporation's procurement of all approvals and permits required by regulatory authorities having jurisdiction over the Plan, Awards made under the Plan and the shares of Common Stock issuable pursuant to those Awards.

B. No shares of Common Stock or other assets shall be issued or delivered under the Plan unless and until there shall have been compliance with all applicable requirements of

26

Federal and state securities laws, including the filing and effectiveness of the Form S–8 registration statement for the shares of Common Stock issuable under the Plan, and all applicable listing requirements of any stock exchange on which Common Stock is then listed for trading.

6.6.   NO EMPLOYMENT/SERVICE RIGHTS

Nothing in the Plan shall confer upon the Optionee or the Participant any right to continue in Service for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Corporation (or any Parent or Subsidiary employing or retaining such person) or of the Optionee or the Participant, which rights are hereby expressly reserved by each, to terminate such person's Service at any time for any reason, with or without cause.

27

## APPENDIX

The following definitions shall be in effect under the Plan:

A. **Award** shall mean any of the following stock or stock–based awards authorized for issuance or grant under the Plan: stock option, stock appreciation right, Restricted Stock or Restricted Stock Unit award.

B. **Board** shall mean the Corporation's Board of Directors.

C. **Change in Control** shall mean a change in ownership or control of the Corporation effected through either of the following transactions:

(i) the acquisition, directly or indirectly by any person or related group of persons (other than the Corporation or a person that directly or indirectly controls, is controlled by, or is under common control with, the Corporation), of beneficial ownership (within the meaning of Rule 13d–3 of the 1934 Act) of securities possessing more than fifty percent (50%) of the total combined voting power of the Corporation's outstanding securities pursuant to a tender or exchange offer made directly to the Corporation's stockholders, or

(ii) a change in the composition of the Board over a period of thirty–six (36) consecutive months or less such that a majority of the Board members ceases, by reason of one or more contested elections for Board membership, to be comprised of individuals who either (A) have been Board members continuously since the beginning of such period or (B) have been elected or nominated for election as Board members during such period by at least a majority of the Board members described in clause (A) who were still in office at the time the Board approved such election or nomination.

D. **Code** shall mean the Internal Revenue Code of 1986, as amended.

E. **Common Stock** shall mean the Corporation's common stock.

F. **Corporate Transaction** shall mean either of the following stockholder– approved transactions to which the Corporation is a party:

(i) a merger or consolidation in which securities possessing more than fifty percent (50%) of the total combined voting power of the Corporation's outstanding securities are transferred to a person or persons different from the persons holding those securities immediately prior to such transaction, or

(ii) the sale, transfer or other disposition of all or substantially all of the Corporation's assets in complete liquidation or dissolution of the Corporation.

G. **Corporation** shall mean Quiksilver, Inc., a Delaware corporation, and any corporate successor to all or substantially all of the assets or voting stock of Quiksilver, Inc. which shall by appropriate action adopt the Plan.

28

H. **Director Automatic Grant Program** shall mean the director automatic grant program in effect under Article Five of the Plan for the Eligible Directors.

I. **Discretionary Option Grant Program** shall mean the discretionary option grant program in effect under Article Two of the Plan.

J. **Eligible Director** shall mean a Board member who is not, at the time of such determination, an employee of the Corporation (or any Parent or Subsidiary) and who is accordingly eligible to participate in the Director Automatic Grant Program in accordance with the eligibility provisions of Articles One and Five.

K. **Employee** shall mean an individual who is in the employ of the Corporation (or any Parent or Subsidiary), subject to the control and direction of the employer entity as to both the work to be performed and the manner and method of performance.

L. **Exercise Date** shall mean the date on which the Corporation shall have received written notice of the option exercise.

M. **Fair Market Value** per share of Common Stock on any relevant date shall be determined in accordance with the following provisions:

(i) If the Common Stock is at the time traded on the Nasdaq Global Select Market (or the Nasdaq Global Market), then the Fair Market Value shall be the closing selling price per share of Common Stock at the close of regular hours trading (i.e., before after–hours trading begins) on the Nasdaq Global Stock Market (or the Nasdaq Global Market) on the date in question, as such price is reported by The Wall Street Journal. If there is no closing selling price for the Common Stock on the date in question, then the Fair Market Value shall be the closing selling price on the last preceding date for which such quotation exists.

(ii) If the Common Stock is at the time listed on any other Stock Exchange, then the Fair Market Value shall be the closing selling price per share of Common Stock at the close of regular hours trading (i.e., before after–hours trading begins) on the date in question on the Stock Exchange determined by the Plan Administrator to be the primary market for the Common Stock, as such price is officially quoted in the composite tape of transactions on such exchange. If there is no closing selling price for the Common Stock on the date in question, then the Fair Market Value shall be the closing selling price on the last preceding date for which such quotation exists.

(iii) If the Common Stock is at the time not listed on any established stock exchange, the Fair Market Value shall be determined by the Board in good faith.

N. **Family Member** means, with respect to a particular Optionee or Participant, any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother–in–law, father–in–law, son–in–law, daughter–in–law, brother–in–law or sister–in–law.

O. **Hostile Take–Over** shall mean the acquisition, directly or indirectly, by any person or related group of persons (other than the Corporation or a person that directly or

29

indirectly controls, is controlled by, or is under common control with, the Corporation) of beneficial ownership (within the meaning of Rule 13d–3 of the 1934 Act) of securities possessing more than fifty percent (50%) of the total combined voting power of the Corporation's outstanding securities pursuant to a tender or exchange offer made directly to the Corporation's stockholders which the Board does not recommend such stockholders to accept.

P. **Incentive Option** shall mean an option which satisfies the requirements of Code Section 422.

Q. **Involuntary Termination** shall mean the termination of the Service of any individual which occurs by reason of:

    (i) such individual's involuntary dismissal or discharge by the Corporation for reasons other than Misconduct, or

    (ii) such individual's voluntary resignation following (A) a change in his or her position with the Corporation which materially reduces his or her duties and responsibilities or the level of management to which he or she reports, (B) a reduction in his or her level of compensation (including base salary, fringe benefits and target bonus under any corporate–performance based bonus or incentive programs) by more than twenty percent (20%) or (C) a relocation of such individual's place of employment by more than fifty (50) miles, provided and only if such change, reduction or relocation is effected by the Corporation without the individual's consent.

R. **Misconduct** shall mean the commission of any act of fraud, embezzlement or dishonesty by the Optionee or Participant, any unauthorized use or disclosure by such person of confidential information or trade secrets of the Corporation (or any Parent or Subsidiary), or any other intentional misconduct by such person adversely affecting the business or affairs of the Corporation (or any Parent or Subsidiary) in a material manner. The foregoing definition shall not be deemed to be inclusive of all the acts or omissions which the Corporation (or any Parent or Subsidiary) may consider as grounds for the dismissal or discharge of any Optionee, Participant or other person in the Service of the Corporation (or any Parent or Subsidiary).

S. **1934 Act** shall mean the Securities Exchange Act of 1934, as amended.

T. **Non–Statutory Option** shall mean an option not intended to satisfy the requirements of Code Section 422.

U. **Optionee** shall mean any person to whom an option is granted under the Discretionary Option Grant or Director Automatic Grant Program.

V. **Parent** shall mean any corporation (other than the Corporation) in an unbroken chain of corporations ending with the Corporation, provided each corporation in the unbroken chain (other than the Corporation) owns, at the time of the determination, stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

W. **Participant** shall mean any person who is issued shares of Restricted Stock under the Restricted Stock Program or under the Director Automatic Grant Program, and any person who is issued Restricted Stock Units under the Restricted Stock Unit Program.

X. **Permanent Disability Or Permanently Disabled** shall mean the inability of the Optionee or the Participant to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which is both (i) expected to result in death or determined to be total and permanent by two (2) physicians selected by the Corporation or its insurers and acceptable to the Optionee or the Participant (or the Optionee's or Participant's legal representative), and (ii) to the extent the Optionee is eligible to participate in the Corporation's long–term disability plan, entitles the Optionee or the Participant to the payment of long–term disability benefits from the Corporation's long–term disability plan. The process for determining a Permanent Disability in accordance with the foregoing shall be completed no later than the later of (i) the close of the calendar year in which the Optionee's or the Participant's Service terminates by reason of the physical or mental impairment triggering the determination process or (ii) the fifteenth day of the third calendar month following such termination of Service. However, solely for purposes of the Director Automatic Grant Program, Permanent Disability or Permanently Disabled shall mean the inability of the Eligible Director to perform his or her usual duties as a Board member by reason of any medically determinable physical or mental impairment expected to result in death or to be of continuous duration of twelve (12) months or more.

Y. **Plan** shall mean the Corporation's 2000 Stock Incentive Plan, as amended and restated and set forth in this document.

Z. **Plan Administrator** shall mean the particular entity, whether the Primary Committee, the Board or the Secondary Committee, which is authorized to administer the Discretionary Option Grant, Restricted Stock and Restricted Stock Unit Programs with respect to one or more classes of eligible persons, to the extent such entity is carrying out its administrative functions under those programs with respect to the persons under its jurisdiction.

AA. **Plan Effective Date** shall mean March 31, 2000.

BB. **Predecessor Plans** shall mean the Corporation's (i) 1996 Stock Option Plan, (ii) the 1998 Nonemployee Directors' Stock Option Plan, (iii) the 1995 Nonemployee Directors' Stock Option Plan and (iv) the 1992 Nonemployee Directors' Stock Option Plan, as each of those plans was in effect immediately prior to the Plan Effective Date hereunder.

CC. **Primary Committee** shall mean the committee of two (2) or more Eligible Directors appointed by the Board to administer the Discretionary Option Grant, Restricted Stock and Restricted Stock Unit Programs with respect to Section 16 Insiders.

DD. **Restricted Stock** shall mean shares of Common Stock issued to a Participant pursuant to the Restricted Stock or Director Automatic Grant Program, subject to such restrictions and conditions as are established pursuant to such Restricted Stock or Director Automatic Grant Program.

31

EE. **Restricted Stock Agreement** shall mean the agreement entered into by the Corporation and the Participant at the time of grant of Restricted Stock under the Restricted Stock or Automatic Director Grant Programs.

FF. **Restricted Stock Program** shall mean the discretionary Restricted Stock program under Article Three of the Plan.

GG. **Restricted Stock Unit** shall mean the right to receive one share of Common Stock issued pursuant to the Restricted Stock Unit Program, subject to such restrictions and conditions as are established pursuant to the Restricted Stock Unit Program.

HH. **Restricted Stock Unit Agreement** shall mean the agreement entered into by the Corporation and the Participant at the time of grant of Restricted Stock Units under the Restricted Stock Unit Program.

II. **Restricted Stock Unit Program** shall mean the discretionary Restricted Stock Unit program under Article Four of the Plan.

JJ. **Secondary Committee** shall mean a committee of one or more Board members appointed by the Board to administer the Discretionary Option Grant, Restricted Stock and Restricted Stock Unit Programs with respect to eligible persons other than Section 16 Insiders.

KK. **Section 16 Insider** shall mean an officer or director of the Corporation subject to the short–swing profit liability provisions of Section 16 of the 1934 Act.

LL. **Service** shall mean the performance of services for the Corporation (or any Parent or Subsidiary) by a person in the capacity of an Employee, an Eligible Director or a consultant or independent advisor, except to the extent otherwise specifically provided in the documents evidencing the Award made to such person. For purposes of the Plan, an Optionee or Participant shall be deemed to cease Service immediately upon the occurrence of either of the following events: (i) the Optionee or Participant no longer performs services in any of the foregoing capacities for the Corporation or any Parent or Subsidiary; or (ii) the entity for which the Optionee or Participant is performing such services ceases to remain a Parent or Subsidiary of the Corporation, even though the Optionee or Participant may subsequently continue to perform services for that entity.

MM. **Stock Exchange** shall mean the American Stock Exchange, the Nasdaq Global Select Market, the Nasdaq Global Market or the New York Stock Exchange.

NN. **Subsidiary** shall mean any corporation (other than the Corporation) in an unbroken chain of corporations beginning with the Corporation, provided each corporation (other than the last corporation) in the unbroken chain owns, at the time of the determination, stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

OO. **Take–Over Price** shall mean the greater of (i) the Fair Market Value per share of Common Stock on the date the option is surrendered to the Corporation in connection with a Hostile Take–Over or (ii) the highest reported price per share of Common Stock paid by the

32

tender offeror in effecting such Hostile Take–Over through the acquisition of Common Stock. However, if the surrendered option is an Incentive Option, the Take–Over Price shall not exceed the clause (i) price per share.

PP. **10% Stockholder** shall mean the owner of stock (as determined under Code Section 424(d)) possessing more than ten percent (10%) of the total combined voting power of all classes of stock of the Corporation (or any Parent or Subsidiary).

QQ. **Withholding Taxes** shall mean the federal, state and local income and employment withholding taxes to which the Optionee or Participant may become subject in connection with the issuance, exercise or vesting of an Award made to him or her under the Plan.

33



## NOTICE OF GRANT OF STOCK OPTION
**(Standard Form)**

Notice is hereby given of the following option grant (the "Option") to purchase shares of the Common Stock of Quiksilver, Inc. (the "Corporation"):

Optionee:                        Grant Date:

Number of Options Shares:                 Exercise Price:

Type of Option: ☐ Incentive Stock Option        Expiration Date:
                 ☐ Non–Statutory Stock Option

<u>Exercise and Vesting Schedule</u>: Subject to the limitations contained in this Option and the Plan, this Option shall vest and become exercisable in installments as follows:

| Number of Shares (Installment) | Date of Earliest Exercise (Vesting) |
| --- | --- |
| | |

In no event shall the Option become exercisable for any additional Option Shares after Optionee's cessation of Service.

Optionee understands and agrees that the Option is granted subject to and in accordance with the terms of the Quiksilver, Inc. amended and restated 2000 Stock Incentive Plan (the "Plan"). Optionee further agrees to be bound by the terms of the Plan and the terms of the Option as set forth in the Stock Option Agreement attached hereto as <u>Exhibit A</u>. Optionee hereby acknowledges having received and read a copy of the official Plan Summary and Prospectus for the Plan. A copy of the Plan is available upon request made to the Corporate Secretary at the Corporation's principal offices.

<u>Employment/Services at Will</u>. Nothing in this Notice or in the attached Stock Option Agreement or in the Plan shall confer upon Optionee any right to continue in Service for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Corporation (or any Parent or Subsidiary employing or retaining Optionee) or of Optionee, which rights are hereby expressly reserved by each, to terminate Optionee's Service at any time for any reason, with or without cause.

<u>Definitions</u>. All capitalized terms in this Notice shall have the meaning assigned to them in this Notice or in the attached Stock Option Agreement.

Date: _____

QUIKSILVER, INC.

By:

OPTIONEE                      Title:

Address:                      <u>ATTACHMENTS</u>

Exhibit A — Stock Option Agreement

**[Exhibit B — French Addendum (for French optionees only)]**

**EXHIBIT A**
**QUIKSILVER, INC.**
**STOCK OPTION AGREEMENT**
R E C I T A L S

A. The Board has adopted the Plan for the purpose of retaining the services of selected Employees, non–employee members of the Board (or the board of directors of any Parent or Subsidiary) and consultants and other independent advisors who provide services to the Corporation (or any Parent or Subsidiary).

B. Optionee is to render valuable services to the Corporation (or a Parent or Subsidiary), and this Agreement is executed pursuant to, and is intended to carry out the purposes of, the Plan in connection with the Corporation's grant of an option to Optionee.

C. All capitalized terms in this Agreement shall have the meaning assigned to them in the attached Appendix.

**NOW, THEREFORE**, it is hereby agreed as follows:

1. **Grant of Option**. The Corporation hereby grants to Optionee, as of the Grant Date, an option to purchase up to the number of Option Shares specified in the Grant Notice. The Option Shares shall be purchasable from time to time during the option term specified in Paragraph 2 at the Exercise Price.

2. **Option Term**. This option shall have a maximum term of _____ (___) years measured from the Grant Date and shall accordingly expire at the close of business on the Expiration Date, unless sooner terminated in accordance with Paragraph 5 or 6.

3. **Limited Transferability**.

(a) If this option is designated a Non–Statutory Option in the Grant Notice, then this option may be assigned in whole or in part during Optionee's lifetime only by gift or pursuant to a domestic relations order to one or more Family Members of the Optionee or to a trust established for the exclusive benefit of Optionee and/or one or more such Family Members. The assigned portion shall be exercisable only by the person or persons who acquire a proprietary interest in the option pursuant to such assignment. The terms applicable to the assigned portion shall be the same as those in effect for this option immediately prior to such assignment.

(b) Except as provided in Paragraph 3(a) above, this option shall be neither transferable nor assignable by Optionee other than by will or the laws of inheritance following Optionee's death and may be exercised, during Optionee's lifetime, only by Optionee. However, Optionee may designate one or more persons as the beneficiary or beneficiaries of this option, and this option shall, in accordance with such designation, automatically be transferred to

(Standard Form)
A–1

such beneficiary or beneficiaries upon the Optionee's death while holding this option. Such beneficiary or beneficiaries shall take the transferred option subject to all the terms and conditions of this Agreement, including (without limitation) the limited time period during which this option may, pursuant to Paragraph 5, be exercised following Optionee's death.

