**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Ramzi Abadou (222567)
rabadou@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Fax: (415) 400-3001

-and-

Eric L. Zagar (250519)
ezagar@ktmc.com
Robin Winchester
rwinchester@ktmc.com
Kristen L. Ross
kross@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Fax: (267) 948-2512

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA STOCKMAN-SANN, Derivatively on Behalf of QUIKSILVER, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT B. MCKNIGHT, JR., PIERRE AGNES, CRAIG STEVENSON, WILLIAM M. BARNUM, JR., JOSEPH F. BERARDINO, JAMES G. ELLIS, CHARLES S. EXON, M. STEVEN LANGMAN, ROBERT L. METTLER, PAUL C. SPEAKER, ANDREW W. SWEET, DOUGLAS K. AMMERMAN<br><br>Defendants,<br><br>and<br><br>QUIKSILVER, INC., a Delaware Corporation<br><br>Nominal Defendant. | Case No.: 8:12-cv-01882-AG-JPR<br><br>**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT
DEC 19 2012
CENTRAL DISTRICT OF CALIFORNIA
BY           DEPUTY

RECEIVED BUT NOT FILED
DEC 19 2012
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION
BY           DEPUTY

Plaintiff Patricia Stockman-Sann ("Plaintiff"), by her undersigned attorneys, submits this Verified Amended Shareholder Derivative Complaint against the defendants named herein, and alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, an investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

## NATURE AND SUMMARY OF THE ACTION

1. Plaintiff brings this action derivatively for the benefit of nominal defendant Quiksilver, Inc. ("Quiksilver" or the "Company") against certain of its executive officers and members of its Board of Directors (the "Board") seeking to remedy defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, federal statutory violations, and other violations of law that have caused Quiksilver, the real party in interest, to sustain damages.

2. In gross breach of their fiduciary duties as directors of the Company, the members of the Board's Compensation Committee (the "Compensation Committee") knowingly granted restricted stock units to three Quiksilver executive officers in deliberate violation of the Company's 2000 Stock Incentive Plan (as amended and restated, the "2000 Plan", attached hereto as Exhibit A), and then tried to cover up their breaches by an ineffective amendment and subsequent grants.

3. The 2000 Plan allows the Compensation Committee to grant equity awards such as stock options, restricted stock and restricted stock units to executive officers, employees and directors of the Company. While the Compensation Committee has been delegated the authority to administer the 2000 Plan, its discretion in exercising such authority is not unlimited. Rather, the 2000 Plan, as approved by Quiksilver's shareholders, specifically prohibits the Compensation Committee from granting any one person more than 800,000 shares of Quiksilver common stock in any calendar year (the "Limit").

4. In blatant violation of the Limit, in 2011, the Compensation Committee, comprised at the time of defendants Douglas K. Ammerman ("Ammerman"), William M. Barnum, Jr. ("Barnum"), Joseph F. Berardino ("Berardino") and Robert L. Mettler ("Mettler"), granted each of three Quiksilver executive officers equity awards for more than 800,000 shares of Quiksilver common stock. Specifically, on June 13, 2011, the Compensation Committee granted Quiksilver's President and Chief Executive Officer ("CEO"), defendant Robert B. McKnight, Jr. ("McKnight") 2,000,000 restricted stock units and defendants Pierre Agnes ("Agnes") and Craig Stevenson ("Stevenson"), then Presidents of Quiksilver Europe and Quiksilver Americas, respectively, 1,000,000 restricted stock units each (collectively, "the 2011 Grants"). These awards were *ultra vires*, a waste of Quiksilver's assets and constituted a flagrant breach of the Compensation Committee members' fiduciary duties owed to the Company and its shareholders.

5. On October 29, 2012, Plaintiff filed in this Court a verified shareholder derivative complaint (the "Complaint") alleging, *inter alia*, that defendants breached their fiduciary duties and wasted corporate assets by granting defendants McKnight, Agnes and Stevenson a total of 1.6 million restricted stock units in excess of the Limit and in deliberate violation of the 2000 Plan (the "Action").