4. **Dates of Exercise**. This option shall become exercisable for the Option Shares in one or more installments as specified in the Grant Notice. As the option becomes exercisable for such installments, those installments shall accumulate, and the option shall remain exercisable for the accumulated installments until the Expiration Date or sooner termination of the option term under Paragraph 5 or 6. Notwithstanding the foregoing, should the Optionee elect to exercise this option during any period during which the Optionee is under investigation by the Corporation for Misconduct, then any Option Shares acquired by the Optionee as a result of such exercise and/or the net proceeds of any sale or sales of those acquired Option Shares (the gross sale proceeds less any Exercise Price payment or withholding taxes due the Corporation in broker commissions) during such period shall be held by the Corporation in escrow until such time as the investigation is satisfactorily completed.

5. **Cessation of Service/Termination of Option**. The option term specified in Paragraph 2 shall terminate (and this option shall cease to be outstanding) prior to the Expiration Date should any of the following provisions become applicable:

(a) Should Optionee cease to remain in Service for any reason (other than death, Permanent Disability or Misconduct) while holding this option, then Optionee shall have a period of three (3) months (commencing with the date of such cessation of Service) during which to exercise this option, but in no event shall this option be exercisable at any time after the Expiration Date.

(b) Should Optionee die while holding this option, then the personal representative of Optionee's estate or the person or persons to whom the option is transferred pursuant to Optionee's will or the laws of inheritance shall have the right to exercise this option. However, if Optionee has designated one or more beneficiaries of this option, then those persons shall have the exclusive right to exercise this option following Optionee's death. Any such right to exercise this option shall lapse, and this option shall cease to be outstanding, upon the earlier of (i) the expiration of the twelve (12)–month period measured from the date of Optionee's death or (ii) the Expiration Date.

(c) Should Optionee cease Service by reason of Permanent Disability while holding this option, then Optionee shall have a period of twelve (12) months (commencing with the date of such cessation of Service) during which to exercise this option. In no event shall this option be exercisable at any time after the Expiration Date.

(d) The applicable post–Service exercise period in effect for this option pursuant to the foregoing provisions of this Paragraph 5 shall automatically be extended by an additional period of time equal in duration to any interval within that otherwise applicable post–Service exercise period in which the exercise of this option or the immediate sale of the Option Shares acquired hereunder cannot be effected in compliance with applicable federal and state

(Standard Form)<br>
A–2

securities laws, but in no event shall such an extension result in the continuation of this option beyond the Expiration Date.

(e) During the limited period of post–Service exercisability, this option may not be exercised in the aggregate for more than the number of Option Shares for which the option is exercisable at the time of Optionee's cessation of Service. Upon the expiration of such limited exercise period or (if earlier) upon the Expiration Date, this option shall terminate and cease to be outstanding for any exercisable Option Shares for which the option has not been exercised. However, this option shall, immediately upon Optionee's cessation of Service for any reason, terminate and cease to be outstanding with respect to any Option Shares for which this option is not otherwise at that time exercisable.

(f) Should Optionee's Service be terminated for Misconduct or should Optionee otherwise engage in any Misconduct while this option is outstanding, then this option shall terminate immediately and cease to remain outstanding.

6. **Special Acceleration of Option**.

(a) This option, to the extent outstanding at the time of a Corporate Transaction but not otherwise fully exercisable, shall NOT vest or become exercisable on an accelerated basis if and to the extent: (i) this option is, in connection with the Corporate Transaction, to be assumed by the successor corporation (or parent thereof) or otherwise continued in full force and effect pursuant to the terms of the Corporate Transaction or (ii) this option is to be replaced with a cash incentive program of the successor corporation which preserves the spread existing at the time of the Corporate Transaction on any Option Shares for which this option is not otherwise at that time exercisable (the excess of the Fair Market Value of those Option Shares over the aggregate Exercise Price payable for such shares) and provides for subsequent payout in accordance with the same option exercise/vesting schedule for those Option Shares set forth in the Grant Notice. However, if none of the foregoing conditions apply to this option at the time of the Corporate Transaction, then this option shall automatically accelerate so that such option shall, immediately prior to the effective date of that Corporate Transaction, become exercisable for all the shares of Common Stock at the time subject to this option and may be exercised for any or all of those shares as fully vested shares of Common Stock.

(b) Immediately following the Corporate Transaction, this option shall terminate and cease to be outstanding, except to the extent assumed by the successor corporation (or parent thereof) in connection with the Corporate Transaction or otherwise continued in full force and effect pursuant to the terms of the Corporate Transaction.

(c) If this option is assumed in connection with a Corporate Transaction or otherwise continued in effect, then this option shall be appropriately adjusted, immediately after such Corporate Transaction, to apply to the number and class of securities which would have been issuable to Optionee in consummation of such Corporate Transaction had the option been exercised immediately prior to such Corporate Transaction, and appropriate adjustments shall also be made to the Exercise Price, provided the aggregate Exercise Price shall remain the same. To the extent the actual holders of the Corporation's outstanding Common

(Standard Form)<br>A–3

Stock receive cash consideration for their Common Stock in consummation of the Corporate Transaction, the successor corporation may, in connection with the assumption of this option, substitute one or more shares of its own common stock with a fair market value equivalent to the cash consideration paid per share of Common Stock in such Corporate Transaction.

(d) This Agreement shall not in any way affect the right of the Corporation to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate or sell or transfer all or any part of its business or assets.

7. **Adjustment in Option Shares**. Should any change be made to the Common Stock by reason of any stock split, stock dividend, recapitalization, combination of shares, exchange of shares or other change affecting the outstanding Common Stock as a class without the Corporation's receipt of consideration, appropriate adjustments shall be made to (i) the total number and/or class of securities subject to this option and (ii) the Exercise Price in order to reflect such change and thereby preclude a dilution or enlargement of benefits hereunder.

8. **Stockholder Rights**. The holder of this option shall not have any stockholder rights with respect to the Option Shares until such person shall have exercised the option, paid the Exercise Price and become a holder of record of the purchased shares.

9. **Manner of Exercising Option**.

(a) In order to exercise this option with respect to all or any part of the Option Shares for which this option is at the time exercisable, Optionee (or any other person or persons exercising the option) must take the following actions:

(i) Execute and deliver to the Corporation a Notice of Exercise for the Option Shares for which the option is exercised.

(ii) Pay the aggregate Exercise Price for the purchased shares in one or more of the following forms:

(A) cash or check made payable to the Corporation;

(B) shares of Common Stock valued at Fair Market Value on the Exercise Date and held by Optionee (or any other person or persons exercising the option) for the period, if any, necessary to avoid any charge to the Corporation's earnings for financial reporting purposes; or

(C) through a special sale and remittance procedure pursuant to which Optionee (or any other person or persons exercising the option) shall concurrently provide irrevocable instructions to (i) a Corporation–designated brokerage firm to effect the immediate sale of the purchased shares and remit to the Corporation, out of the sale proceeds available on the settlement date, sufficient funds to cover the aggregate Exercise Price payable for the purchased shares plus all applicable Federal, state and local income and employment taxes required to be withheld by the Corporation by reason of such exercise and

(Standard Form)

A–4

(ii) the Corporation to deliver the certificates for the purchased shares directly to such brokerage firm in order to complete the sale.

Except to the extent the sale and remittance procedure is utilized in connection with the option exercise, payment of the Exercise Price must accompany the Notice of Exercise delivered to the Corporation in connection with the option exercise.

(iii) Furnish to the Corporation appropriate documentation that the person or persons exercising the option (if other than Optionee) have the right to exercise this option.

(iv) Make appropriate arrangements with the Corporation (or Parent or Subsidiary employing or retaining Optionee) for the satisfaction of all Federal, state and local income and employment tax withholding requirements applicable to the option exercise.

(b) As soon as practical after the Exercise Date, the Corporation shall issue to or on behalf of Optionee (or any other person or persons exercising this option) a certificate for the purchased Option Shares, with the appropriate legends affixed thereto.

(c) In no event may this option be exercised for any fractional shares.

10. **Compliance with Laws and Regulations**.

(a) The exercise of this option and the issuance of the Option Shares upon such exercise shall be subject to compliance by the Corporation and Optionee with all applicable requirements of law relating thereto and with all applicable regulations of any stock exchange (or over–the–counter market, if applicable) on which the Common Stock may be listed for trading at the time of such exercise and issuance.

(b) The inability of the Corporation to obtain approval from any regulatory body having authority deemed by the Corporation to be necessary to the lawful issuance and sale of any Common Stock pursuant to this option shall relieve the Corporation of any liability with respect to the non–issuance or sale of the Common Stock as to which such approval shall not have been obtained. The Corporation, however, shall use its best efforts to obtain all such approvals.

11. **Successors and Assigns**. Except to the extent otherwise provided in Paragraphs 3 and 6, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Corporation and its successors and assigns and Optionee, Optionee's assigns, the legal representatives, heirs and legatees of Optionee's estate and any beneficiaries of this option designated by Optionee.

12. **Notices**. Any notice required to be given or delivered to the Corporation under the terms of this Agreement shall be in writing and addressed to the Corporation at its principal corporate offices. Any notice required to be given or delivered to Optionee shall be in writing and addressed to Optionee at the address indicated below Optionee's signature line on

(Standard Form)<br>A–5

the Grant Notice. All notices shall be deemed effective upon personal delivery or upon deposit in the U.S. mail, postage prepaid and properly addressed to the party to be notified.

13. **Construction**. This Agreement and the option evidenced hereby are made and granted pursuant to the Plan and are in all respects limited by and subject to the terms of the Plan. All decisions of the Plan Administrator with respect to any question or issue arising under the Plan or this Agreement shall be conclusive and binding on all persons having an interest in this option.

14. **Governing Law**. The interpretation, performance and enforcement of this Agreement shall be governed by the laws of the State of California without resort to that State's conflict–of–laws rules.

15. **Excess Shares**. If the Option Shares covered by this Agreement exceed, as of the Grant Date, the number of shares of Common Stock which may without stockholder approval be issued under the Plan, then this option shall be void with respect to those excess shares, unless stockholder approval of an amendment sufficiently increasing the number of shares of Common Stock issuable under the Plan is obtained in accordance with the provisions of the Plan.

16. **Additional Terms Applicable to an Incentive Option**. In the event this option is designated an Incentive Option in the Grant Notice, the following terms and conditions shall also apply to the grant:

(a) This option shall cease to qualify for favorable tax treatment as an Incentive Option if (and to the extent) this option is exercised for one or more Option Shares: (A) more than three (3) months after the date Optionee ceases to be an Employee for any reason other than death or Permanent Disability or (B) more than twelve (12) months after the date Optionee ceases to be an Employee by reason of Permanent Disability.

(b) No installment under this option shall qualify for favorable tax treatment as an Incentive Option if (and to the extent) the aggregate Fair Market Value (determined at the Grant Date) of the Common Stock for which such installment first becomes exercisable hereunder would, when added to the aggregate value (determined as of the respective date or dates of grant) of the Common Stock or other securities for which this option or any other Incentive Options granted to Optionee prior to the Grant Date (whether under the Plan or any other option plan of the Corporation or any Parent or Subsidiary) first become exercisable during the same calendar year, exceed One Hundred Thousand Dollars ($100,000) in the aggregate. Should such One Hundred Thousand Dollar ($100,000) limitation be exceeded in any calendar year, this option shall nevertheless become exercisable for the excess shares in such calendar year as a Non–Statutory Option.

(c) Should the exercisability of this option be accelerated upon a Corporate Transaction, then this option shall qualify for favorable tax treatment as an Incentive Option only to the extent the aggregate Fair Market Value (determined at the Grant Date) of the Common Stock for which this option first becomes exercisable in the calendar year in which the Corporate Transaction occurs does not, when added to the aggregate value (determined as of the

(Standard Form)

A–6

respective date or dates of grant) of the Common Stock or other securities for which this option or one or more other Incentive Options granted to Optionee prior to the Grant Date (whether under the Plan or any other option plan of the Corporation or any Parent or Subsidiary) first become exercisable during the same calendar year, exceed One Hundred Thousand Dollars ($100,000) in the aggregate. Should the applicable One Hundred Thousand Dollar ($100,000) limitation be exceeded in the calendar year of such Corporate Transaction, the option may nevertheless be exercised for the excess shares in such calendar year as a Non–Statutory Option.

   (d) Should Optionee hold, in addition to this option, one or more other options to purchase Common Stock which become exercisable for the first time in the same calendar year as this option, then, for purposes of the foregoing limitations on the exercisability of such options as Incentive Options, this option and each of those other options shall be deemed to become first exercisable in that calendar year on the basis of the chronological order in which they were granted, except to the extent otherwise provided under applicable law or regulation.

(Standard Form)
A–7

**Exhibit A−1**
**<u>NOTICE OF EXERCISE</u>**

I hereby notify Quiksilver, Inc. (the "Corporation") that I elect to purchase _____ shares of the Corporation's Common Stock (the "Purchased Shares") at the option exercise price of $_____ per share (the "Exercise Price") pursuant to that certain option (the "Option") granted to me under the Corporation's amended and restated 2000 Stock Incentive Plan on _____, _____

Concurrently with the delivery of this Exercise Notice to the Corporation, I shall hereby pay to the Corporation the Exercise Price for the Purchased Shares in accordance with the provisions of my agreement with the Corporation (or other documents) evidencing the Option and shall deliver whatever additional documents may be required by such agreement as a condition for exercise. Alternatively, I may utilize the special broker−dealer sale and remittance procedure specified in my agreement to effect payment of the Exercise Price.

_____, _____
Date

Optionee

Address:

Print name in exact manner it is to appear on the stock certificate:

Address to which certificate is to be sent, if different from address above:

Social Security Number:

(Standard Form)
A−8

**APPENDIX**

The following definitions shall be in effect under the Agreement:

A. **Agreement** shall mean this Stock Option Agreement.

B. **Board** shall mean the Corporation's Board of Directors.

C. **Code** shall mean the Internal Revenue Code of 1986, as amended.

D. **Common Stock** shall mean shares of the Corporation's common stock.

E. **Corporate Transaction** shall mean either of the following stockholder–approved transactions to which the Corporation is a party:

    (i) a merger or consolidation in which securities possessing more than fifty percent (50%) of the total combined voting power of the Corporation's outstanding securities are transferred to a person or persons different from the persons holding those securities immediately prior to such transaction, or

    (ii) the sale, transfer or other disposition of all or substantially all of the Corporation's assets in complete liquidation or dissolution of the Corporation.

F. **Corporation** shall mean Quiksilver, Inc., a Delaware corporation, and any successor corporation to all or substantially all of the assets or voting stock of Quiksilver, Inc. which shall by appropriate action adopt the Plan.

G. **Employee** shall mean an individual who is in the employ of the Corporation (or any Parent or Subsidiary), subject to the control and direction of the employer entity as to both the work to be performed and the manner and method of performance.

H. **Exercise Date** shall mean the date on which the option shall have been exercised in accordance with Paragraph 9 of the Agreement.

I. **Exercise Price** shall mean the exercise price per Option Share as specified in the Grant Notice.

J. **Expiration Date** shall mean the date on which the option expires as specified in the Grant Notice.

K. **Fair Market Value** per share of Common Stock on any relevant date shall be determined in accordance with the following provisions:

    (i) If the Common Stock is at the time traded on the Nasdaq Global Select Market (or the Nasdaq Global Market), then the Fair Market Value shall be the closing selling price per share of

Common Stock at the close of regular hours trading (i.e., before after–hours trading begins) on the Nasdaq Global Stock Market (or the Nasdaq Global Market) on the date in question, as such price is reported by The Wall Street Journal. If there is no closing selling price for the Common Stock on the date in question, then the Fair Market Value shall be the closing selling price on the last preceding date for which such quotation exists.

(ii) If the Common Stock is at the time listed on any other Stock Exchange, then the Fair Market Value shall be the closing selling price per share of Common Stock at the close of regular hours trading (i.e., before after–hours trading begins) on the date in question on the Stock Exchange determined by the Plan Administrator to be the primary market for the Common Stock, as such price is officially quoted in the composite tape of transactions on such exchange. If there is no closing selling price for the Common Stock on the date in question, then the Fair Market Value shall be the closing selling price on the last preceding date for which such quotation exists.

(iii) If the Common Stock is at the time <u>not</u> listed on any established stock exchange, the Fair Market Value shall be determined by the Board in good faith.

L. **Family Member** shall mean, with respect to the Optionee, any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother–in–law, father–in–law, son–in–law, daughter–in–law, brother–in–law or sister–in–law.

M. **Grant Date** shall mean the date of grant of the option as specified in the Grant Notice.

N. **Grant Notice** shall mean the Notice of Grant of Stock Option accompanying the Agreement, pursuant to which Optionee has been informed of the basic terms of the option evidenced hereby.

O. **Incentive Option** shall mean an option which satisfies the requirements of Code Section 422.

P. **Misconduct** shall mean the commission of any act of fraud, embezzlement or dishonesty by Optionee, any unauthorized use or disclosure by Optionee of confidential information or trade secrets of the Corporation (or any Parent or Subsidiary), or any other intentional misconduct by Optionee adversely affecting the business or affairs of the Corporation (or any Parent or Subsidiary) in a material manner. The foregoing definition shall not be deemed to be inclusive of all the acts or omissions which the Corporation (or any Parent or Subsidiary) may consider as grounds for the dismissal or discharge of Optionee or any other individual in the Service of the Corporation (or any Parent or Subsidiary).