6. On November 13, 2012, in response to the Action, the Company filed with the Securities and Exchange Commission ("SEC") a Form 8-K (the "8-K") stating that in February 2012, the Board, without seeking or obtaining shareholder approval or even making any public disclosure, formally amended the 2000 Plan to clarify that the Limit did not apply to any award, including restricted stock units, not intended to be exempt under the Internal Revenue Code of 1986 (the "Code") and not designed to be deductable by the Company for tax purposes (the "Amendment"). The 8-K further stated that the Board retroactively applied the Amendment to the

2011 Grants, as the Amendment was effective as of June 13, 2011 (the date of the 2011 Grants).

7. The 8-K also stated that on November 13, 2012, defendants McKnight, Agnes and Stevenson surrendered, and the Company cancelled, 1,200,000, 200,000 and 200,000 of the restricted stock units, respectively, they had received in the 2011 Grants, and immediately following the surrender and cancellation, the Compensation Committee granted defendants McKnight, Agnes and Stevenson 1,200,000, 200,000 and 200,000 restricted stock units, respectively, under substantially similar terms as those of the 2011 Grants (collectively, the "2012 Grants").

8. In violation of the unambiguous terms of the 2000 Plan, the members of the Board neither sought nor obtained shareholder approval of the Amendment, and thus both the Amendment and the November 13, 2012 grant to defendant McKnight, which still exceeded the Limit by 400,000 units, are *ultra vires*, invalid, and constituted a breach of the Board members' fiduciary duties owed to the Company and the stockholders.

9. In addition to the foregoing, on February 8, 2012, the Board, as a further and separate breach of fiduciary duties and in violation of Section 14(a) of the Securities Exchange Act of 1934 ("Section 14(a)"), filed with the SEC and disseminated to Quiksilver shareholders a Form DEF 14A proxy statement (the "2012 Proxy") containing false and misleading statements and omitting material information regarding the awards of restricted stock units and the Amendment.

10. The 2012 Proxy is false and misleading in several respects, leaving shareholders either uninformed or misinformed as to, among other things: (i) the representation that the Compensation Committee had "complete discretion" to determine the amount of equity awards that could be granted to the Company's executive officers, which was not true because the committee's discretion was subject to the Limit; (ii) the Board's failure to disclose that the 2011 Grants violated

the 2000 Plan; and (iii) the Board's failure to disclose the existence of the Amendment, which violated the 2000 Plan because the Board approved it without seeking or obtaining shareholder approval. These false and misleading statements and omissions were material in the solicitation of votes for the election of Quiksilver's directors, including defendants Barnum, Berardino, McKnight and Mettler.

11. Through this Action, Plaintiff seeks to recover for the Company the damages caused by the misconduct alleged herein, to compel defendant McKnight to disgorge to the Company the improper benefits he received, and to rescind the *ultra vires* Amendment.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the allegations contained herein state a federal question relating to the submission and dissemination of false proxy statements in violation of Section 14(a). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(3), in that Plaintiff and Defendants are citizens of different states and, with respect to certain Defendants, of foreign states, and the matter in controversy exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States which it would not otherwise have.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because nominal defendant Quiksilver is headquartered in this District. In addition, a substantial portion of the occurrences complained of herein occurred in this District and one or more of the Defendants either resides in, or maintains offices in, this District.

## PARTIES

14. Plaintiff is a shareholder of Quiksilver, was a shareholder of Quiksilver at the time of the wrongdoing alleged herein, and has been a shareholder of Quiksilver continuously since that time. Plaintiff has been a shareholder of Quiksilver continuously since March 8, 2004. Plaintiff is a citizen of the State of Iowa.

15. Nominal defendant Quiksilver is a Delaware corporation with its principal place of business located at 15202 Graham Street, Huntington Beach, California, and thus is a citizen of Delaware and California. Shares of Quiksilver's common stock are traded on the NYSE under the ticker symbol "ZQK." According to its public filings, Quiksilver is "a globally diversified company that designs, develops and distributes branded apparel, footwear, accessories and related products, catering to the casual, youthful lifestyle associated with the sports of surfing, skateboarding and snowboarding." Its major brands are Quiksilver, Roxy and DC.