(Standard Form)
A–10

Q. **Non–Statutory Option** shall mean an option not intended to satisfy the requirements of Code Section 422.

R. **Notice of Exercise** shall mean the notice of exercise in substantially the form attached hereto as Exhibit A–1.

S. **Option Shares** shall mean the number of shares of Common Stock subject to the option as specified in the Grant Notice.

T. **Optionee** shall mean the person to whom the option is granted as specified in the Grant Notice.

U. **Parent** shall mean any corporation (other than the Corporation) in an unbroken chain of corporations ending with the Corporation, provided each corporation in the unbroken chain (other than the Corporation) owns, at the time of the determination, stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

V. **Permanent Disability Or Permanently Disabled** shall mean the inability of the Optionee to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which is both (i) expected to result in death or determined to be total and permanent by two (2) physicians selected by the Corporation or its insurers and acceptable to the Optionee (or the Optionee's legal representative), and (ii) to the extent the Optionee is eligible to participate in the Corporation's long–term disability plan, entitles the Optionee to the payment of long–term disability benefits from the Corporation's long–term disability plan. The process for determining a Permanent Disability in accordance with the foregoing shall be completed no later than the later of (i) the close of the calendar year in which the Optionee's Service terminates by reason of the physical or mental impairment triggering the determination process or (ii) the fifteenth day of the third calendar month following such termination of Service.

W. **Plan** shall mean the Corporation's amended and restated 2000 Stock Incentive Plan.

X. **Plan Administrator** shall mean either the Board or a committee of the Board acting in its capacity as administrator of the Plan.

Y. **Service** shall mean the Optionee's performance of services for the Corporation (or any Parent or Subsidiary) in the capacity of an Employee, a non–employee member of the board of directors or a consultant or independent advisor. An Optionee shall be deemed to cease Service immediately upon the occurrence of either of the following events: (i) the Optionee no longer performs services in any of the foregoing capacities for the Corporation or any Parent or Subsidiary; or (ii) the entity for which the Optionee is performing such services ceases to remain a Parent or Subsidiary of the Corporation, even though the Optionee may subsequently continue to perform services for that entity.

Z. **Stock Exchange** shall mean the American Stock Exchange, the Nasdaq Global Select Market, the Nasdaq Global Market or the New York Stock Exchange.

(Standard Form)<br>A–11

AA. **Subsidiary** shall mean any corporation (other than the Corporation) in an unbroken chain of corporations beginning with the Corporation, provided each corporation (other than the last corporation) in the unbroken chain owns, at the time of the determination, stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

(Standard Form)

A–12

**EXHIBIT B**
**FRENCH OPTIONS AGREEMENT ADDENDUM**
**FRENCH PLAN TERMS**

This Addendum contains the terms of options granted to employees and officers under the Quiksilver, Inc. 2000 Stock Incentive Plan ("the Plan") to eligible French Employees and officers ("the French Plan"). The terms of the French Plan are identical to the Plan except as provided below:

1.  For the purposes of any options granted in accordance with the French Plan, the terms of the Plan shall be deemed incorporated by reference to this Addendum.

2.  For the purposes of the French Plan, options granted in accordance with the French Plan ("French Options") may be designated as Qualifying French Stock Options within the meaning of the conditions set forth in the French Commercial Code (articles L 225–177 to L 225–186–1).

3.  The per share exercise price of French Options determined in accordance with the French Plan shall not be less than 95% of the average Fair Market Value during the 20 trading days preceding the date of option grant.

4.  The employees and officers to whom French Options may be granted according to the French Plan are restricted as follows:

    French Options may not be granted to persons holding more than 10% of the share capital of the Corporation.

    French Options may only be granted to employees or "Président du Conseil d'administration", "Directeur Général", "Directeurs Généraux Délégués", Members of the "Directoire", "Gérant" of a "Société par actions", or other officers (in particular Président du Conseil de Surveillance) being otherwise a salaried employee of any Parent or Subsidiary of the Corporation where:

    (i)   at least 10% of the employer company share capital or of the voting rights is held, directly or indirectly, by the Corporation;

    (ii)  the employer company holds, directly or indirectly, at least 10% of the share capital or of the voting rights of the Corporation; or

    (iii) at least 50% of the employer company share capital or of the voting rights is held, directly or indirectly, by a company which itself holds, directly or indirectly, at least 50% of the capital of the Corporation.

5.  The period during which French Options may be exercised following date of death under the French Plan is six (6) months.

B–1

6.  Option adjustments under the French Plan include the following:

    "In all cases, the modification of the exercise price or number of options under the French Plan shall be made in accordance with article L 225–181 of the French Commercial Code."

7.  In the case of French Options to acquire treasury shares, the Corporation shall procure sufficient shares of Common Stock available for transfer to satisfy the exercise of such options (which have neither lapsed nor been exercised) to the full extent possible, before the Optionee has the right to exercise the French Option.

8.  No French Options may be granted before the end of the period of 20 trading days following a dividend distribution or increase of authorized capital or before or after 10 trading days of the publication of consolidated or, if none, annual accounts or between the date that the Corporation's officers have knowledge of any information which could significantly affect the value of the shares of Common Stock and 10 trading days after the information has been publicized.

9.  In accepting the grant of French Options, the Optionee undertakes that he or she will notify the employer company in writing with respect to the date of option exercise and share sale at least seven (7) days prior to and seven (7) days following either event.

10. The French Options shall not become exercisable for the Option Shares before the first anniversary of the Grant Date.

11. The sale or transfer as bearer shares of shares of Common Stock purchased upon exercise of French Options shall be restricted until the fourth anniversary of the Grant Date.

12. Under the French Plan, in no event shall the number of shares of Common Stock subject to outstanding unexercised options exceed one–third (1/3) of the Corporation's authorized shares.

B–2

**FRENCH RESTRICTED STOCK ADDENDUM**
**FRENCH PLAN TERMS**

This Addendum contains the terms of restricted stock granted to employees and officers under the Quiksilver, Inc. 2000 Stock Incentive Plan ("the Plan") to eligible French Employees and officers ("the French Plan"). The terms of the French Plan are identical to the Plan except as provided below:

1.  For the purposes of any restricted stock granted in accordance with the French Plan, the terms of the Plan shall be deemed incorporated by reference to this Addendum.

2.  For the purposes of the French Plan, restricted shares granted in accordance with the French Plan ("French Restricted Stock") may be designated as Qualifying French Restricted Stock within the meaning of the conditions set forth in the French Commercial Code (articles L 225–197–1 and s.).

3.  The employees and officers to whom French Restricted Stock may be granted according to the French Plan are restricted as follows:

    French Restricted Stock may not be granted to persons holding more than 10% of the share capital of the Corporation.

    French Restricted Stock may only be granted to employees or "Président du Conseil d'administration", "Directeur Général", "Directeurs Généraux Délégués", Members of the "Directoire", "Gérant" of a "Société par actions", "Président" of a "société par actions simplifiée" or other officers (in particular Président du Conseil de Surveillance) being otherwise a salaried employee of any Parent or Subsidiary of the Corporation where:
    (i)    at least 10% of the employer company share capital or of the voting rights is held, directly or indirectly, by the Corporation;

    (ii)   the employer company holds, directly or indirectly, at least 10% of the share capital or of the voting rights of the Corporation; or

    (iii)  at least 50% of the employer company share capital or of the voting rights is held, directly or indirectly, by a company which itself holds, directly or indirectly, at least 50% of the capital of the Corporation.

4.  According to the article L.225–197–1 of the French Commercial Code, no shares of the French Restricted Stock shall vest before the second anniversary of the Grant Date. During the vesting period the Participant shall not be entitled to any rights (e.g., voting rights, cash dividends, etc.) with respect to the shares of French Restricted Stock. By way of exception, in the event of the death or permanent disability of second or third category of the Participant, all of the French Restricted Stock shall accelerate and vest immediately according to the articles L. 225–197–3 and L. 225–197–1 of the French Commercial Code and all restrictions shall lapse immediately.

B–3

5.  Restricted Stock adjustments under the French Plan include the following:

"In all cases, the modification of the number of shares of the French Restricted Stock under the French Plan shall be made in accordance with the 'instruction DGI of 10 November 2006, 5F–17–06'"

6.  According to the article L.225–197–3 of the French Commercial Code, the sale of the vested shares of the French Restricted stock shall be restricted until the second anniversary of the Vesting Date.

7.  According to the article L.225–197–1 of the French Commercial Code, the sale of the shares of the French Restricted Stock shall be restricted before or after 10 trading days of the publication of consolidated or, if none, annual accounts or between the date that the Corporation's officers have knowledge of any information which could significantly affect the value of the shares of Common Stock and 10 trading days after the information has been publicized.

8.  Under the French Plan, in no event shall the number of shares of the French Restricted Stock granted to the Participants exceed ten percent (10%) of the Corporation's authorized shares.

B–4



### NOTICE OF GRANT OF STOCK OPTION
**(Selected Officer Form)**

Notice is hereby given of the following option grant (the "Option") to purchase shares of the Common Stock of Quiksilver, Inc. (the "Corporation"):

| | |
|---|---|
| Optionee: | Grant Date: |
| Number of Options Shares: | Exercise Price: |
| Type of Option:   ___Incentive Stock Option | Expiration Date: |
| ___Non–Statutory Stock Option | |

<u>Exercise and Vesting Schedule</u>: Subject to the limitations contained in this Option and the Plan, this Option shall vest and become exercisable in installments as follows:

| Number of Shares<br>(Installment) | Date of Earliest Exercise<br>(Vesting) |
|---|---|

In no event shall the Option become exercisable for any additional Option Shares after Optionee's cessation of Service.

Optionee understands and agrees that the Option is granted subject to and in accordance with the terms of the Quiksilver, Inc. amended and restated 2000 Stock Incentive Plan (the "Plan"). Optionee further agrees to be bound by the terms of the Plan and the terms of the Option as set forth in the Stock Option Agreement attached hereto as <u>Exhibit A</u>. Optionee hereby acknowledges having received and read a copy of the official Plan Summary and Prospectus for the Plan. A copy of the Plan is available upon request made to the Corporate Secretary at the Corporation's principal offices.

<u>Employment/Services at Will</u>. Nothing in this Notice or in the attached Stock Option Agreement or in the Plan shall confer upon Optionee any right to continue in Service for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Corporation (or any Parent or Subsidiary employing or retaining Optionee) or of Optionee, which rights are hereby expressly reserved by each, to terminate Optionee's Service at any time for any reason, with or without cause.

<u>Definitions</u>. All capitalized terms in this Notice shall have the meaning assigned to them in this Notice or in the attached Stock Option Agreement.

Date: _____

QUIKSILVER, INC.

By:

OPTIONEE

Title:

Address:

<u>ATTACHMENTS</u>

Exhibit A — Stock Option Agreement

**[Exhibit B — French Addendum (for French optionees only)]**

**EXHIBIT A**
**QUIKSILVER, INC.**
**STOCK OPTION AGREEMENT**
R E C I T A L S

A. The Board has adopted the Plan for the purpose of retaining the services of selected Employees, non–employee members of the Board (or the board of directors of any Parent or Subsidiary) and consultants and other independent advisors who provide services to the Corporation (or any Parent or Subsidiary).

B. Optionee is to render valuable services to the Corporation (or a Parent or Subsidiary), and this Agreement is executed pursuant to, and is intended to carry out the purposes of, the Plan in connection with the Corporation's grant of an option to Optionee.

C. All capitalized terms in this Agreement shall have the meaning assigned to them in the attached Appendix.

**NOW, THEREFORE**, it is hereby agreed as follows:

1. **Grant of Option**. The Corporation hereby grants to Optionee, as of the Grant Date, an option to purchase up to the number of Option Shares specified in the Grant Notice. The Option Shares shall be purchasable from time to time during the option term specified in Paragraph 2 at the Exercise Price.

2. **Option Term**. This option shall have a maximum term of _____ (___) years measured from the Grant Date and shall accordingly expire at the close of business on the Expiration Date, unless sooner terminated in accordance with Paragraph 5 or 6.

3. **Limited Transferability**.

(a) If this option is designated a Non–Statutory Option in the Grant Notice, then this option may be assigned in whole or in part during Optionee's lifetime only by gift or pursuant to a domestic relations order to one or more Family Members of the Optionee or to a trust established for the exclusive benefit of Optionee and/or one or more such Family Members. The assigned portion shall be exercisable only by the person or persons who acquire a proprietary interest in the option pursuant to such assignment. The terms applicable to the assigned portion shall be the same as those in effect for this option immediately prior to such assignment.

(b) Except as provided in Paragraph 3(a) above, this option shall be neither transferable nor assignable by Optionee other than by will or the laws of inheritance following Optionee's death and may be exercised, during Optionee's lifetime, only by Optionee. However, Optionee may designate one or more persons as the beneficiary or beneficiaries of this option, and this option shall, in accordance with such designation, automatically be transferred to

(Selected Officer Form)
A–1

such beneficiary or beneficiaries upon the Optionee's death while holding this option. Such beneficiary or beneficiaries shall take the transferred option subject to all the terms and conditions of this Agreement, including (without limitation) the limited time period during which this option may, pursuant to Paragraph 5, be exercised following Optionee's death.

    4.  **Dates of Exercise**. This option shall become exercisable for the Option Shares in one or more installments as specified in the Grant Notice. As the option becomes exercisable for such installments, those installments shall accumulate, and the option shall remain exercisable for the accumulated installments until the Expiration Date or sooner termination of the option term under Paragraph 5 or 6. Notwithstanding the foregoing, should the Optionee elect to exercise this option during any period during which the Optionee is under investigation by the Corporation for Misconduct, then any Option Shares acquired by the Optionee as a result of such exercise and/or the net proceeds of any sale or sales of those acquired Option Shares (the gross sale proceeds less any Exercise Price payment or withholding taxes due the Corporation in broker commissions) during such period shall be held by the Corporation in escrow until such time as the investigation is satisfactorily completed.

    5.  **Cessation of Service/Termination of Option**. The option term specified in Paragraph 2 shall terminate (and this option shall cease to be outstanding) prior to the Expiration Date should any of the following provisions become applicable:

        (a)  Should Optionee cease to remain in Service by reason of Optionee terminating his or her Service with the Corporation for other than Good Reason, as such term is defined in Optionee's employment agreement in effect on the date of grant of this option (the "Employment Agreement"), while holding this option, then Optionee shall have a period of three (3) months (commencing with the date of such cessation of Service) during which to exercise this option, but in no event shall this option be exercisable at any time after the Expiration Date.

        (b)  Should Optionee die while holding this option, then the personal representative of Optionee's estate or the person or persons to whom the option is transferred pursuant to Optionee's will or the laws of inheritance shall have the right to exercise this option. However, if Optionee has designated one or more beneficiaries of this option, then those persons shall have the exclusive right to exercise this option following Optionee's death. Any such right to exercise this option shall lapse, and this option shall cease to be outstanding, upon the <u>earlier</u> of (i) the expiration of the twelve (12)–month period measured from the date of Optionee's death or (ii) the Expiration Date.

        (c)  Should Optionee cease Service by reason of Permanent Disability while holding this option, then Optionee shall have a period of twelve (12) months (commencing with the date of such cessation of Service) during which to exercise this option. In no event shall this option be exercisable at any time after the Expiration Date.

        (d)  Should Optionee cease Service by reason of termination by the Corporation without Cause (other than as a result of Optionee's death, Permanent Disability or Misconduct), as such term is defined in the Employment Agreement, or by Optionee for Good Reason, as such term is defined in the Employment Agreement, while holding this option, then Optionee shall have a period of twelve (12) months (commencing with the date of such cessation

(Selected Officer Form)

A–2

of Service) during which to exercise this option. In no event shall this option be exercisable at any time after the Expiration Date.

(e) The applicable post–Service exercise period in effect for this option pursuant to the foregoing provisions of this Paragraph 5 shall automatically be extended by an additional period of time equal in duration to any interval within that otherwise applicable post–Service exercise period in which the exercise of this option or the immediate sale of the Option Shares acquired hereunder cannot be effected in compliance with applicable federal and state securities laws, but in no event shall such an extension result in the continuation of this option beyond the Expiration Date.

(f) During the limited period of post–Service exercisability, this option may not be exercised in the aggregate for more than the number of Option Shares for which the option is exercisable at the time of Optionee's cessation of Service. Upon the expiration of such limited exercise period or (if earlier) upon the Expiration Date, this option shall terminate and cease to be outstanding for any exercisable Option Shares for which the option has not been exercised. However, this option shall, immediately upon Optionee's cessation of Service for any reason, terminate and cease to be outstanding with respect to any Option Shares for which this option is not otherwise at that time exercisable.

(g) Should Optionee's Service be terminated for Misconduct or Cause, as such term is defined in the Employment Agreement, or should Optionee otherwise engage in any Misconduct while this option is outstanding, then this option shall terminate immediately and cease to remain outstanding.

6. <u>Special Acceleration of Option</u>.