16. Defendant McKnight co-founded Quiksilver in 1976 and has served as CEO and Chairman of the Board since 1976. He has served as Quiksilver's President from 1979 to July 1991 and from February 2008 to the present. On June 13, 2011, defendant McKnight received an award of 2,000,000 restricted stock units, which exceeded the Limit by 1,200,000 units. On November 13, 2012, defendant McKnight surrendered, and the Company cancelled, 1,200,000 of the 2,000,000 restricted stock units that he received in the 2011 Grants. On the same day, the Compensation Committee granted defendant McKnight 1,200,000 restricted stock units, which exceeded the Limit by 400,000 units. As a member of the Board, defendant McKnight approved the *ultra vires* Amendment. Upon information and belief, defendant McKnight is a citizen of the State of California.

17. Defendant Agnes has served as President of Quiksilver Europe since June 2005. From December 2003 to June 2005 defendant Agnes served as Managing Director of Quiksilver Europe; from 1992 to 2002 as founder and operator

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT - 5 -
CASE NO. 8:12-CV-01882-AG-JPR

of Omareef Europe, a licensee of Quiksilver purchased by the Company in November 2002; and beginning in 1988 as a team manager and in other capacities throughout Quiksilver's European marketing operations. On June 13, 2011, defendant Agnes received an award of 1,000,000 restricted stock units, which exceeded the Limit by 200,000 units. On November 13, 2012, defendant Agnes surrendered, and the Company cancelled, 200,000 of the 1,000,000 restricted stock units that he received in the 2011 Grants. On the same day, the Compensation Committee granted defendant Agnes 200,000 restricted stock units. Upon information and belief, defendant Agnes is a citizen of France.

18. Defendant Stevenson has served as Global Brand President and Chief Operating Officer ("COO") of the Company since November 2011. He previously served as President of Quiksilver Americas from January 2009 to November 2011. He has served in various other capacities with Quiksilver since 1992. On June 13, 2011, defendant Stevenson received an award of 1,000,000 restricted stock units, which exceeded the Limit by 200,000 units. On November 13, 2012, defendant Stevenson surrendered, and the Company cancelled, 200,000 of the 1,000,000 restricted stock units that he received in the 2011 Grants. On the same day, the Compensation Committee granted defendant Stevenson 200,000 restricted stock units. Upon information and belief, defendant Stevenson is a citizen of Australia.

19. Defendant Barnum has served as a director of Quiksilver since 1991. He served on the Compensation Committee during 2011 and 2012 and made the *ultra vires* restricted stock unit awards complained of herein. As a member of the Board, defendant Barnum approved the *ultra vires* Amendment. Upon information and belief, defendant Barnum is a citizen of the State of California.

20. Defendant Berardino has served as a director of Quiksilver since May 13, 2011. He served on the Compensation Committee during 2011 and 2012 and made the *ultra vires* restricted stock unit awards complained of herein. As a member

of the Board, defendant Berardino approved the *ultra vires* Amendment. Upon information and belief, defendant Berardino is a citizen of the State of Connecticut.

21. Defendant James G. Ellis ("Ellis") has served as a director of Quiksilver since 2009 and approved the *ultra vires* Amendment. Upon information and belief, defendant Ellis is a citizen of the State of California.

22. Defendant Charles S. Exon ("Exon") has served as Quiksilver's Chief Administrative Officer ("CAO") since February 2008 and as Secretary and General Counsel since August 2000. He has served as a director of the Company since 2005 and approved the *ultra vires* Amendment. Upon information and belief, defendant Exon is a citizen of the State of California.

23. Defendant M. Steven Langman ("Langman") has served as a director of Quiksilver since 2009 and approved the *ultra vires* Amendment. He was appointed to the Board as a designee of entities affiliated with private equity firm Rhône, which own approximately 29.8% of Quiksilver's outstanding common stock. Defendant Langman co-founded Rhône in 1996. Upon information and belief, defendant Langman is a citizen of the State of New York.

24. Defendant Mettler has served as a director of Quiksilver since 2010. He served on the Compensation Committee during 2011 and 2012 and made the *ultra vires* restricted stock unit awards complained of herein. As a member of the Board, defendant Mettler approved the *ultra vires* Amendment. Upon information and belief, defendant Mettler is a citizen of the State of California.

25. Defendant Paul C. Speaker ("Speaker") has served as a director of Quiksilver since 2010 and approved the *ultra vires* Amendment. Upon information and belief, defendant Speaker is a citizen of the State of California.