(a) This option, to the extent outstanding at the time of a Corporate Transaction but not otherwise fully exercisable, shall NOT vest or become exercisable on an accelerated basis if and to the extent: (i) this option is, in connection with the Corporate Transaction, to be assumed by the successor corporation (or parent thereof) or otherwise continued in full force and effect pursuant to the terms of the Corporate Transaction or (ii) this option is to be replaced with a cash incentive program of the successor corporation which preserves the spread existing at the time of the Corporate Transaction on any Option Shares for which this option is not otherwise at that time exercisable (the excess of the Fair Market Value of those Option Shares over the aggregate Exercise Price payable for such shares) and provides for subsequent payout in accordance with the same option exercise/vesting schedule for those Option Shares set forth in the Grant Notice. However, if none of the foregoing conditions apply to this option at the time of the Corporate Transaction, then this option shall automatically accelerate so that such option shall, immediately prior to the effective date of that Corporate Transaction, become exercisable for all the shares of Common Stock at the time subject to this option and may be exercised for any or all of those shares as fully vested shares of Common Stock.

(b) Immediately following the Corporate Transaction, this option shall terminate and cease to be outstanding, except to the extent assumed by the successor corporation

(Selected Officer Form)

A–3

(or parent thereof) in connection with the Corporate Transaction or otherwise continued in full force and effect pursuant to the terms of the Corporate Transaction.

(c) If this option is assumed in connection with a Corporate Transaction or otherwise continued in effect, then this option shall be appropriately adjusted, immediately after such Corporate Transaction, to apply to the number and class of securities which would have been issuable to Optionee in consummation of such Corporate Transaction had the option been exercised immediately prior to such Corporate Transaction, and appropriate adjustments shall also be made to the Exercise Price, provided the aggregate Exercise Price shall remain the same. To the extent the actual holders of the Corporation's outstanding Common Stock receive cash consideration for their Common Stock in consummation of the Corporate Transaction, the successor corporation may, in connection with the assumption of this option, substitute one or more shares of its own common stock with a fair market value equivalent to the cash consideration paid per share of Common Stock in such Corporate Transaction.

(d) This Agreement shall not in any way affect the right of the Corporation to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate or sell or transfer all or any part of its business or assets.

(e) This option, to the extent outstanding at the time Optionee ceases Service with the Corporation by reason of Optionee's death, Permanent Disability, termination by the Corporation without Cause (as defined in the Employment Agreement) or termination by Optionee for Good Reason (as defined in the Employment Agreement) but not otherwise fully exercisable, shall automatically accelerate so that this option shall immediately prior to such termination of Service, become exercisable for all of the Option Shares at the time subject to this option and may be exercised for any or all of those Option Shares as fully vested shares of Common Stock.

7. Adjustment in Option Shares. Should any change be made to the Common Stock by reason of any stock split, stock dividend, recapitalization, combination of shares, exchange of shares or other change affecting the outstanding Common Stock as a class without the Corporation's receipt of consideration, appropriate adjustments shall be made to (i) the total number and/or class of securities subject to this option and (ii) the Exercise Price in order to reflect such change and thereby preclude a dilution or enlargement of benefits hereunder.

8. **Stockholder Rights**. The holder of this option shall not have any stockholder rights with respect to the Option Shares until such person shall have exercised the option, paid the Exercise Price and become a holder of record of the purchased shares.

9. **Manner of Exercising Option**.

(a) In order to exercise this option with respect to all or any part of the Option Shares for which this option is at the time exercisable, Optionee (or any other person or persons exercising the option) must take the following actions:

(Selected Officer Form)

A–4

(i) Execute and deliver to the Corporation a Notice of Exercise for the Option Shares for which the option is exercised.

(ii) Pay the aggregate Exercise Price for the purchased shares in one or more of the following forms:

(A) cash or check made payable to the Corporation;

(B) shares of Common Stock valued at Fair Market Value on the Exercise Date and held by Optionee (or any other person or persons exercising the option) for the period, if any, necessary to avoid any charge to the Corporation's earnings for financial reporting purposes; or

(C) through a special sale and remittance procedure pursuant to which Optionee (or any other person or persons exercising the option) shall concurrently provide irrevocable instructions to (i) a Corporation–designated brokerage firm to effect the immediate sale of the purchased shares and remit to the Corporation, out of the sale proceeds available on the settlement date, sufficient funds to cover the aggregate Exercise Price payable for the purchased shares plus all applicable Federal, state and local income and employment taxes required to be withheld by the Corporation by reason of such exercise and (ii) the Corporation to deliver the certificates for the purchased shares directly to such brokerage firm in order to complete the sale.

Except to the extent the sale and remittance procedure is utilized in connection with the option exercise, payment of the Exercise Price must accompany the Notice of Exercise delivered to the Corporation in connection with the option exercise.

(iii) Furnish to the Corporation appropriate documentation that the person or persons exercising the option (if other than Optionee) have the right to exercise this option.

(iv) Make appropriate arrangements with the Corporation (or Parent or Subsidiary employing or retaining Optionee) for the satisfaction of all Federal, state and local income and employment tax withholding requirements applicable to the option exercise.

(b) As soon as practical after the Exercise Date, the Corporation shall issue to or on behalf of Optionee (or any other person or persons exercising this option) a certificate for the purchased Option Shares, with the appropriate legends affixed thereto.

(c) In no event may this option be exercised for any fractional shares.

10. **Compliance with Laws and Regulations**.

(a) The exercise of this option and the issuance of the Option Shares upon such exercise shall be subject to compliance by the Corporation and Optionee with all applicable requirements of law relating thereto and with all applicable regulations of any stock

(Selected Officer Form)

A–5

exchange (or over–the–counter market, if applicable) on which the Common Stock may be listed for trading at the time of such exercise and issuance.

    (b) The inability of the Corporation to obtain approval from any regulatory body having authority deemed by the Corporation to be necessary to the lawful issuance and sale of any Common Stock pursuant to this option shall relieve the Corporation of any liability with respect to the non–issuance or sale of the Common Stock as to which such approval shall not have been obtained. The Corporation, however, shall use its best efforts to obtain all such approvals.

    11. **Successors and Assigns**. Except to the extent otherwise provided in Paragraphs 3 and 6, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Corporation and its successors and assigns and Optionee, Optionee's assigns, the legal representatives, heirs and legatees of Optionee's estate and any beneficiaries of this option designated by Optionee.

    12. **Notices**. Any notice required to be given or delivered to the Corporation under the terms of this Agreement shall be in writing and addressed to the Corporation at its principal corporate offices. Any notice required to be given or delivered to Optionee shall be in writing and addressed to Optionee at the address indicated below Optionee's signature line on the Grant Notice. All notices shall be deemed effective upon personal delivery or upon deposit in the U.S. mail, postage prepaid and properly addressed to the party to be notified.

    13. **Construction**. This Agreement and the option evidenced hereby are made and granted pursuant to the Plan and are in all respects limited by and subject to the terms of the Plan. All decisions of the Plan Administrator with respect to any question or issue arising under the Plan or this Agreement shall be conclusive and binding on all persons having an interest in this option.

    14. **Governing Law**. The interpretation, performance and enforcement of this Agreement shall be governed by the laws of the State of California without resort to that State's conflict–of–laws rules.

    15. **Excess Shares**. If the Option Shares covered by this Agreement exceed, as of the Grant Date, the number of shares of Common Stock which may without stockholder approval be issued under the Plan, then this option shall be void with respect to those excess shares, unless stockholder approval of an amendment sufficiently increasing the number of shares of Common Stock issuable under the Plan is obtained in accordance with the provisions of the Plan.

    16. **Additional Terms Applicable to an Incentive Option**. In the event this option is designated an Incentive Option in the Grant Notice, the following terms and conditions shall also apply to the grant:

    (a) This option shall cease to qualify for favorable tax treatment as an Incentive Option if (and to the extent) this option is exercised for one or more Option Shares: (A) more than three (3) months after the date Optionee ceases to be an Employee for any reason

(Selected Officer Form)<br>A–6

other than death or Permanent Disability or (B) more than twelve (12) months after the date Optionee ceases to be an Employee by reason of Permanent Disability.

    (b) No installment under this option shall qualify for favorable tax treatment as an Incentive Option if (and to the extent) the aggregate Fair Market Value (determined at the Grant Date) of the Common Stock for which such installment first becomes exercisable hereunder would, when added to the aggregate value (determined as of the respective date or dates of grant) of the Common Stock or other securities for which this option or any other Incentive Options granted to Optionee prior to the Grant Date (whether under the Plan or any other option plan of the Corporation or any Parent or Subsidiary) first become exercisable during the same calendar year, exceed One Hundred Thousand Dollars ($100,000) in the aggregate. Should such One Hundred Thousand Dollar ($100,000) limitation be exceeded in any calendar year, this option shall nevertheless become exercisable for the excess shares in such calendar year as a Non–Statutory Option.

    (c) Should the exercisability of this option be accelerated upon a Corporate Transaction, then this option shall qualify for favorable tax treatment as an Incentive Option only to the extent the aggregate Fair Market Value (determined at the Grant Date) of the Common Stock for which this option first becomes exercisable in the calendar year in which the Corporate Transaction occurs does not, when added to the aggregate value (determined as of the respective date or dates of grant) of the Common Stock or other securities for which this option or one or more other Incentive Options granted to Optionee prior to the Grant Date (whether under the Plan or any other option plan of the Corporation or any Parent or Subsidiary) first become exercisable during the same calendar year, exceed One Hundred Thousand Dollars ($100,000) in the aggregate. Should the applicable One Hundred Thousand Dollar ($100,000) limitation be exceeded in the calendar year of such Corporate Transaction, the option may nevertheless be exercised for the excess shares in such calendar year as a Non–Statutory Option.

    (d) Should Optionee hold, in addition to this option, one or more other options to purchase Common Stock which become exercisable for the first time in the same calendar year as this option, then, for purposes of the foregoing limitations on the exercisability of such options as Incentive Options, this option and each of those other options shall be deemed to become first exercisable in that calendar year on the basis of the chronological order in which they were granted, except to the extent otherwise provided under applicable law or regulation.

(Selected Officer Form)<br>A–7

**Exhibit A–1**
**NOTICE OF EXERCISE**

I hereby notify Quiksilver, Inc. (the "Corporation") that I elect to purchase _____ shares of the Corporation's Common Stock (the "Purchased Shares") at the option exercise price of $_____ per share (the "Exercise Price") pursuant to that certain option (the "Option") granted to me under the Corporation's amended and restated 2000 Stock Incentive Plan on _____, _____

Concurrently with the delivery of this Exercise Notice to the Corporation, I shall hereby pay to the Corporation the Exercise Price for the Purchased Shares in accordance with the provisions of my agreement with the Corporation (or other documents) evidencing the Option and shall deliver whatever additional documents may be required by such agreement as a condition for exercise. Alternatively, I may utilize the special broker–dealer sale and remittance procedure specified in my agreement to effect payment of the Exercise Price.

_____, _____
Date

Optionee

Address:

Print name in exact manner it is to
appear on the stock certificate: _____

Address to which certificate is to _____
be sent, if different from address above: _____
_____

Social Security Number: _____

(Selected Officer Form)
A–8

## APPENDIX

The following definitions shall be in effect under the Agreement:

A. **Agreement** shall mean this Stock Option Agreement.

B. **Board** shall mean the Corporation's Board of Directors.

C. **Code** shall mean the Internal Revenue Code of 1986, as amended.

D. **Common Stock** shall mean shares of the Corporation's common stock.

E. **Corporate Transaction** shall mean either of the following stockholder–approved transactions to which the Corporation is a party:

    (i) a merger or consolidation in which securities possessing more than fifty percent (50%) of the total combined voting power of the Corporation's outstanding securities are transferred to a person or persons different from the persons holding those securities immediately prior to such transaction, or

    (ii) the sale, transfer or other disposition of all or substantially all of the Corporation's assets in complete liquidation or dissolution of the Corporation.

F. **Corporation** shall mean Quiksilver, Inc., a Delaware corporation, and any successor corporation to all or substantially all of the assets or voting stock of Quiksilver, Inc. which shall by appropriate action adopt the Plan.

G. **Employee** shall mean an individual who is in the employ of the Corporation (or any Parent or Subsidiary), subject to the control and direction of the employer entity as to both the work to be performed and the manner and method of performance.

H. **Exercise Date** shall mean the date on which the option shall have been exercised in accordance with Paragraph 9 of the Agreement.

I. **Exercise Price** shall mean the exercise price per Option Share as specified in the Grant Notice.

J. **Expiration Date** shall mean the date on which the option expires as specified in the Grant Notice.

K. **Fair Market Value** per share of Common Stock on any relevant date shall be determined in accordance with the following provisions:

    (i) If the Common Stock is at the time traded on the Nasdaq Global Select Market (or the Nasdaq Global Market), then the Fair Market Value shall be the closing selling price per share of

(Selected Officer Form)<br>A–9

Common Stock at the close of regular hours trading (i.e., before after–hours trading begins) on the Nasdaq Global Stock Market (or the Nasdaq Global Market) on the date in question, as such price is reported by The Wall Street Journal. If there is no closing selling price for the Common Stock on the date in question, then the Fair Market Value shall be the closing selling price on the last preceding date for which such quotation exists.

    (ii) If the Common Stock is at the time listed on any other Stock Exchange, then the Fair Market Value shall be the closing selling price per share of Common Stock at the close of regular hours trading (i.e., before after–hours trading begins) on the date in question on the Stock Exchange determined by the Plan Administrator to be the primary market for the Common Stock, as such price is officially quoted in the composite tape of transactions on such exchange. If there is no closing selling price for the Common Stock on the date in question, then the Fair Market Value shall be the closing selling price on the last preceding date for which such quotation exists.

    (iii) If the Common Stock is at the time <u>not</u> listed on any established stock exchange, the Fair Market Value shall be determined by the Board in good faith.

    L. **<u>Family Member</u>** shall mean, with respect to the Optionee, any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother–in–law, father–in–law, son–in–law, daughter–in–law, brother–in–law or sister–in–law.

    M. **<u>Grant Date</u>** shall mean the date of grant of the option as specified in the Grant Notice.

    N. **<u>Grant Notice</u>** shall mean the Notice of Grant of Stock Option accompanying the Agreement, pursuant to which Optionee has been informed of the basic terms of the option evidenced hereby.

    O. **<u>Incentive Option</u>** shall mean an option which satisfies the requirements of Code Section 422.

    P. **<u>Misconduct</u>** shall mean the commission of any act of fraud, embezzlement or dishonesty by Optionee, any unauthorized use or disclosure by Optionee of confidential information or trade secrets of the Corporation (or any Parent or Subsidiary), or any other intentional misconduct by Optionee adversely affecting the business or affairs of the Corporation (or any Parent or Subsidiary) in a material manner. The foregoing definition shall not be deemed to be inclusive of all the acts or omissions which the Corporation (or any Parent or Subsidiary) may consider as grounds for the dismissal or discharge of Optionee or any other individual in the Service of the Corporation (or any Parent or Subsidiary).

(Selected Officer Form)

Q. **Non–Statutory Option** shall mean an option not intended to satisfy the requirements of Code Section 422.

R. **Notice of Exercise** shall mean the notice of exercise in substantially the form attached hereto as Exhibit A–1.

S. **Option Shares** shall mean the number of shares of Common Stock subject to the option as specified in the Grant Notice.

T. **Optionee** shall mean the person to whom the option is granted as specified in the Grant Notice.

U. **Parent** shall mean any corporation (other than the Corporation) in an unbroken chain of corporations ending with the Corporation, provided each corporation in the unbroken chain (other than the Corporation) owns, at the time of the determination, stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

V. **Permanent Disability Or Permanently Disabled** shall mean the inability of the Optionee to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which is both (i) expected to result in death or determined to be total and permanent by two (2) physicians selected by the Corporation or its insurers and acceptable to the Optionee (or the Optionee's legal representative), and (ii) to the extent the Optionee is eligible to participate in the Corporation's long–term disability plan, entitles the Optionee to the payment of long–term disability benefits from the Corporation's long–term disability plan. The process for determining a Permanent Disability in accordance with the foregoing shall be completed no later than the later of (i) the close of the calendar year in which the Optionee's Service terminates by reason of the physical or mental impairment triggering the determination process or (ii) the fifteenth day of the third calendar month following such termination of Service.

W. **Plan** shall mean the Corporation's amended and restated 2000 Stock Incentive Plan.

X. **Plan Administrator** shall mean either the Board or a committee of the Board acting in its capacity as administrator of the Plan.

Y. **Service** shall mean the Optionee's performance of services for the Corporation (or any Parent or Subsidiary) in the capacity of an Employee, a non–employee member of the board of directors or a consultant or independent advisor. An Optionee shall be deemed to cease Service immediately upon the occurrence of either of the following events: (i) the Optionee no longer performs services in any of the foregoing capacities for the Corporation or any Parent or Subsidiary; or (ii) the entity for which the Optionee is performing such services ceases to remain a Parent or Subsidiary of the Corporation, even though the Optionee may subsequently continue to perform services for that entity.

Z. **Stock Exchange** shall mean the American Stock Exchange, the Nasdaq Global Select Market, the Nasdaq Global Market or the New York Stock Exchange.