26. Defendant Andrew W. Sweet ("Sweet") has served as a director of Quiksilver since 2009 and approved the *ultra vires* Amendment. He was appointed to the Board as a designee of entities affiliated with Rhône and is a Managing

Director of Rhône. Upon information and belief, defendant Sweet is a citizen of the State of Connecticut.

27. Defendant Ammerman served as a director of Quiksilver from 2005 to March 20, 2012 and approved the *ultra vires* Amendment. He served on the Compensation Committee during 2011 and made the *ultra vires* 2011 Grants complained of herein. Upon information and belief, defendant Ammerman is a citizen of the State of California.

28. Defendants Agnes, Ammerman, Barnum, Berardino, Ellis, Exon, Langman, McKnight, Mettler, Speaker, Stevenson and Sweet are referred to collectively herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

29. By reason of their positions as officers and/or directors of Quiksilver and because of their ability to control the business and corporate affairs of Quiksilver, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Quiksilver and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of Quiksilver owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

30. To discharge their duties, the Individual Defendants, as officers and directors of the Company, were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.

By virtue of such duties, the Individual Defendants were required to, among other things:

    a.    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business;

    b.    exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules and regulations and requirements and the Company's governing documents, *e.g.*, the 2000 Plan, including acting only within the scope of their legal authority;

    c.    refrain from wasting the Company's assets or otherwise unduly benefiting themselves and other Company insiders at the expense of the Company; and

    d.    make full, fair, and accurate disclosures to shareholders.

31.    The Individual Defendants, as well as all employees of Quiksilver, were and are required to comply with the Company's Code of Business Conduct and Ethics ("Code of Conduct"). According to the Code of Conduct, "[s]ince its founding, [Quiksilver] has insisted that all its employees act with honesty, fairness and integrity in their dealings with and on behalf of the Company." The Code of Conduct further requires that directors, officers and employees "comply in all material respects with all applicable laws, rules and regulations" and with "all other policies applicable to them that are adopted by the Company from time to time."

32.    Quiksilver also maintains a "Code of Ethics for Senior Financial Officers" which applies to defendant McKnight as President and CEO. Article V thereof, entitled "Full, Fair, Accurate and Timely Disclosure for SEC Filings; Record Keeping," requires that defendant McKnight, as well as other senior officers, review the Company's SEC filings and press releases before they are filed and/or issued to the public:

> *The Company requires full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the SEC and in other public communications.*

> Unrecorded or "off the book" funds or assets should not be maintained unless permitted by applicable laws or regulations. In addition, no undisclosed or unrecorded fund or asset shall be maintained for any improper purpose and no transaction shall be carried out in a manner intended to obscure the substance of the transaction, nor shall any transaction be recorded in violation of applicable legal and accounting requirements. If a material mistake in any information previously disclosed in any such filing or submission is discovered, such mistake should immediately be brought to the attention of the Audit Committee.
>
> *The Chief Executive Officer, Chief Financial Officer and, when appropriate, other Senior Financial Officers, shall read each SEC report and press release prior to the time it is filed, furnished or issued to the SEC or public, as applicable. Any inaccuracy or material misstatement in, or the omission of any information necessary to make the statements made not misleading from, any SEC filing or press release shall be immediately disclosed to the Audit Committee and, if applicable, the Company's auditors.*

(Emphasis added).

33. Additionally, the members of the Compensation Committee, defendants Ammerman, Berardino, Barnum and Mettler, were responsible for properly administering the 2000 Plan and were required to comply with the obligations set forth in the Charter for Compensation Committee (the "Charter"). According to the Charter, "the primary purpose of the Compensation Committee is to (i) assist the Board of Directors in discharging its responsibilities in respect of compensation of the Company's executive officers and directors; and (ii) produce an annual report on executive compensation for inclusion in the Company's proxy statement."

34. The Charter further provides that the Compensation Committee members have the following duties and responsibilities:

- Review and approve the Company's goals and objectives, relevant to CEO compensation, evaluate the CEO's performance in light of those goals and objectives, and have sole authority to/together with the other independent directors determine the CEO's compensation level based on this evaluation.

- Consider the Company's performance and relative shareholder return, the value of similar incentive awards to CEO's at comparable companies, and the awards given to the Company's CEO in past years when determining the long-term component of the CEO's compensation.

- Make recommendations to the Board with respect to non-CEO executive compensation, incentive-compensation plans and equity based plans.