(Selected Officer Form)<br>A–11

AA. **Subsidiary** shall mean any corporation (other than the Corporation) in an unbroken chain of corporations beginning with the Corporation, provided each corporation (other than the last corporation) in the unbroken chain owns, at the time of the determination, stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

(Selected Officer Form)

A–12

**EXHIBIT B**
**FRENCH OPTIONS AGREEMENT ADDENDUM**
**FRENCH PLAN TERMS**

This Addendum contains the terms of options granted to employees and officers under the Quiksilver, Inc. 2000 Stock Incentive Plan ("the Plan") to eligible French Employees and officers ("the French Plan"). The terms of the French Plan are identical to the Plan except as provided below:

1.  For the purposes of any options granted in accordance with the French Plan, the terms of the Plan shall be deemed incorporated by reference to this Addendum.

2.  For the purposes of the French Plan, options granted in accordance with the French Plan ("French Options") may be designated as Qualifying French Stock Options within the meaning of the conditions set forth in the French Commercial Code (articles L 225–177 to L 225–186–1).

3.  The per share exercise price of French Options determined in accordance with the French Plan shall not be less than 95% of the average Fair Market Value during the 20 trading days preceding the date of option grant.

4.  The employees and officers to whom French Options may be granted according to the French Plan are restricted as follows:

    French Options may not be granted to persons holding more than 10% of the share capital of the Corporation.

    French Options may only be granted to employees or "Président du Conseil d'administration", "Directeur Général", "Directeurs Généraux Délégués", Members of the "Directoire", "Gérant" of a "Société par actions", or other officers (in particular Président du Conseil de Surveillance) being otherwise a salaried employee of any Parent or Subsidiary of the Corporation where:

    (i) at least 10% of the employer company share capital or of the voting rights is held, directly or indirectly, by the Corporation;

    (ii) the employer company holds, directly or indirectly, at least 10% of the share capital or of the voting rights of the Corporation; or

    (iii) at least 50% of the employer company share capital or of the voting rights is held, directly or indirectly, by a company which itself holds, directly or indirectly, at least 50% of the capital of the Corporation.

5.  The period during which French Options may be exercised following date of death under the French Plan is six (6) months.

B–1

6.  Option adjustments under the French Plan include the following:

    "In all cases, the modification of the exercise price or number of options under the French Plan shall be made in accordance with article L 225–181 of the French Commercial Code."

7.  In the case of French Options to acquire treasury shares, the Corporation shall procure sufficient shares of Common Stock available for transfer to satisfy the exercise of such options (which have neither lapsed nor been exercised) to the full extent possible, before the Optionee has the right to exercise the French Option.

8.  No French Options may be granted before the end of the period of 20 trading days following a dividend distribution or increase of authorized capital or before or after 10 trading days of the publication of consolidated or, if none, annual accounts or between the date that the Corporation's officers have knowledge of any information which could significantly affect the value of the shares of Common Stock and 10 trading days after the information has been publicized.

9.  In accepting the grant of French Options, the Optionee undertakes that he or she will notify the employer company in writing with respect to the date of option exercise and share sale at least seven (7) days prior to and seven (7) days following either event.

10. The French Options shall not become exercisable for the Option Shares before the first anniversary of the Grant Date.

11. The sale or transfer as bearer shares of shares of Common Stock purchased upon exercise of French Options shall be restricted until the fourth anniversary of the Grant Date.

12. Under the French Plan, in no event shall the number of shares of Common Stock subject to outstanding unexercised options exceed one–third (1/3) of the Corporation's authorized shares.

**FRENCH RESTRICTED STOCK ADDENDUM**
**FRENCH PLAN TERMS**

This Addendum contains the terms of restricted stock granted to employees and officers under the Quiksilver, Inc. 2000 Stock Incentive Plan ("the Plan") to eligible French Employees and officers ("the French Plan"). The terms of the French Plan are identical to the Plan except as provided below:

1.  For the purposes of any restricted stock granted in accordance with the French Plan, the terms of the Plan shall be deemed incorporated by reference to this Addendum.

2.  For the purposes of the French Plan, restricted shares granted in accordance with the French Plan ("French Restricted Stock") may be designated as Qualifying French Restricted Stock within the meaning of the conditions set forth in the French Commercial Code (articles L 225−197−1 and s.).

3.  The employees and officers to whom French Restricted Stock may be granted according to the French Plan are restricted as follows:

    French Restricted Stock may not be granted to persons holding more than 10% of the share capital of the Corporation.

    French Restricted Stock may only be granted to employees or "Président du Conseil d'administration", "Directeur Général", "Directeurs Généraux Délégués", Members of the "Directoire", "Gérant" of a "Société par actions", "Président" of a "société par actions simplifiée" or other officers (in particular Président du Conseil de Surveillance) being otherwise a salaried employee of any Parent or Subsidiary of the Corporation where:

    (i) at least 10% of the employer company share capital or of the voting rights is held, directly or indirectly, by the Corporation;

    (ii) the employer company holds, directly or indirectly, at least 10% of the share capital or of the voting rights of the Corporation; or

    (iii) at least 50% of the employer company share capital or of the voting rights is held, directly or indirectly, by a company which itself holds, directly or indirectly, at least 50% of the capital of the Corporation.

4.  According to the article L.225−197−1 of the French Commercial Code, no shares of the French Restricted Stock shall vest before the second anniversary of the Grant Date. During the vesting period the Participant shall not be entitled to any rights (e.g., voting rights, cash dividends, etc.) with respect to the shares of French Restricted Stock. By way of exception, in the event of the death or permanent disability of second or third category of the Participant, all of the French Restricted Stock shall accelerate and vest immediately according to the articles L. 225−197−3 and L. 225−197−1 of the French Commercial Code and all restrictions shall lapse immediately.

B−3

5. Restricted Stock adjustments under the French Plan include the following:

"In all cases, the modification of the number of shares of the French Restricted Stock under the French Plan shall be made in accordance with the 'instruction DGI of 10 November 2006, 5F–17–06'"

6. According to the article L.225–197–3 of the French Commercial Code, the sale of the vested shares of the French Restricted stock shall be restricted until the second anniversary of the Vesting Date.

7. According to the article L.225–197–1 of the French Commercial Code, the sale of the shares of the French Restricted Stock shall be restricted before or after 10 trading days of the publication of consolidated or, if none, annual accounts or between the date that the Corporation's officers have knowledge of any information which could significantly affect the value of the shares of Common Stock and 10 trading days after the information has been publicized.

8. Under the French Plan, in no event shall the number of shares of the French Restricted Stock granted to the Participants exceed ten percent (10%) of the Corporation's authorized shares.

B–4



**NOTICE OF GRANT OF**
**NON–EMPLOYEE DIRECTOR AUTOMATIC STOCK OPTION**
**(Annual Meeting and Initial Grant Form)**

Notice is hereby given of the following option grant (the "Option") to purchase shares of the Common Stock of Quiksilver, Inc. (the "Corporation"):

| | | |
|---|---|---|
| Optionee: | | Grant Date: |
| Number of Options Shares: | **25,000** | Exercise Price: |
| Type of Option: | ☐ Incentive Stock Option | Expiration Date: |
| | ☒ Non–Statutory Stock Option | |

Exercise and Vesting Schedule: The option shall be fully vested and exercisable immediately upon grant.

Optionee understands and agrees that the Option is granted subject to and in accordance with the terms of the Director Automatic Grant Program under the Quiksilver, Inc. amended and restated 2000 Stock Incentive Plan (the "Plan"). Optionee further agrees to be bound by the terms of the Plan and the terms of the Option as set forth in the Automatic Stock Option Agreement attached hereto as Exhibit A. Optionee hereby acknowledges having received and read a copy of the official Plan Summary and Prospectus for the Plan. A copy of the Plan is available upon request made to the Corporate Secretary at the Corporation's principal offices.

Impairment of Rights. Nothing in this Notice or in the attached Automatic Stock Option Agreement or in the Plan shall interfere with or otherwise restrict in any way the rights of the Corporation and the Corporation's stockholders to remove Optionee from the Board at any time in accordance with the provisions of applicable law.

Definitions. All capitalized terms in this Notice shall have the meaning assigned to them in this Notice or in the attached Stock Option Agreement.

Date: _____

QUIKSILVER, INC.

By:

OPTIONEE

Title:

Address:

ATTACHMENTS

Exhibit A — Automatic Stock Option Agreement

**EXHIBIT A**
## AUTOMATIC STOCK OPTION AGREEMENT
R E C I T A L S

A. The Corporation has implemented an automatic grant program under the Plan pursuant to which eligible non–employee members of the Board will automatically receive option grants at periodic intervals over their period of Board service to provide such individuals with a meaningful incentive to continue to serve as members of the Board.

B. Optionee is an eligible non–employee Board member, and this Agreement is executed pursuant to, and is intended to carry out the purposes of, the Plan in connection with the automatic grant of an option to purchase shares of Common Stock under the Plan.

C. All capitalized terms in this Agreement shall have the meaning assigned to them in the attached Appendix.

**NOW, THEREFORE**, it is hereby agreed as follows:

1. **Grant of Option**. The Corporation hereby grants to Optionee, as of the Grant Date, a Non–Statutory Option to purchase up to the number of Option Shares specified in the Grant Notice. The Option Shares shall be purchasable from time to time during the option term specified in Paragraph 2 at the Exercise Price.

2. **Option Term**. This option shall have a maximum term of seven (7) years measured from the Grant Date and shall accordingly expire at the close of business on the Expiration Date, unless sooner terminated in accordance with Paragraph 5 or 6.

3. **Limited Transferability**.

(a) This option may be assigned in whole or in part during Optionee's lifetime only by gift or pursuant to a domestic relations order to one or more Family Members of the Optionee or to a trust established for the exclusive benefit of Optionee and/or one or more such Family Members. The assigned portion shall be exercisable only by the person or persons who acquire a proprietary interest in the option pursuant to such assignment. The terms applicable to the assigned portion shall be the same as those in effect for this option immediately prior to such assignment.

(b) Except as provided in Paragraph 3(a) above, this option shall be neither transferable nor assignable by Optionee other than by will or the laws of inheritance following Optionee's death and may be exercised, during Optionee's lifetime, only by Optionee. However, Optionee may designate one or more persons as the beneficiary or beneficiaries of this option, and this option shall, in accordance with such designation, automatically be transferred to such beneficiary or beneficiaries upon the Optionee's death while holding this option. Such beneficiary or beneficiaries shall take the transferred option subject to all the terms and

(Non–Employee Director)
A–1

conditions of this Agreement, including (without limitation) the limited time period during which this option may, pursuant to Paragraph 5, be exercised following Optionee's death.

   4. **Dates of Exercise**. This option shall be fully vested and immediately exercisable for the Option Shares and shall remain so until the Expiration Date or sooner termination of the option term under Paragraph 5 or 6.

   5. **Cessation of Board Service/Termination of Option**. Should Optionee's Service as a Board member cease while this option is outstanding, then the option term specified in Paragraph 2 shall terminate (and this option shall cease to be outstanding) prior to the Expiration Date in accordance with the following provisions:

      (a) Should Optionee cease to serve as a Board member for any reason while this option is outstanding, then the period during which this option may be exercised shall be reduced to a twelve (12)–month period measured from the date of such cessation of Board Service, but in no event shall this option be exercisable at any time after the Expiration Date. During such limited period of exercisability, Optionee (or the person or persons to whom this option is transferred pursuant to a permitted transfer under Paragraph 3) may exercise this option with respect to any Option Shares for which the option has not been exercised. Upon the expiration of such limited exercise period or (if earlier) upon the Expiration Date, this option shall terminate and cease to be outstanding for any exercisable Option Shares for which the option has not been exercised.

      (b) The applicable post–Service exercise period in effect for this option pursuant to the foregoing provisions of this Paragraph 5 shall automatically be extended by an additional period of time equal in duration to any interval within that otherwise applicable post–Service exercise period in which the exercise of this option or the immediate sale of the Option Shares acquired hereunder cannot be effected in compliance with applicable federal and state securities laws, but in no event shall such an extension result in the continuation of this option beyond the Expiration Date.

   6. **Corporate Transaction/Hostile Take–Over**.

      (a) Immediately following a Corporate Transaction, this option shall terminate and cease to be outstanding, except to the extent assumed by the successor corporation (or parent thereof) in connection with the Corporate Transaction or otherwise continued in full force and effect pursuant to the terms of the Corporate Transaction.

      (b) If this option is assumed in connection with a Corporate Transaction or otherwise continued in effect, then this option shall be appropriately adjusted, immediately after such Corporate Transaction, to apply to the number and class of securities which would have been issuable to Optionee in consummation of such Corporate Transaction had the option been exercised immediately prior to such Corporate Transaction, and appropriate adjustments shall also be made to the Exercise Price, provided the aggregate Exercise Price shall remain the same. To the extent the actual holders of the Corporation's outstanding Common Stock receive cash consideration for their Common Stock in consummation of the Corporate Transaction, the successor corporation may, in connection with the assumption of this option,

(Non–Employee Director)

A–2

substitute one or more shares of its own common stock with a fair market value equivalent to the cash consideration paid per share of Common Stock in such Corporate Transaction.

(c) This Agreement shall not in any way affect the right of the Corporation to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate or sell or transfer all or any part of its business or assets.

(d) Upon the occurrence of a Hostile Take–Over while Optionee remains a Board member, the Optionee shall have a thirty (30)–day period immediately following the consummation of the Hostile Take–Over in which to surrender to the Corporation this option in exchange for a cash distribution from the Corporation in an amount equal to the excess of (i) the Take–Over Price of the shares of Common Stock at the time subject to this option less (ii) the aggregate Exercise Price payable for such shares. This Paragraph 6(d) limited stock appreciation right shall in all events terminate upon the expiration or sooner termination of the option term and may not be assigned or transferred by Optionee, except to the extent the option is transferred in accordance with the provisions of this Agreement.

(e) To exercise the Paragraph 6(d) limited stock appreciation right, Optionee must, during the applicable thirty (30)–day exercise period, provide the Corporation with written notice of the option surrender in which there is specified the number of Option Shares as to which the option is being surrendered. Such notice must be accompanied by the return of Optionee's copy of this Agreement, together with any written amendments to such Agreement. The cash distribution shall be paid to Optionee within five (5) business days following such delivery date. The exercise of such limited stock appreciation right in accordance with the terms of this Paragraph 6 has been pre–approved pursuant to the express provisions of the Director Automatic Grant Program, and neither the approval of the Plan Administrator nor the consent of the Board shall be required at the time of the actual option surrender and cash distribution. Upon receipt of the cash distribution, this option shall be canceled with respect to the shares subject to the surrendered option (or the surrendered portion) and Optionee shall cease to have any further right to acquire those Option Shares under this Agreement. This option shall, however, remain outstanding for the balance of the Option Shares (if any) in accordance with the terms and provisions of this Agreement, and the Corporation shall accordingly issue a replacement stock option agreement (substantially in the same form as this Agreement) for those remaining Option Shares.

7. **Adjustment in Option Shares**. Should any change be made to the Common Stock by reason of any stock split, stock dividend, recapitalization, combination of shares, exchange of shares or other change affecting the outstanding Common Stock as a class without the Corporation's receipt of consideration, appropriate adjustments shall be made to (i) the total number and/or class of securities subject to this option and (ii) the Exercise Price in order to reflect such change and thereby preclude a dilution or enlargement of benefits hereunder.

8. **Stockholder Rights**. The holder of this option shall not have any stockholder rights with respect to the Option Shares until such person shall have exercised the option, paid the Exercise Price and become a holder of record of the purchased shares.

(Non–Employee Director)
A–3

9. **Manner of Exercising Option**.

(a) In order to exercise this option with respect to all or any part of the Option Shares for which this option is at the time exercisable, Optionee (or any other person or persons exercising the option) must take the following actions:

(i) Execute and deliver to the Corporation a Notice of Exercise for the Option Shares for which the option is exercised.

(ii) Pay the aggregate Exercise Price for the purchased shares in one or more of the following forms:

(A) cash or check made payable to the Corporation;

(B) shares of Common Stock valued at Fair Market Value on the Exercise Date and held by Optionee (or any other person or persons exercising the option) for the period, if any, necessary to avoid any charge to the Corporation's earnings for financial reporting purposes; or

(C) through a special sale and remittance procedure pursuant to which Optionee (or any other person or persons exercising the option) shall concurrently provide irrevocable instructions to (i) a Corporation–designated brokerage firm to effect the immediate sale of the purchased shares and remit to the Corporation, out of the sale proceeds available on the settlement date, sufficient funds to cover the aggregate Exercise Price payable for the purchased shares plus all applicable Federal, state and local income and employment taxes required to be withheld by the Corporation by reason of such exercise and (ii) the Corporation to deliver the certificates for the purchased shares directly to such brokerage firm in order to complete the sale.

Except to the extent the sale and remittance procedure is utilized in connection with the option exercise, payment of the Exercise Price must accompany the Notice of Exercise delivered to the Corporation in connection with the option exercise.

(iii) Furnish to the Corporation appropriate documentation that the person or persons exercising the option (if other than Optionee) have the right to exercise this option.

(iv) Make appropriate arrangements with the Corporation (or Parent or Subsidiary employing or retaining Optionee) for the satisfaction of all Federal, state and local income and employment tax withholding requirements applicable to the option exercise.