- Review and approve on behalf of the full Board, the annual salary, bonus and other benefits, direct and indirect, of executive officers. This authority extends to the approval of employment agreements between the Company and such employees.

- Review and approve individual stock option grants for employees pursuant to plans approved by the Board.

- Review periodically and administer the Company's existing stock option, stock incentive, stock purchase and stock bonus plans or arrangements and make recommendations to the full Board for changes, if any, to such plans.

- Review periodically and submit to the full Board recommendations concerning existing or new executive compensation, employee benefits, stock plans or management perquisites.

- Produce an annual report on executive compensation for inclusion in the proxy statement as the Compensation Committee Report.

- Conduct an annual review of non-employee director compensation and, if appropriate, recommend any changes in the type or amount of non-employee director compensation. The Committee should consider that directors' independence may be jeopardized if director compensation and perquisites exceed customary levels, if the Company makes substantial contributions to organizations with which a director is affiliated, or if the Company enters into consulting contracts with (or provides other indirect forms of compensation to) a director or an organization with which a director is affiliated. Compensation of nonemployee directors should be comparable to that offered by other companies of similar size and scope and a portion of director compensation should be in the form of stock or stock options.

- Make regular reports to the Board and propose any necessary action to the Board.

- Review and reassess the adequacy of this charter annually and recommend any proposed changes to the Board for approval.

- Evaluate its performance as the Compensation Committee on an annual basis.

- Perform such other specific functions as the Company's Board of Directors may from time to time direct.

(Emphasis added).

35. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

## SUBSTANTIVE ALLEGATIONS

### The 2000 Plan

36. The 2000 Plan was originally adopted by the Board on February 15, 2000 and approved by the Company's shareholders at its annual meeting on March 31, 2000. The stated purpose of the 2000 Plan is "to promote the interests of [Quiksilver] by providing eligible persons in the Corporation's service with the opportunity to acquire a proprietary interest, or otherwise increase their proprietary interest, in the Corporation as an incentive for them to remain in such service."

37. The 2000 Plan provides for several types of equity awards under four separate programs:

- the Discretionary Option Grant Program, under which eligible persons may, at the discretion of the Plan Administrator, be granted options to purchase shares of Common Stock,

- the Restricted Stock Program, under which eligible persons may be awarded restricted shares of Common Stock by and at the discretion of the Plan Administrator, that vest upon, among other things, the completion of a designated service period and/or the attainment of pre-established performance milestones or other criteria,

- the Restricted Stock Unit Program, under which eligible persons may be awarded restricted stock units by and at the discretion of the Plan Administrator, that vest upon, among other things, the completion of a designated service period and/or the attainment of pre-established performance milestones or other criteria, and

- the Director Automatic Grant Program under which Eligible Directors shall automatically receive option grants and restricted shares of Common Stock at designated intervals over their period of Board service.

38. According to the Compensation Committee Charter and the Company's SEC filings, the Compensation Committee has been delegated the authority to administer the 2000 Plan.

39. The 2000 Plan expressly limits the equity awards that may be granted thereunder, stating that "[n]o one person participating in the [2000] Plan may receive Awards for more than 800,000 shares of Common Stock in the aggregate per calendar year." The 2000 Plan defines "Award" as "any of the following stock or stock-based awards authorized for issuance or grant under the Plan: stock option, stock appreciation right, Restricted Stock or Restricted Stock Unit award." Thus, an award of more than 800,000 restricted stock units to any one person during a calendar year necessarily violates the express terms of the 2000 Plan.

40. On February 8, 2011, just four months before the *ultra vires* 2011 Grants were awarded, the Compensation Committee and the full Board approved an amendment to the 2000 Plan that increased the reserve of common stock available for issuance thereunder. In soliciting shareholder approval of the amendment, the Board reiterated the Limit in its proxy materials:

> No participant in the 2000 Plan may receive Equity Awards under the 2000 Plan for more than 800,000 shares of common stock in the aggregate per calendar year. Stockholder approval of this Proposal will also constitute a re-approval of the 800,000 share-limitation for purposes of Section 162(m) of the Code.

Form DEF 14A proxy statement filed on February 9, 2011 (the "2011 Proxy").

41. The amended plan, including the Limit, was approved by the Company's shareholders at the annual meeting on March 22, 2011.