(b) As soon as practical after the Exercise Date, the Corporation shall issue to or on behalf of Optionee (or any other person or persons exercising this option) a certificate for the purchased Option Shares, with the appropriate legends affixed thereto.

(c) In no event may this option be exercised for any fractional shares.

(Non–Employee Director)
A–4

10. <u>Compliance with Laws and Regulations</u>.

(a) The exercise of this option and the issuance of the Option Shares upon such exercise shall be subject to compliance by the Corporation and Optionee with all applicable requirements of law relating thereto and with all applicable regulations of any stock exchange (or over–the–counter market, if applicable) on which the Common Stock may be listed for trading at the time of such exercise and issuance.

(b) The inability of the Corporation to obtain approval from any regulatory body having authority deemed by the Corporation to be necessary to the lawful issuance and sale of any Common Stock pursuant to this option shall relieve the Corporation of any liability with respect to the non–issuance or sale of the Common Stock as to which such approval shall not have been obtained. The Corporation, however, shall use its best efforts to obtain all such approvals.

11. **<u>Successors and Assigns</u>**. Except to the extent otherwise provided in Paragraphs 3 and 6, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Corporation and its successors and assigns and Optionee, Optionee's assigns, the legal representatives, heirs and legatees of Optionee's estate and any beneficiaries of this option designated by Optionee.

12. **<u>Notices</u>**. Any notice required to be given or delivered to the Corporation under the terms of this Agreement shall be in writing and addressed to the Corporation at its principal corporate offices. Any notice required to be given or delivered to Optionee shall be in writing and addressed to Optionee at the address indicated below Optionee's signature line on the Grant Notice. All notices shall be deemed effective upon personal delivery or upon deposit in the U.S. mail, postage prepaid and properly addressed to the party to be notified.

13. **<u>Construction</u>**. This Agreement and the option evidenced hereby are made and granted pursuant to the Plan and are in all respects limited by and subject to the terms of the Plan. All decisions of the Plan Administrator with respect to any question or issue arising under the Plan or this Agreement shall be conclusive and binding on all persons having an interest in this option.

14. **<u>Governing Law</u>**. The interpretation, performance and enforcement of this Agreement shall be governed by the laws of the State of California without resort to that State's conflict–of–laws rules.

15. **<u>Excess Shares</u>**. If the Option Shares covered by this Agreement exceed, as of the Grant Date, the number of shares of Common Stock which may without stockholder approval be issued under the Plan, then this option shall be void with respect to those excess shares, unless stockholder approval of an amendment sufficiently increasing the number of shares of Common Stock issuable under the Plan is obtained in accordance with the provisions of the Plan.

(Non–Employee Director)

A–5

**Exhibit A–1**

**<u>NOTICE OF EXERCISE</u>**

I hereby notify Quiksilver, Inc. (the "Corporation") that I elect to purchase _____ shares of the Corporation's Common Stock (the "Purchased Shares") at the option exercise price of $_____ per share (the "Exercise Price") pursuant to that certain option (the "Option") granted to me under the Corporation's amended and restated 2000 Stock Incentive Plan on _____, ___.

Concurrently with the delivery of this Exercise Notice to the Corporation, I shall hereby pay to the Corporation the Exercise Price for the Purchased Shares in accordance with the provisions of my agreement with the Corporation (or other documents) evidencing the Option and shall deliver whatever additional documents may be required by such agreement as a condition for exercise. Alternatively, I may utilize the special broker–dealer sale and remittance procedure specified in my agreement to effect payment of the Exercise Price.

_____, ___
Date

Optionee

Address:

Print name in exact manner it is to
appear on the stock certificate:                    _____

Address to which certificate is to                  _____
be sent, if different from address above:           _____
                                                    _____

Social Security Number:                             _____

(Non–Employee Director)

A–6

**APPENDIX**

The following definitions shall be in effect under the Agreement:

A. **Agreement** shall mean this Stock Option Agreement.

B. **Board** shall mean the Corporation's Board of Directors.

C. **Code** shall mean the Internal Revenue Code of 1986, as amended.

D. **Common Stock** shall mean shares of the Corporation's common stock.

E. **Corporate Transaction** shall mean either of the following stockholder–approved transactions to which the Corporation is a party:

    (i) a merger or consolidation in which securities possessing more than fifty percent (50%) of the total combined voting power of the Corporation's outstanding securities are transferred to a person or persons different from the persons holding those securities immediately prior to such transaction, or

    (ii) the sale, transfer or other disposition of all or substantially all of the Corporation's assets in complete liquidation or dissolution of the Corporation.

F. **Corporation** shall mean Quiksilver, Inc., a Delaware corporation, and any successor corporation to all or substantially all of the assets or voting stock of Quiksilver, Inc. which shall by appropriate action adopt the Plan.

G. **Exercise Date** shall mean the date on which the option shall have been exercised in accordance with Paragraph 9 of the Agreement.

H. **Exercise Price** shall mean the exercise price per Option Share as specified in the Grant Notice.

I. **Expiration Date** shall mean the date on which the option expires as specified in the Grant Notice.

J. **Fair Market Value** per share of Common Stock on any relevant date shall be determined in accordance with the following provisions:

    (i) If the Common Stock is at the time traded on the Nasdaq Global Select Market (or the Nasdaq Global Market), then the Fair Market Value shall be the closing selling price per share of Common Stock at the close of regular hours trading (i.e., before after–hours trading begins) on the Nasdaq Global Stock Market (or the Nasdaq Global Market) on the date in question, as such price is reported by The Wall Street Journal. If there is no closing selling

price for the Common Stock on the date in question, then the Fair Market Value shall be the closing selling price on the last preceding date for which such quotation exists.

(ii) If the Common Stock is at the time listed on any other Stock Exchange, then the Fair Market Value shall be the closing selling price per share of Common Stock at the close of regular hours trading (i.e., before after–hours trading begins) on the date in question on the Stock Exchange determined by the Plan Administrator to be the primary market for the Common Stock, as such price is officially quoted in the composite tape of transactions on such exchange. If there is no closing selling price for the Common Stock on the date in question, then the Fair Market Value shall be the closing selling price on the last preceding date for which such quotation exists.

(iii) If the Common Stock is at the time **not** listed on any established stock exchange, the Fair Market Value shall be determined by the Board in good faith.

K. **Family Member** shall mean, with respect to the Optionee, any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother–in–law, father–in–law, son–in–law, daughter–in–law, brother–in–law or sister–in–law.

L. **Grant Date** shall mean the date of grant of the option as specified in the Grant Notice.

M. **Grant Notice** shall mean the Notice of Grant of Stock Option accompanying the Agreement, pursuant to which Optionee has been informed of the basic terms of the option evidenced hereby.

N. **Hostile Take–Over** shall mean the acquisition, directly or indirectly, by any person or related group of persons (other than the Corporation or a person that directly or indirectly controls, is controlled by, or is under common control with, the Corporation) of beneficial ownership (within the meaning of Rule 13d–3 of the 1934 Act) of securities possessing more than fifty percent (50%) of the total combined voting power of the Corporation's outstanding securities pursuant to a tender or exchange offer made directly to the Corporation's stockholders which the Board does not recommend such stockholders to accept.

O. **Non–Statutory Option** shall mean an option not intended to satisfy the requirements of Code Section 422.

P. **Notice of Exercise** shall mean the notice of exercise in substantially the form attached hereto as Exhibit A–1.

Q. **Option Shares** shall mean the number of shares of Common Stock subject to the option as specified in the Grant Notice.

(Non–Employee Director)

A–8

R. **Optionee** shall mean the person to whom the option is granted as specified in the Grant Notice.

S. **Parent** shall mean any corporation (other than the Corporation) in an unbroken chain of corporations ending with the Corporation, provided each corporation in the unbroken chain (other than the Corporation) owns, at the time of the determination, stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

T. **Permanent Disability** shall mean the inability of Optionee to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which is expected to result in death or has lasted or can be expected to last for a continuous period of twelve (12) months or more.

U. **Plan** shall mean the Corporation's amended and restated 2000 Stock Incentive Plan.

V. **Plan Administrator** shall mean either the Board or a committee of the Board acting in its capacity as administrator of the Plan.

W. **Service** shall mean the Optionee's performance of services for the Corporation (or any Parent or Subsidiary) in the capacity of an Employee, a non–employee member of the board of directors or a consultant or independent advisor. An Optionee shall be deemed to cease Service immediately upon the occurrence of either of the following events: (i) the Optionee no longer performs services in any of the foregoing capacities for the Corporation or any Parent or Subsidiary; or (ii) the entity for which the Optionee is performing such services ceases to remain a Parent or Subsidiary of the Corporation, even though the Optionee may subsequently continue to perform services for that entity.

X. **Stock Exchange** shall mean the American Stock Exchange, the Nasdaq Global Select Market, the Nasdaq Global Market or the New York Stock Exchange.

Y. **Subsidiary** shall mean any corporation (other than the Corporation) in an unbroken chain of corporations beginning with the Corporation, provided each corporation (other than the last corporation) in the unbroken chain owns, at the time of the determination, stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

Z. **Take–Over Price** shall mean the greater of (i) the Fair Market Value per share of Common Stock on the date the option is surrendered to the Corporation in connection with a Hostile Take–Over or (ii) the highest reported price per share of Common Stock paid by the tender offeror in effecting such Hostile Take–Over through the acquisition of Common Stock.

AA. **1934 Act** shall mean the Securities Exchange Act of 1934, as amended.

(Non–Employee Director)

A–9

**QUIKSILVER, INC.**
**RESTRICTED STOCK AGREEMENT**
**(Non–Employee Director Automatic Grant — Annual Meeting and Initial Grant Form)**

**Director:** _____

**Grant Date:** _____

**Number of Shares of**
**Restricted Stock Granted: 15,000**

     **THIS RESTRICTED STOCK AGREEMENT** (this "Agreement") dated as of **[** _____ **]**, 20___(the "Grant Date") is entered into by and between Quiksilver, Inc., a Delaware corporation (the "Corporation"), and the Director specified above, pursuant to the Director Automatic Grant Program under the Quiksilver, Inc. amended and restated 2000 Stock Incentive Plan (the "Plan"). Capitalized terms used herein and not otherwise defined in the attached Appendix or elsewhere herein shall have the meaning assigned to such terms in the Plan.

     **NOW, THEREFORE**, in consideration of services rendered and to be rendered by the Director, and the mutual promises made herein and the mutual benefits to be derived therefrom, the parties agree as follows:

  1. **Grant**. Subject to the terms of this Agreement, the Corporation hereby grants to the Director an aggregate of 15,000 restricted shares of Common Stock of the Corporation (the "Restricted Stock").

  2. **Vesting**.

    (a) Time Vesting. Subject to Section 7 below, the Restricted Stock shall vest, and restrictions shall lapse, as follows:

      (i) 5,000 shares of Restricted Stock shall vest on the first anniversary of the Grant Date or, if this grant is being made on the date of an annual meeting of stockholders of the Corporation, on the day immediately preceding the date of the first annual meeting of stockholders of the Corporation following the Grant Date, if earlier than such first anniversary;

      (ii) 5,000 shares of Restricted Stock shall vest on the second anniversary of the Grant Date or, if this grant is being made on the date of an annual meeting of stockholders of the Corporation, on the day immediately preceding the date of the second annual meeting of stockholders of the Corporation following the Grant Date, if earlier than such second anniversary;

(Non–Employee Director Automatic Grant — Annual Meeting and Initial Grant Form)

(iii) 5,000 shares of Restricted Stock shall vest on the third anniversary of the Grant Date or, if this grant is being made on the date of an annual meeting of stockholders of the Corporation, on the day immediately preceding the date of the third annual meeting of stockholders of the Corporation following the Grant Date, if earlier than such third anniversary.

(b) <u>Acceleration of Vesting Upon Corporate Transaction/Change in Control.</u> All of the Restricted Stock shall accelerate and vest and all restrictions shall lapse, immediately prior to the effective date of a Corporate Transaction or Change in Control.

(c) <u>Acceleration of Vesting Upon Death or Permanent Disability.</u> In the event of the death or Permanent Disability of Director, all of the Restricted Stock shall accelerate and vest and all restrictions shall lapse immediately prior to such death or Permanent Disability.

3. **Continuance of Service**. Vesting of the Restricted Stock requires continued Service of the Director as a member of the Corporation's Board of Directors from the Grant Date through each applicable vesting date as a condition to the vesting of the applicable installment of the Restricted Stock and the rights and benefits under this Agreement. Nothing contained in this Agreement or the Plan constitutes a service commitment by the Corporation, confers upon the Director any right to remain in service to the Corporation, interferes in any way with the right of the Corporation at any time to terminate such services, or affects the right of the Corporation to increase or decrease the Director's other compensation or benefits. Nothing in this section, however, is intended to adversely affect any independent contractual right of the Director without his or her consent thereto.

4. **Dividend and Voting Rights**. After the Grant Date, the Director shall be entitled to voting rights and any regular cash dividends with respect to the shares of Restricted Stock even though such shares are not vested, provided that such rights shall terminate immediately as to any shares of Restricted Stock that are forfeited pursuant to Section 7 below.

5. **Restrictions on Transfer**. Prior to the time that they have become vested, neither shares of the Restricted Stock, nor any interest therein, amount payable in respect thereof, or Restricted Property (as defined in Section 8 hereof) may be sold, assigned, transferred, pledged or otherwise disposed of, alienated or encumbered (collectively, a "Transfer"), either voluntarily or involuntarily. The Transfer restrictions in the preceding sentence shall not apply to (i) transfers to the Corporation, or (ii) transfers by will or the laws of descent and distribution. After any shares of Restricted Stock have vested, the Director shall be permitted to Transfer such shares of Restricted Stock, subject to applicable securities law requirements, the Corporation's insider trading policies, and other applicable laws and regulations.

6. **Stock Certificates**.

(a) <u>Book Entry Form</u>. The Corporation shall issue the shares of Restricted Stock either: (i) in certificate form as provided in Section 6(b) below; or (ii) in book entry form, registered in the name of the Director with notations regarding the applicable restrictions on transfer imposed under this Agreement.

(b) <u>Certificates to be Held by Corporation; Legend</u>. Any certificates representing shares of Restricted Stock that may be delivered to the Director by the Corporation

(Non–Employee Director Automatic Grant — Annual Meeting and Initial Grant Form)
2

prior to vesting shall be redelivered to the Corporation to be held by the Corporation until the restrictions on such shares shall have lapsed and the shares shall thereby have become vested or the shares represented thereby have been forfeited hereunder. Such certificates shall bear the following legend:

*"The ownership of this certificate and the shares of stock evidenced hereby and any interest therein are subject to substantial restrictions on transfer under an Agreement entered into between the registered owner and Quiksilver, Inc. A copy of such Agreement is on file in the office of the Secretary of Quiksilver, Inc."*

(c) <u>Delivery of Certificates Upon Vesting</u>. Promptly after shares of Restricted Stock have vested, and all other conditions and restrictions applicable to such Restricted Stock have been satisfied or lapse (including satisfaction of any applicable Withholding Taxes), the Corporation shall, as applicable, either remove the notations on any shares of Restricted Stock issued in book entry form which have vested or deliver to the Director a certificate or certificates evidencing the number of shares of Restricted Stock which have vested (or, in either case, such lesser number of shares as may be permitted pursuant to Section 9). The Director (or the beneficiary or personal representative of the Director in the event of the Director's death or Permanent Disability, as the case may be) shall deliver to the Corporation any representations or other documents or assurances as the Corporation may deem desirable to assure compliance with all applicable legal and accounting requirements. The shares so delivered shall no longer be Restricted Stock hereunder.

(d) <u>Stock Power; Power of Attorney</u>. Concurrently with the execution and delivery of this Agreement, the Director shall deliver to the Corporation an executed stock power in the form attached hereto as <u>Exhibit A</u>, in blank, with respect to such shares. The Director, by acceptance of the Restricted Stock, shall be deemed to appoint, and does so appoint by execution of this Agreement, the Corporation and each of its authorized representatives as the Director's attorney(s)–in–fact to effect any transfer of unvested forfeited shares of Restricted Stock (or shares otherwise reacquired by the Corporation hereunder) to the Corporation as may be required pursuant to the Plan or this Agreement and to execute such documents as the Corporation or such representatives deem necessary or advisable in connection with any such transfer.

7. **<u>Effect of Termination of Service</u>**. Subject to earlier vesting as provided in Section 2 hereof, if the Director ceases to provide Service to the Corporation as a member of the Corporation's Board of Directors, the Director's shares of Restricted Stock (and related Restricted Property as defined in Section 8 hereof) shall be forfeited to the Corporation to the extent such shares have not become vested pursuant to Section 2 upon the date the Director's Service as a member of the Board of Directors terminates (the "Severance Date"), regardless of the reason for such termination (whether with or without cause, voluntarily or involuntarily). Upon the occurrence of any forfeiture of shares of Restricted Stock hereunder, such unvested, forfeited shares and related Restricted Property shall be automatically transferred to the Corporation, without any other action by the Director. No additional consideration shall be paid by the Corporation with respect to such transfer. The Corporation may exercise its powers under Section 6(d) hereof and take any other action necessary or advisable to evidence such transfer.