### The 2011 Grants

42. Despite this clear limitation, the 2012 Proxy disclosed that on June 13, 2011, the Compensation Committee (defendants Ammerman, Berardino, Barnum and Mettler) awarded restricted stock units to Quiksilver's Section 16 officers as follows:

| Name | Title at Time of Grant | Restricted Stock Units |
|---|---|---|
| Robert B. McKnight, Jr. | Chairman, CEO and President | 2,000,000 |
| Joseph Scirocco | Chief Financial Officer | 700,000 |

VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. 8:12-cv-01882-AG-JPR

- 13 -

| Charles S. Exon | Chief Administrative Officer and General Counsel | 700,000 |
|---|---|---|
| Craig Stevenson | President – Quiksilver Americas | 1,000,000 |
| Pierre Agnes | President – Quiksilver Europe | 1,000,000 |

43. The award of 2,000,000 restricted stock units to defendant McKnight exceeded the Limit by 1,200,000 restricted stock units and each award of 1,000,000 million restricted stock units granted to defendants Agnes and Stevenson exceeded the Limit by 200,000 restricted stock units. Thus, the Compensation Committee blatantly violated the 2000 Plan by making these improper and wasteful awards.

44. The members of the Compensation Committee, defendants Ammerman, Berardino, Barnum and Mettler, knew that the 2000 Plan limited awards to Plan participants to 800,000 per person per calendar year, yet they deliberately violated the Limit by granting the excessive awards to defendants McKnight, Agnes and Stevenson.

45. Indeed, the Limit had been in place since March 24, 2006, when the Company's shareholders approved various amendments to the 2000 Plan, including an increase from the previous limit of 400,000 shares. In seeking shareholder approval for the amendments, the Board, which at the time included defendants Barnum, Exon and McKnight, stated that a "principal feature[] of the 2000 Plan" is the Limit. *See* Form DEF 14A proxy statement filed on February 24, 2006 (the "2006 Proxy").

46. Awards of compensation to Quiksilver officers are entitled to tax deductibility pursuant to section 162(m) of the Internal Revenue Code only if the awards comply with the terms of the shareholder-approved 2000 Plan. By violating the Limit, the members of the Compensation Committee, defendants Ammerman, Berardino, Barnum and Mettler, put at risk the tax deductibility of the 2011 Grants.

47. Previous awards granted by the Compensation Committee, which included defendants Barnum and Ammerman, who served on the Compensation Committee since at least 1996 and 2006, respectively, did not violate the Limit:

| Year | Executive | Options | Restricted Stock | Restricted Stock Units | Total |
|---|---|---|---|---|---|
| 2010 | McKnight | 250,000 | 0 | 0 | 250,000 |
| | Scirocco | 100,000 | 0 | 0 | 100,000 |
| | Exon | 100,000 | 0 | 0 | 100,000 |
| | Agnes | 100,000 | 0 | 0 | 100,000 |
| | Stevenson | 100,000 | 0 | 0 | 100,000 |
| 2009 | McKnight | 645,000 | 120,000 | 0 | 765,000 |
| | Scirocco | 540,000 | 90,000 | 0 | 630,000 |
| | Exon | 540,000 | 90,000 | 0 | 630,000 |
| | Agnes | 625,000 | 75,000 | 0 | 700,000 |
| | Stevenson | 570,000 | 75,000 | 0 | 645,000 |

### The Action

48. On October 29, 2012, Plaintiff commenced this Action by filing in this Court the Complaint alleging, *inter alia*, that (i) defendants Ammerman, Barnum, Berardino and Mettler breached their fiduciary duties and wasted corporate assets by granting 1.6 million restricted stock units in excess of the Limit and in deliberate violation of the 2000 Plan; (ii) defendants Barnum, Berardino, Ellis, Exon, Langman, McKnight, Mettler, Speaker and Sweet breached their fiduciary duties and Section 14(a) of the Securities and Exchange Act by disseminating the 2012 Proxy, which contained false and misleading statements regarding the Compensation Committee's discretion to grant equity awards under the 2000 Plan and material omissions regarding the violations of the 2000 Plan in connection with the 2011 Grants; and (iii) defendants McKnight, Agnes and Stevenson were unjustly enriched by receiving excessive and unwarranted restricted stock units in excess of the Limit and in violation of the 2000 Plan.