(Non–Employee Director Automatic Grant — Annual Meeting and Initial Grant Form)

The Director shall deliver any additional documents of transfer that the Corporation may request to confirm the transfer of such unvested, forfeited shares and related Restricted Property to the Corporation.

    8. **Adjustments Upon Specified Events**. If any change is made to the Common Stock by reason of any stock split, stock dividend, recapitalization, combination of shares, exchange of shares or other change affecting the outstanding Common Stock as a class, appropriate adjustment shall be made to the number and/or class of securities in effect under this Agreement. Such adjustments to the outstanding Restricted Stock are to be effected in a manner which shall preclude the enlargement or dilution of rights and benefits under this Agreement. The adjustments determined by the Corporation shall be final, binding and conclusive. If any adjustment shall be made pursuant to the foregoing or any dividend other than a regular cash dividend is declared and the shares of Restricted Stock are not fully vested upon such event or prior thereto, the restrictions applicable to such shares of Restricted Stock shall continue in effect with respect to any consideration or other securities (the "Restricted Property" and, for the purposes of this Agreement, "Restricted Stock" shall include "Restricted Property," unless the context otherwise requires) received in respect of such Restricted Stock. Such Restricted Property shall vest at such times and in such proportion as the shares of Restricted Stock to which the Restricted Property is attributable vest, or would have vested pursuant to the terms hereof if such shares of Restricted Stock had remained outstanding.

    9. **Taxes**.

      (a) Tax Withholding. The Corporation shall be entitled to require a cash payment by or on behalf of the Director and/or to deduct from other compensation payable to the Director any sums required with respect to Withholding Taxes. Alternatively, the Director or other person in whom the Restricted Stock vests may irrevocably elect, in such manner and at such time or times prior to any applicable tax date as may be permitted or required under rules established by the Corporation, to have the Corporation withhold and reacquire shares of Restricted Stock at their Fair Market Value at the time of vesting to satisfy all or part of the minimum Withholding Taxes of the Corporation with respect to such vesting. Any election to have shares so held back and reacquired shall be subject to such rules and procedures, which may include prior approval of the Corporation, as the Corporation may impose, and shall not be available if the Director makes or has made an election pursuant to Section 83(b) of the Code with respect to such Restricted Stock.

      (b) Tax Consequences to Director. Director acknowledges that the issuance and the vesting of the Restricted Stock may have significant and adverse tax consequences for Director and that Director has been advised by the Corporation to review the Questions and Answers on Federal Income Tax Consequences portion of the Corporation's Stock Plan Summary and Prospectus and to consult Director's personal tax advisor regarding the consequences of the issuance and vesting of the Restricted Stock to Director.

    10. **Notices**. Any notice to be given under the terms of this Agreement shall be in writing and addressed to the Corporation at its principal office to the attention of the Secretary, and to the Director at the Director's last address reflected on the Corporation's records. Any notice shall be delivered in person or shall be enclosed in a properly sealed envelope, addressed

(Non–Employee Director Automatic Grant — Annual Meeting and Initial Grant Form)

4

as aforesaid, registered or certified, and deposited (postage and registry or certification fee prepaid) in a post office or branch office regularly maintained by the United States Government. Any such notice shall be given only when received, but shall be deemed to have been duly given five business days after the date mailed in accordance with the foregoing provisions of this Section 10.

11. **Plan**. The Restricted Stock and all rights of the Director under this Agreement are subject to the terms and conditions of the provisions of the Plan, incorporated herein by reference. The Director agrees to be bound by the terms of the Plan and this Agreement. The Director acknowledges having read and understanding the Plan, the Plan Summary and Prospectus for the Plan, and this Agreement.

12. **Entire Agreement**. This Agreement and the Plan together constitute the entire agreement and supersede all prior understandings and agreements, written or oral, of the parties hereto with respect to the subject matter hereof. The Plan and this Agreement may be amended pursuant to Section 6.3 of the Plan. Such amendment must be in writing and signed by the Corporation. The Corporation may, however, unilaterally waive any provision hereof in writing to the extent such waiver does not adversely affect the interests of the Director hereunder, but no such waiver shall operate as or be construed to be a subsequent waiver of the same provision or a waiver of any other provision hereof.

13. **Counterparts**. This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

14. **Section Headings**. The section headings of this Agreement are for convenience of reference only and shall not be deemed to alter or affect any provision hereof.

15. **Governing Law**. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware without regard to conflict of law principles thereunder.

*[Signature page follows]*

(Non–Employee Director Automatic Grant — Annual Meeting and Initial Grant Form)

5

**IN WITNESS WHEREOF**, the Corporation has caused this Agreement to be executed on its behalf by a duly authorized officer and the Director has hereunto set his or her hand as of the date and year first above written.

**QUIKSILVER, INC., a Delaware corporation**

By: _____

_____

_____

**DIRECTOR**

_____

_____

_____

_____

(Non–Employee Director Automatic Grant — Annual Meeting and Initial Grant Form)

6

## APPENDIX

The following definitions shall be in effect under the Agreement:

A. "**Board**" shall mean the Corporation's Board of Directors.

B. "**Change in Control**" shall mean a change in ownership or control of the Corporation effected through either of the following transactions.

(i) the acquisition, directly or indirectly, by any person or related group of persons (other than the Corporation or a person that directly controls, is controlled by, or is under common control with, the Corporation), of beneficial ownership (within the meaning of Rule 13d–3 of the 1934 Act) of securities possessing more than fifty percent (50%) of the total combined voting power of the Corporation's outstanding securities pursuant to a tender or exchange offer made directly to the Corporation's stockholders, or

(ii) a change in the composition of the Board over a period of thirty–six (36) consecutive months or less such that a majority of the Board members ceases, by reason of one or more contested elections for Board membership, to be comprised of individuals who either (A) have been Board members continuously since the beginning of such period or (b) have been elected or nominated for election as Board members during such period by at least a majority of the Board members described in clause (A) who were still in office at the time the Board approved such election or nomination.

C. "**Common Stock**" shall mean the Corporation's common stock.

D. "**Corporate Transaction**" shall mean either of the following stockholder–approved transactions to which the Corporation is a party:

(i) a merger or consolidation in which securities possessing more than fifty percent (50%) of the total combined voting power of the Corporation's outstanding securities are transferred to a person or persons different from the persons holding those securities immediately prior to such transaction, or

(ii) the sale, transfer or other disposition of all or substantially all of the Corporation's assets in complete liquidation or dissolution of the Corporation.

E. "**Fair Market Value**" per share of Common Stock on any relevant date shall be determined in accordance with the following provisions:

(i) If the Common Stock is at the time traded on the Nasdaq Global Select Market (or the Nasdaq Global Market), then the Fair Market Value shall be the closing selling price per share of Common Stock at the close of regular hours trading (i.e., before after–hours trading begins) on the Nasdaq Global Stock Market (or the Nasdaq Global Market) on the date in question, as such price is reported by The Wall Street Journal. If there is no closing selling price for the Common Stock on the date in question, then the Fair Market Value shall be the closing selling price on the last preceding date for which quotation exists.

(Non–Employee Director Automatic Grant — Annual Meeting and Initial Grant Form)

7

(ii) If the Common Stock is at the time listed on any other Stock Exchange, then the Fair Market Value shall be the closing selling price per share of Common Stock at the close of regular hours trading (i.e., before after–hours trading begins) on the date in question on the Stock Exchange determined by the Plan Administrator to be the primary market for the Common Stock, as such price is officially quoted in the composite tape of transactions on such exchange. If there is no closing selling price for the Common Stock on the date in question, then the Fair Market Value shall be the closing selling price on the last preceding date for which such quotation exists.

(iii) If the Common Stock is at the time not listed on any established stock exchange, the Fair Market Value shall be determined by the Board in good faith.

F. "**Permanent Disability**" or "**Permanently Disabled**" shall mean the inability of the Director to perform his or her usual duties as a Board member by reason of any medically determinable physical or mental impairment expected to result in death or to be of continuous duration of twelve (12) months or more.

G. "**Service**" shall mean the performance of services for the Corporation by a person in the capacity of a member of the Corporation's Board of Directors.

H. "**Stock Exchange**" shall mean the American Stock Exchange, the Nasdaq Global Select Market, the Nasdaq Global Market or the New York Stock Exchange.

I. "**Withholding Taxes**" shall mean the federal, state and local income and employment withholding taxes to which the Director may become subject in connection with the issuance or vesting of shares of Restricted Stock or upon the disposition of shares acquired pursuant to this Agreement.

(Non–Employee Director Automatic Grant — Annual Meeting and Initial Grant Form)

## CONSENT OF SPOUSE

In consideration of the execution of the foregoing Restricted Stock Agreement by Quiksilver, Inc., I, _____, the spouse of the Director therein named, do hereby join with my spouse in executing the foregoing Restricted Stock Agreement and do hereby agree to be bound by all of the terms and provisions thereof and of the Plan.

Dated: _____, 20___

_____
*Signature of Spouse*

_____
*Print Name*

(Non–Employee Director Automatic Grant — Annual Meeting and Initial Grant Form)

9

## STOCK POWER

FOR VALUE RECEIVED and pursuant to that certain Restricted Stock Agreement between Quiksilver, Inc., a Delaware corporation (the "Corporation"), and the individual named below (the "Individual") dated as of _____, 20___, the Individual, hereby sells, assigns and transfers to the Corporation, an aggregate _____ shares of Common Stock of the Corporation, standing in the Individual's name on the books of the Corporation and represented by stock certificate number(s) _____ to which this instrument is attached, and hereby irrevocably constitutes and appoints _____ as his or her attorney in fact and agent to transfer such shares on the books of the Corporation, with full power of substitution in the premises.

Dated _____, _____

_____

*Signature*

_____

*Print Name*

*(Instruction: Please do not fill in any blanks other than the signature line. The purpose of the assignment is to enable the Corporation to exercise its sale/purchase option set forth in the Restricted Stock Agreement without requiring additional signatures on the part of the Individual.)*

(Non–Employee Director Automatic Grant — Annual Meeting and Initial Grant Form)

10

**F O R M**
**QUIKSILVER, INC.**
**RESTRICTED STOCK AGREEMENT**
(Employee Grant)

**Participant:**                    _____

**Grant Date:**                    _____

**Number of Shares of**
**Restricted Stock Granted:**                    _____

     **THIS RESTRICTED STOCK AGREEMENT** (this "Agreement") dated as of [_____], 20___ (the "Grant Date") is entered into by and between Quiksilver, Inc., a Delaware corporation (the "Corporation"), and the Participant specified above, pursuant to the Restricted Stock Program under the Quiksilver, Inc. amended and restated 2000 Stock Incentive Plan (the "Plan"). Capitalized terms used herein and not otherwise defined in the attached Appendix or elsewhere herein shall have the meaning assigned to such terms in the Plan.

     **NOW, THEREFORE**, in consideration of services rendered and to be rendered by the Participant, and the mutual promises made herein and the mutual benefits to be derived therefrom, the parties agree as follows:

    1. **Grant**. Subject to the terms of this Agreement, the Corporation hereby grants to the Participant an aggregate of _____ restricted shares of Common Stock of the Corporation (the "Restricted Stock").

    2. **Vesting**.

       (a) <u>Vesting</u>. Subject to Section 7 below, the Restricted Stock shall vest, and restrictions shall lapse, as follows:

          ***[Insert Vesting Provisions]***

       (b) <u>Acceleration of Vesting Upon Corporate Transaction</u>. No shares of the Restricted Stock shall vest at the time of a Corporate Transaction on an accelerated basis if and to the extent that (i) this Agreement is, in connection with the Corporate Transaction, continued or assumed by the successor corporation (or parent thereof) or otherwise continued in full force and effect pursuant to the express terms of the Corporate Transaction, or (ii) substitution of new agreements of comparable value covering shares of the successor corporation (or parent thereof) in exchange for such shares of Restricted Stock, with appropriate adjustments as to the number and kind of shares and purchase price, is provided for pursuant to the express terms of the Corporation Transaction. However, if none of the foregoing conditions are satisfied,

(Employee Grant Form)
1

immediately prior to the effective date of the Corporate Transaction, all of the Restricted Stock shall accelerate and vest and all restrictions shall lapse, immediately prior to the effective date of the Corporate Transaction. In addition, if this Agreement is continued or assumed by a successor corporation (or parent thereof) or otherwise continued in full force and effect pursuant to the express terms of the Corporate Transaction or new agreements of comparable value covering shares of the successor corporation (or parent thereof) are substituted in exchange for the shares of Restricted Stock, and the successor corporation (or parent thereof) terminates Participant as an employee, other than for Misconduct, all of the Restricted Stock shall accelerate and vest and all restrictions shall lapse immediately prior to such termination of Participant as an employee of the successor corporation (or parent thereof).

(c) <u>Acceleration of Vesting Upon Change in Control</u>. In the event that the Corporation terminates Participant as an Employee, other than for Misconduct, following a Change in Control, all of the Restricted Stock shall accelerate and vest and all restrictions shall lapse, immediately prior to such termination of Participant as an Employee.

(d) <u>Acceleration of Vesting Upon Death or Permanent Disability.</u> In the event of the death or Permanent Disability of Participant, all of the Restricted Stock shall accelerate and vest and all restrictions shall lapse immediately prior to such death or Permanent Disability.

3. **<u>Continuance of Service</u>**. Vesting of the Restricted Stock requires continued Service of the Participant from the Grant Date through each applicable vesting date as a condition to the vesting of the applicable installment of the Restricted Stock and the rights and benefits under this Agreement. Nothing contained in this Agreement or the Plan constitutes an employment or service commitment by the Corporation, affects the Participant's status as an employee at will who is subject to termination without cause, confers upon the Participant any right to remain employed by or in service to the Corporation (or any Parent or Subsidiary), interferes in any way with the right of the Corporation (or any Parent or Subsidiary) at any time to terminate such employment or services, or affects the right of the Corporation (or any Parent or Subsidiary) to increase or decrease the Participant's other compensation or benefits. Nothing in this section, however, is intended to adversely affect any independent contractual right of the Participant without his or her consent thereto.

4. **<u>Dividend and Voting Rights</u>**. After the Grant Date, the Participant shall be entitled to voting rights and any regular cash dividends with respect to the shares of Restricted Stock even though such shares are not vested, provided that such rights shall terminate immediately as to any shares of Restricted Stock that are forfeited pursuant to Section 7 below.

5. **<u>Restrictions on Transfer</u>**. Prior to the time that they have become vested, neither shares of the Restricted Stock, nor any interest therein, amount payable in respect thereof, or Restricted Property (as defined in Section 8 hereof) may be sold, assigned, transferred, pledged or otherwise disposed of, alienated or encumbered (collectively, a "Transfer"), either voluntarily or involuntarily. The Transfer restrictions in the preceding sentence shall not apply to (i) transfers to the Corporation, or (ii) transfers by will or the laws of descent and distribution. After any shares of Restricted Stock have vested, the Participant shall be permitted to Transfer such shares of Restricted Stock, subject to applicable securities law requirements, the Corporation's insider trading policies, and other applicable laws and regulations.

(Employee Grant Form)<br>2

6. **Stock Certificates**.

(a) Book Entry Form. The Corporation shall issue the shares of Restricted Stock either: (i) in certificate form as provided in Section 6(b) below; or (ii) in book entry form, registered in the name of the Participant with notations regarding the applicable restrictions on transfer imposed under this Agreement.

(b) Certificates to be Held by Corporation; Legend. Any certificates representing shares of Restricted Stock that may be delivered to the Participant by the Corporation prior to vesting shall be redelivered to the Corporation to be held by the Corporation until the restrictions on such shares shall have lapsed and the shares shall thereby have become vested or the shares represented thereby have been forfeited hereunder. Such certificates shall bear the following legend:

*"The ownership of this certificate and the shares of stock evidenced hereby and any interest therein are subject to substantial restrictions on transfer under an Agreement entered into between the registered owner and Quiksilver, Inc. A copy of such Agreement is on file in the office of the Secretary of Quiksilver, Inc."*

(c) Delivery of Certificates Upon Vesting. Promptly after shares of Restricted Stock have vested, and all other conditions and restrictions applicable to such Restricted Stock have been satisfied or lapse (including satisfaction of any applicable Withholding Taxes), the Corporation shall, as applicable, either remove the notations on any shares of Restricted Stock issued in book entry form which have vested or deliver to the Participant a certificate or certificates evidencing the number of shares of Restricted Stock which have vested (or, in either case, such lesser number of shares as may be permitted pursuant to Section 9). The Participant (or the beneficiary or personal representative of the Participant in the event of the Participant's death or Permanent Disability, as the case may be) shall deliver to the Corporation any representations or other documents or assurances as the Corporation may deem desirable to assure compliance with all applicable legal and accounting requirements. The shares so delivered shall no longer be Restricted Stock hereunder.

(d) Stock Power; Power of Attorney. Concurrently with the execution and delivery of this Agreement, the Participant shall deliver to the Corporation an executed stock power in the form attached hereto, in blank, with respect to such shares. The Participant, by acceptance of the Restricted Stock, shall be deemed to appoint, and does so appoint by execution of this Agreement, the Corporation and each of its authorized representatives as the Participant's attorney(s)–in–fact to effect any transfer of unvested forfeited shares of Restricted Stock (or shares otherwise reacquired by the Corporation hereunder) to the Corporation as may be required pursuant to the Plan or this Agreement and to execute such documents as the Corporation or such representatives deem necessary or advisable in connection with any such transfer.

(Employee Grant Form)

3

7. **Effect of Termination of Service; Misconduct**.

(a) <u>Termination of Service</u>. Subject to earlier vesting as provided in Section 2 hereof, if the Participant ceases to provide Service to the Corporation (or a Parent or Subsidiary), the Participant's shares of Restricted Stock (and related Restricted Property as defined in Section 8 hereof) shall be forfeited to the Corporation to the extent such shares have not become vested pursuant to Section 2 upon the date the Participant's Service terminates, regardless of the reason for such termination (whether with or without cause, voluntarily or involuntarily).

(b) <u>Misconduct</u>. Subject to earlier vesting as provided in Section 2 hereof, if the Participant engages in Misconduct, the Participant's shares of Restricted Stock (and related Restricted Property as defined in Section 8 hereof) shall be forfeited to the Corporation to the extent such shares have not become vested pursuant to Section 2 immediately prior to the date the Participant first engaged in Misconduct.

(c) <u>Forfeiture Procedures</u>. Upon the occurrence of any forfeiture of shares of Restricted Stock under this Section 7, such unvested, forfeited shares and related Restricted Property shall be automatically transferred to the Corporation, without any other action by the Participant. No additional consideration shall be paid by the Corporation with respect to such transfer. The Corporation may exercise its powers under Section 6(d) hereof and take any other action necessary or advisable to evidence such transfer. The Participant shall deliver any additional documents of transfer that the Corporation may request to confirm the transfer of such unvested, forfeited shares and related Restricted Property to the Corporation.

8. **Adjustments Upon Specified Events**. If any change is made to the Common Stock by reason of any stock split, stock dividend, recapitalization, combination of shares, exchange of shares, Corporate Transaction (not resulting in acceleration of vesting pursuant to Section 2(b)) or other change affecting the outstanding Common Stock as a class, appropriate adjustment shall be made to the number and/or class of securities in effect under this Agreement. Such adjustments to the outstanding Restricted Stock are to be effected in a manner which shall preclude the enlargement or dilution of rights and benefits under this Agreement. The adjustments determined by the Corporation shall be final, binding and conclusive. If any adjustment shall be made pursuant to the foregoing or any dividend other than a regular cash dividend is declared and the shares of Restricted Stock are not fully vested upon such event or prior thereto, the restrictions applicable to such shares of Restricted Stock shall continue in effect with respect to any consideration or other securities (the "Restricted Property") and, for the purposes of this Agreement, "Restricted Stock" shall include "Restricted Property," unless the context otherwise requires) received in respect of such Restricted Stock. Such Restricted Property shall vest at such times and in such proportion as the shares of Restricted Stock to which the Restricted Property is attributable vest, or would have vested pursuant to the terms hereof if such shares of Restricted Stock had remained outstanding.

9. **Taxes**.

(a) <u>Tax Withholding</u>. The Corporation (or any Parent or Subsidiary last employing the Participant) shall be entitled to require a cash payment by or on behalf of the Participant and/or to deduct from other compensation payable to the Participant any sums

(Employee Grant Form)

4

required with respect to Withholding Taxes. Alternatively, the Participant or other person in whom the Restricted Stock vests may irrevocably elect, in such manner and at such time or times prior to any applicable tax date as may be permitted or required under rules established by the Corporation, to have the Corporation withhold and reacquire shares of Restricted Stock at their Fair Market Value at the time of vesting to satisfy all or part of the minimum Withholding Taxes of the Corporation (or any Parent or Subsidiary) with respect to such vesting. Any election to have shares so held back and reacquired shall be subject to such rules and procedures, which may include prior approval of the Corporation, as the Corporation may impose, and shall not be available if the Participant makes or has made an election pursuant to Section 83(b) of the Code with respect to such Restricted Stock.

(b) Tax Consequences to Participant. Participant acknowledges that the issuance and the vesting of the Restricted Stock may have significant and adverse tax consequences for Participant and that Participant has been advised by the Corporation to review the Questions and Answers on Federal Income Tax Consequences portion of the Corporation's Stock Plan Summary and Prospectus and to consult Participant's personal tax advisor regarding the consequences of the issuance and vesting of the Restricted Stock to Participant.

10. **Notices**. Any notice to be given under the terms of this Agreement shall be in writing and addressed to the Corporation at its principal office to the attention of the Secretary, and to the Participant at the Participant's last address reflected on the Corporation's payroll records. Any notice shall be delivered in person or shall be enclosed in a properly sealed envelope, addressed as aforesaid, registered or certified, and deposited (postage and registry or certification fee prepaid) in a post office or branch office regularly maintained by the United States Government. Any such notice shall be given only when received, but if the Participant is no longer an Employee shall be deemed to have been duly given five business days after the date mailed in accordance with the foregoing provisions of this Section 10.

11. **Plan**. The Restricted Stock and all rights of the Participant under this Agreement are subject to the terms and conditions of the provisions of the Plan, incorporated herein by reference. The Participant agrees to be bound by the terms of the Plan and this Agreement. The Participant acknowledges having read and understanding the Plan, the Plan Summary and Prospectus for the Plan, and this Agreement. Unless otherwise expressly provided in other sections of this Agreement, provisions of the Plan that confer discretionary authority on the Board or the Committee do not (and shall not be deemed to) create any rights in the Participant unless such rights are expressly set forth herein or otherwise in the sole discretion of the Board or the Committee so conferred by appropriate action of the Board or the Committee under the Plan after the date hereof.

12. **Entire Agreement**. This Agreement and the Plan together constitute the entire agreement and supersede all prior understandings and agreements, written or oral, of the parties hereto with respect to the subject matter hereof. The Plan and this Agreement may be amended pursuant to Section 6.3 of the Plan. Such amendment must be in writing and signed by the Corporation. The Corporation may, however, unilaterally waive any provision hereof in writing to the extent such waiver does not adversely affect the interests of the Participant hereunder, but no such waiver shall operate as or be construed to be a subsequent waiver of the same provision or a waiver of any other provision hereof.

(Employee Grant Form)

13. **Counterparts**. This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

14. **Section Headings**. The section headings of this Agreement are for convenience of reference only and shall not be deemed to alter or affect any provision hereof.

15. **Governing Law**. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware without regard to conflict of law principles thereunder.

**IN WITNESS WHEREOF**, the Corporation has caused this Agreement to be executed on its behalf by a duly authorized officer and the Participant has hereunto set his or her hand as of the date and year first above written.

**QUIKSILVER, INC., a Delaware corporation**

By: _____

Print Name: _____

Its: _____

**PARTICIPANT**

*Signature*

*Print Name*
(Employee Grant Form)
6

## APPENDIX

The following definitions shall be in effect under the Agreement:

A. "**Board**" shall mean the Corporation's Board of Directors.

B. "**Change in Control**" shall mean a change in ownership or control of the Corporation effected through either of the following transactions.

(i) the acquisition, directly or indirectly, by any person or related group of persons (other than the Corporation or a person that directly controls, is controlled by, or is under common control with, the Corporation), of beneficial ownership (within the meaning of Rule 13d–3 of the 1934 Act) of securities possessing more than fifty percent (50%) of the total combined voting power of the Corporation's outstanding securities pursuant to a tender or exchange offer made directly to the Corporation's stockholders, or

(ii) a change in the composition of the Board over a period of thirty–six (36) consecutive months or less such that a majority of the Board members ceases, by reason of one or more contested elections for Board membership, to be comprised of individuals who either (A) have been Board members continuously since the beginning of such period or (b) have been elected or nominated for election as Board members during such period by at least a majority of the Board members described in clause (A) who were still in office at the time the Board approved such election or nomination.

C. "**Committee**" shall mean the Compensation Committee of the Board of Directors.

D. "**Common Stock**" shall mean the Corporation's common stock.

E. "**Corporate Transaction**" shall mean either of the following stockholder–approved transactions to which the Corporation is a party:

(i) a merger or consolidation in which securities possessing more than fifty percent (50%) of the total combined voting power of the Corporation's outstanding securities are transferred to a person or persons different from the persons holding those securities immediately prior to such transaction, or

(ii) the sale, transfer or other disposition of all or substantially all of the Corporation's assets in complete liquidation or dissolution of the Corporation.

F. "**Employee**" shall mean any individual who is in the employ of the Corporation (or any Parent or Subsidiary), subject to the control and direction of the employer entity as to both the work to be performed and the manner and method of performance.

G. **Fair Market Value** per share of Common Stock on any relevant date shall be determined in accordance with the following provisions:

(Employee Grant Form)

7

(i) If the Common Stock is at the time traded on the Nasdaq Global Select Market (or the Nasdaq Global Market), then the Fair Market Value shall be the closing selling price per share of Common Stock at the close of regular hours trading (i.e., before after–hours trading begins) on the Nasdaq Global Stock Market (or the Nasdaq Global Market) on the date in question, as such price is reported by The Wall Street Journal. If there is no closing selling price for the Common Stock on the date in question, then the Fair Market Value shall be the closing selling price on the last preceding date for which such quotation exists.

(ii) If the Common Stock is at the time listed on any other Stock Exchange, then the Fair Market Value shall be the closing selling price per share of Common Stock at the close of regular hours trading (i.e., before after–hours trading begins) on the date in question on the Stock Exchange determined by the Plan Administrator to be the primary market for the Common Stock, as such price is officially quoted in the composite tape of transactions on such exchange. If there is no closing selling price for the Common Stock on the date in question, then the Fair Market Value shall be the closing selling price on the last preceding date for which such quotation exists.

(iii) If the Common Stock is at the time <u>not</u> listed on any established stock exchange, the Fair Market Value shall be determined by the Board in good faith.

H. "**Misconduct**" shall mean the commission of any act of fraud, embezzlement or dishonesty by the Participant, any unauthorized use or disclosure by such person of confidential information or trade secrets of the Corporation (or any Parent or Subsidiary), or any other intentional misconduct by such person adversely affecting the business or affairs of the Corporation (or any Parent or Subsidiary) in a material manner. The foregoing definitions shall not be deemed to be inclusive of all the acts or omissions which the Corporation (or any Parent or Subsidiary) may consider as grounds for the dismissal or discharge of any Participant or other person in the Service of the Corporation (or any Parent or Subsidiary).

I. "**Parent**" shall mean any corporation (other than the Corporation) in an unbroken chain of corporations ending with the Corporation, provided each corporation in the unbroken chain (other than the Corporation) owns, at the time of the determination, stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

J. "**Permanent Disability**" or "**Permanently Disabled**" shall mean the inability of the Participant to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which is both (i) expected to result in death or determined to be total and permanent by two (2) physicians selected by the Corporation or its insurers and acceptable to the Participant (or the Participant's legal representative), and (ii) to the extent the Participant is eligible to participate in the Corporation's long–term disability plan, entitles the Participant to the payment of long–term disability benefits from the Corporation's long–term disability plan. The process for determining a Permanent Disability in accordance with the foregoing shall be completed no later than the later of (i) the close of the calendar year in which the Participant's Service terminates by reason of the physical or mental impairment triggering the determination process or (ii) the fifteenth day of the third calendar month following such termination of Service.

(Employee Grant Form)

8

K. "**Service**" shall mean the performance of services for the Corporation (or any Parent or Subsidiary) by a person in the capacity of an Employee. Participant shall be deemed to cease Service immediately upon the occurrence of either of the following events: (i) the Participant no longer performs services in the capacity of an Employee for the Corporation or any Parent or Subsidiary; or (ii) the entity for which the Participant is performing such services ceases to remain a Parent or Subsidiary of the Corporation, even though the Participant may subsequently continue to perform services for that entity.

L. "**Stock Exchange**" shall mean the American Stock Exchange, the Nasdaq Global Select Market, the Nasdaq Global Market or the New York Stock Exchange.

M. "**Subsidiary**" shall mean any corporation (other than the Corporation) in the unbroken chain of corporations beginning with the Corporation, provided each corporation (other than the last corporation) in the unbroken chain owns, at the time of the determination, stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

N. "**Withholding Taxes**" shall mean the federal, state and local income and employment withholding taxes to which the Participant may become subject in connection with the issuance or vesting of shares of Restricted Stock or upon the disposition of shares acquired pursuant to this Agreement.

(Employee Grant Form)

### CONSENT OF SPOUSE

In consideration of the execution of the foregoing Restricted Stock Agreement by Quiksilver, Inc., I, _____, the spouse of the Participant therein named, do hereby join with my spouse in executing the foregoing Restricted Stock Agreement and do hereby agree to be bound by all of the terms and provisions thereof and of the Plan.

Dated: _____, 20____

*Signature of Spouse*

*Print Name*
(Employee Grant Form)
10

### STOCK POWER

FOR VALUE RECEIVED and pursuant to that certain Restricted Stock Agreement between Quiksilver, Inc., a Delaware corporation (the "Corporation"), and the individual named below (the "Individual") dated as of _____, 20___, the Individual, hereby sells, assigns and transfers to the Corporation, an aggregate _____ shares of Common Stock of the Corporation, standing in the Individual's name on the books of the Corporation and represented by stock certificate number(s) _____ to which this instrument is attached, and hereby irrevocably constitutes and appoints _____ as his or her attorney in fact and agent to transfer such shares on the books of the Corporation, with full power of substitution in the premises.

Dated _____, _____

*Signature*

*Print Name*

*(Instruction: Please do not fill in any blanks other than the signature line. The purpose of the assignment is to enable the Corporation to exercise its sale/purchase option set forth in the Restricted Stock Agreement without requiring additional signatures on the part of the Individual.)*

(Employee Grant Form)

11

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| Patricia Stockmann-Sans, Derivatively on Behalf of Quiksilver, Inc. | Robert B. McKnight, Jr., Pierre Agnes, Craig Stevenson, William M. Barnum, Jr., Joseph F. Berardino, James G. Ellis, Charles S. Exon, M. Steven Langman, Robert L. Mettler, Paul Speaker, Andrew W. Sweet and Douglas K.; and  Nominal Defendant Quiksilver, Inc. |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Kessler Topaz Meltzer & Check, LLP~ Ramzi Abadou (222567) One Sansome Street, Suite 1850, San Francisco, CA 94104 Telephone: (415) 400-3000 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No   ☐ MONEY DEMANDED IN COMPLAINT: $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Shareholder Derivative Action for Breach of Fiduciary Duties, Waste, Unjust Enrichment and Violations of Security Exchange Act (17 C.F.R. § 240.14-A-9)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | IMMIGRATION | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 462 Naturalization Application | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus- Alien Detainee | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | | ☐ 871 IRS-Third Party 26 USC 7609 |

## SACV12 1882

**FOR OFFICE USE ONLY:**   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

| CV-71 (05/08) | CIVIL COVER SHEET | Page 1 of 2 |
|---|---|---|

### UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
#### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                                    ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                                    ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                                    ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | State of Iowa |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County; Los Angeles County; Ventura County | Country of France; Country of Australia; State of Connecticut; State of New York |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County |  |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____     Date 10/29/12

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### Central District of California

PATRICIA STOCKMAN-SANN, Derivatively on
Behalf of QUIKSILVER, INC.

_____
*Plaintiff(s)*

v.

ROBERT B. MCKNIGHT, JR., et al.

~~See Attached~~
_____
*Defendant(s)*

)
)
)
)
)
)
)
)
)
)
)
)

**SACV12 1882AG(JPRx)**

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  See Attachment A

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you
are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ.
P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of
the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney,
whose name and address are:   Ramzi Abadou
Kessler Topaz Meltzer & Check, LLP
One Sansome Street, Suite 1850
San Francisco, CA 94104

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint.
You also must file your answer or motion with the court.

OCT 29 2012

CLERK OF COURT

JULIE PRADO

Date: _____          _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

### PROOF OF SERVICE
#### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏  I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏  I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏  I returned the summons unexecuted because _____ ; or

❏  Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

# Attachment A

| Defendant's Name | Address |
|---|---|
| Andrew W. Sweet | 20 Beverly Place<br>Darien, CT 06820 |
| Charles S. Exon | 22 Pintail<br>Irvine, CA 92604 |
| Craig Stevenson | 18 Broadbeach Road<br>Jan Juc, Victoria, 3228, Australia |
| Douglas K. Ammerman | 57 Emerald Bay<br>Laguna Beach, CA 92651 |
| James G. Ellis | 1435 Circle Drive<br>San Marino, CA 91108 |
| Joseph F. Berardino | 4 Avon Lane<br>Greenwich, CT 06830 |
| M. Steven Langman | 1133 5th Avenue, 5th Floor #5/4A<br>New York, NY 10128 |
| Paul C. Speaker | 1999 Trentham Road<br>Lake Sherwood, CA 91361 |
| Pierre Agnes | 3, Rue Marlan, 40130<br>Capbreton, France |
| Quiksilver, Inc. | 15202 Graham Street<br>Huntington Beach, CA 92649 |
| Robert B. McKnight, Jr. | 167 Emerald Bay<br>Laguna Beach, CA 92651 |
| Robert L. Mettler | 11986 Lockridge Road<br>Studio City, CA 91604 |
| William M. Barnum, Jr. | 1677 Amalfi Drive<br>Pacific Palisades, CA 90272 |