1

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Ramzi Abadou (222567)
rabadou@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Fax: (415) 400-3001

-and-

Eric L. Zagar (250519)
ezagar@ktmc.com
Robin Winchester
rwinchester@ktmc.com
Kristen L. Ross
kross@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Fax: (267) 948-2512

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA STOCKMAN-SANN, Derivatively on Behalf of QUIKSILVER, INC., <br><br> Plaintiff, <br><br> v. <br><br> ROBERT B. MCKNIGHT, JR., WILLIAM M. BARNUM, JR., JOSEPH F. BERARDINO, JAMES G. ELLIS, CHARLES S. EXON, M. STEVEN LANGMAN, ROBERT L. METTLER, PAUL C. SPEAKER, ANDREW W. SWEET, <br><br> Defendants, <br><br> and <br><br> QUIKSILVER, INC., a Delaware Corporation, <br><br> Nominal Defendant. | Case No.: 8:12-cv-01882-AG-JPR <br><br><br> **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO NOMINAL DEFENDANT QUIKSILVER, INC.'S MOTION TO DISMISS THE CORRECTED VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT** |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION.................................................................1

II.   STATEMENT OF FACTS................................................4

    A.    The Company.................................................4

    B.    The Adoption of the 2000 Plan and The Board's History of Properly Seeking Shareholder Approval to Amend It............................4

    C.    The Improper 2011 Grants................................5

    D.    The Individual Defendants' Attempt to "Fix" the Grants and Reveal the Secret Amendment to the Plan........................6

    E.    The Cancellation of the 2011 Grants and New Improper Grant to McKnight................................7

    F.    The False and Materially Misleading 2012 Proxy................7

III.  ARGUMENT ................................................8

    A.    Legal Standards Applicable to the Court's Demand Futility Analysis................................8

    B.    There Is a Reasonable Doubt That a Majority of the Board is Incapable of Considering a Pre-Suit Demand................10

        1.    Demand is Excused Under *Aronson*................11

            a.    Demand is Excused Under the Second Prong of *Aronson* Because the Entire Board's Decision to Approve the Secret Amendment Which Eliminated the Limit is an *Ultra Vires* Act Which is Not Protected Under the Business Judgment Rule ................11

            b.    Demand is Excused Under the Second Prong of *Aronson* Because Issuance of the False and Misleading 2012 Proxy Was Not a Valid Exercise of Business Judgment................15

        2.    Demand is Also Excused Under *Rales*................17

            a.    There is a Reasonable Doubt Regarding the Disinterestedness of Defendants Barnum, Berardino and Mettler Because They Face a Substantial Likelihood of Liability for Approving the 2012 Grant ................18

b.    There is a Reasonable Doubt Regarding the Disinterestedness of Defendant McKnight Due to His Receipt of the Improper 2012 Grant ................................................................................21

c.    Defendants McKnight and Exon are Not Disinterested Due to Their Positions as Quiksilver Executives ..........................................23

IV.   CONCLUSION ....................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aronson v. Lewis*,
  473 A.2d 805 (Del. 1984)..........................................................................passim

*Beam v. Stewart*,
  845 A.2d 1040 (Del. 2004)................................................................................ 11

*Belova v. Sharp*,
  07-299, No. 07-299, 2008 WL 700961 (D. Or. Mar. 13, 2008) .................. 17, 20

*Brehm v. Eisner*,
  746 A.2d 244 (Del. 2000)............................................................................... 9, 10

*Cal Pub. Emps. Ret. Sys. v. Coulter*,
  No. 19191, 2002 Del. Ch. LEXIS 144 (Del. Ch. Dec. 18, 2002) ............... 12, 14

*Cohen v. Beneficial Indus. Loan Corp.*,
  337 U.S. 541 (1949) .......................................................................................... 1

*Conrad v. Blank*,
  940 A.2d 28 (Del. Ch. 2007).......................................................................passim

*Edmonds v. Getty*,
  524 F. Supp. 2d 1267 (W.D. Wash. 2007)...................................................... 20, 22

*Grobow v. Perot*,
  539 A.2d 180 (Del. 1988)................................................................................... 9

*Harris v. Carter*,
  582 A.2d 222 (Del. Ch. 1990) .......................................................................... 10

*Heineman v. Datapoint*,
  611 A.2d 950 (Del. 1992)................................................................................... 9

*In re Adolor Corp. Derivative Litig.*,
  No. 04-3649, 2009 WL 1325738 (E.D. Pa. May 12, 2009) .............................. 24

*In re Atmel Corp. Derivative Litig.*,
  No. 06-4592, 2008 U.S. Dist. LEXIS 91909
  (N.D. Cal. June 25, 2008).................................................................. 20, 21, 23

*In re Cendant Corp., Sec. Litig.*,
  189 F.R.D. 117 (D.N.J. 1999) .......................................................................... 10

*In re CNET Networks, Inc. S'holder Derivative Litig.*,
  483 F. Supp. 2d 947 (N.D. Cal. 2007) ............................................................. 21

*In re Computer Scis. Corp. Derivative Litig.*,
  244 F.R.D. 580 (9th Cir. 2009) ........................................................................ 20

*In re Computer Scis. Corp. Derivative Litig.*,
No. 06-5288, 2007 U.S. Dist. LEXIS 25414 (C.D. Cal. Mar. 27, 2007)...........22

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008)...............................................25

*In re Dow Chem. Co. Derivative Litig.*,
No. 4349-CC, 2010 WL 66769 (Del. Ch. Jan. 11, 2010)................................24

*In re Goldman Sachs Group, Inc. S'holder Litig.*,
No. 5215-VCG, 2011 WL 4826104 (Del. Ch. Oct. 12, 2011)..........................23

*In re InfoUSA S'holders Litig.*,
No. 1956-CC, 2007 WL 3325921 (Del. Ch. Aug. 20, 2007)..........................15

*In re Maxim Integrated Products, Inc. Derivative Litig.*,
574 F. Supp. 2d 1046 (N.D. Cal. 2008) ..............................................17

*In re MIPS Techs., Inc. Derivative Litig.*,
542 F. Supp. 2d 968 (N.D. Cal. 2008) ...............................................21

*In re Silicon Graphics Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ........................................................8

*In re THQ, Inc. Derivative Litig.*,
No. BC 357600, 2007 WL 4990689 (Cal. Super. Ct. Oct. 11, 2007) ..........20, 22

*In re Tyson Foods, Inc. Consol. S'holder Litig.*,
919 A.2d 563 (Del. Ch. 2007) ......................................................22

*In re Tyson Foods, Inc. Consol. S'holder Litig.*,
C.A. No. 1106-CC, 2007 Del. Ch. LEXIS 120 (Del. Ch. Aug. 15, 2007).......3, 5

*In re Verisign, Inc., Derivative Litig.*,
531 F. Supp. 2d 1173 (N.D. Cal. 2007) .............................................21

*In re Zoran Corp. Derivative Litig.*,
511 F. Supp. 2d 986 (N.D. Cal. 2007) .......................................passim

*Jones ex rel. CSK Auto Corp.*,
503 F. Supp. 2d 1325 (D. Ariz. 2007)...............................................24

*Kamen v. Kemper Fin. Serv.*,
500 U.S. 90 (1991) .................................................................8

*Kaufman v. Belmont*,
479 A.2d 282 (Del. Ch. 1984) ......................................................21

*Khanna v. McMinn*,
No. 20545-NC, 2006 WL 1388744, (Del. Ch. May 9, 2006) ..........................9

*Lola Cars Intern. Ltd. v. Krohn Racing, LLC*,
Nos. 4479-VCN, 4886-VCN, 2009 WL 4052681, (Del. Ch. Nov. 12, 2009) .....9

*Lynch v. Rawls*,
    429 F. App'x 641 (9th Cir. 2011).................................................................. 10, 12

*MCG Capital Corp. v. Maginn*,
    No. 4521–CC, 2010 WL 1782271, (Del. Ch. May 05, 2010)............................ 24

*Mizel v. Connelly*,
    No. 16638, 1999 WL 550369 (Del. Ch. July 22, 1999).................................... 23

*Parnes v. Bally Entertainment Corp.*,
    722 A.2d 1243 (Del. 1999)............................................................................. 15

*Pogostin v. Rice*,
    480 A.2d 619 (Del. 1984)...................................................................... 9, 10, 21

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993)........................................................................ passim

*Robotti & Co., LLC v. Liddell*,
    No. 3128-VCN, 2010 WL 157474 (Del. Ch. Jan 14, 2010) ............................ 25

*Ryan v. Gifford*,
    918 A.2d 341 (Del. Ch. 2007) ................................................................ passim

*Sanders v. Wang*,
    No. 16640, 1999 WL 1044880 (Del. Ch. Nov. 8, 1999)........................... passim

*Seminaris v. Landa*,
    662 A.2d 1350 (Del. Ch. 1995) .................................................................. 8, 20

*Solomon v. Armstrong*,
    747 A.2d 1098 (Del. Ch. 1999) ...................................................................... 14

*Strougo v. Carroll*,
    No. 8040, 1991 WL 9978 (Del. Ch. Jan. 29, 1991) ......................................... 9

*Weiss v. Swanson*,
    948 A.2d 433 (Del. Ch. 2008) ........................................................................ 17

1   Plaintiff Patricia Stockman-Sann ("Plaintiff"), by her undersigned counsel,
2   respectfully submits this Memorandum of Law in opposition to Nominal Defendant
3   Quiksilver, Inc's ("Quiksilver" or the "Company") Motion to Dismiss the Corrected
4   Verified Amended Shareholder Derivative Complaint (the "Motion").[1]

5   **I.    INTRODUCTION**

6   This shareholder derivative action (the "Action") alleges that the members of
7   Quiksilver's Compensation Committee (the "Compensation Committee") violated
8   the Company's shareholder-approved 2000 Stock Incentive Plan (the "2000 Plan")
9   by granting equity awards to its executive officers, including Quiksilver's Chief
10   Executive Officer ("CEO") and Chairman of the Board, which exceeded the 2000
11   Plan's express per-person annual limit.  Then, to make matters worse, the entire
12   Board of Directors of Quiksilver (the "Board") participated in a deliberate scheme to
13   cover-up the improper grants made by their fellow directors by adopting a Secret
14   Amendment (defined herein) which effectively eliminated the per-person annual
15   limit – without seeking or obtaining the necessary approval from Quiksilver's
16   shareholders as the 2000 plan required  –  and adopted the bogus amendment to
17   apply retroactively to the improper grants. Particularly telling, the Board did not
18   disclose the Secret Amendment until *after* Plaintiff filed the Action challenging the
19   improper grants, at which time the Board also responded to the Action by cancelling
20   some of the improper grants (a remedy sought in the Complaint[2]) but the
21   Compensation Committee then granted the CEO a new equity award which again
22   violated the 2000 Plan's express per-person annual limit.   The particularized
23   allegations pled in the Amended Complaint (defined herein) illustrate the epitome of
24   "faithless directors" ignoring their fiduciary duties to a public company and its
25   shareholders.  *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949)

---

[1] Citations to the Motion will be referenced as "Nom. Def. Memo at __."

[2] The term "Complaint" refers to the Verified Shareholder Derivative Complaint filed by Plaintiff on behalf of Quiksilver on October 29, 2012 (Dkt. No. 1).

(finding that without shareholder derivative actions, "long the chief regulator of corporate management … there would be little practical check on such abuses.").

Nonetheless, the Company – which remains under the stewardship of all nine defendant Board members – incorrectly asserts that Delaware's "business judgment rule" actually protects such misconduct and that the Corrected Verified Amended Shareholder Derivative Complaint (the "Amended Complaint") fails to plead facts from which one could find a reason to doubt the presumed "disinterestedness" of a majority of Quiksilver's directors in responding to a demand that Quiksilver sue them for violations of state and federal law.  According to Quiksilver, Plaintiff rushed to bring suit without making a litigation demand on the Board prior to filing the lawsuit.  Nom. Def. Memo at 1.  However, Delaware law is quite clear; directors breach their fiduciary duties when they violate the non-discretionary terms of equity plans and such directors cannot impartially consider a demand to sue themselves.  Indeed, it is an *ultra vires* act to violate a shareholder-approved equity plan by granting or receiving an award made in violation of that plan, whether or not that award has vested and regardless of its present or future value, which excuses demand as futile.

Despite Quiksilver's concession that Delaware applies to its Motion, it instead relies upon a hodge-podge of mostly non-Delaware cases and completely misrepresents the holding of *Sanders v. Wang*, No. 16640, 1999 WL 1044880 (Del. Ch. Nov. 8, 1999) ("*Sanders*"), the seminal Delaware case which requires a finding that demand is futile here. Defendants also ignore *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007) ("*Ryan*") and its progeny, which commands the same result.  In addition, Quiksilver's Motion complains throughout that the Amended Complaint's allegations are not particular enough, however, Quiksilver completely ignores the Amended Complaint's particularized facts just as it ignores the cardinal precepts of Delaware law.   Quiksilver even accuses *Plaintiff* of omitting portions of the 2000 Plan's clause which prohibits changing the annual per-person limit without

shareholder approval (even thought the Amended Complaint contains the entire clause) when it is Quiksilver which creatively interprets the clear and unambiguous language of the 2000 Plan in a weak attempt to justify the Board's Secret Amendment which it contends "clarified" the language when, in reality, resulted in entirely eliminating the limit.

The particularized allegations in the Amended Complaint create a reasonable doubt that a majority of the Board is disinterested and independent and that the challenged conduct is the product of a valid exercise of business judgment. The Amended Complaint alleges with particularity that the entire Board violated the 2000 Plan by adopting the Secret Amendment that effectively eliminated the annual per-person limit without first seeking or obtaining shareholder approval and then tried to cover up the improper grants with a false and misleading proxy filing.  Further, demand is excused for additional reasons because the directors who approved the improper grants and/or received the improper grant, cannot impartially consider a demand.  Last, a director who also serves as an officer of the Company is unable to disinterestedly consider a demand when one's entire livelihood could be put at serious risk.  As the Delaware Court of Chancery has warned, "directors should not take a seat at the board table prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic candor." *In re Tyson Foods, Inc. Consol. S'holder Litig.*, C.A. No. 1106-CC, 2007 Del. Ch. LEXIS 120, at **10-12 (Del. Ch. Aug. 15, 2007).  Here, the allegations in the Amended Complaint create a reasonable doubt that a pre-suit litigation demand would have been futile as any finding to the contrary simply ignores the clear pronouncements of the Delaware courts regarding demand futility in virtually identical cases. Accordingly, Plaintiff respectfully requests that the Court deny the Motion.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.   STATEMENT OF FACTS

### A.   The Company

Quiksilver, a Delaware corporation, designs, develops and distributes branded apparel, footwear, accessories and related products, catering to the casual, youthful lifestyle associated with the sports of surfing, skateboarding and snowboarding. ¶15.[3]  At the time the Complaint was filed, the Board consisted of the nine Individual Defendants.[4]  ¶¶16-24.  Two of these directors, defendants McKnight and Exon, also serve as executive officers of the Company. Defendant McKnight co-founded Quiksilver in 1976 and has served as CEO and Chairman of the Board since 1976. ¶16.  Exon has served as Quiksilver's Secretary and General Counsel since August 2000 and as Chief Administrative Officer ("CAO") since February 2008.  ¶20.

### B.   The Adoption of the 2000 Plan and The Board's History of Properly Seeking Shareholder Approval to Amend It

In 2000, the Company adopted and Quiksilver shareholders approved the 2000 Plan.  ¶34.[5]  The 2000 Plan allows the Company to award stock options, restricted stock and restricted stock units ("RSUs") to executive officers, employees and directors.   ¶¶3, 35, 37.   The 2000 Plan is administered by the Compensation Committee which has authority to determine the incentive and equity compensation awarded to the CEO.  ¶¶31-32, 36.

As described by Quiksilver in its Securities and Exchange Commission ("SEC") filings, one of the 2000 Plan's "principal features" is its express limitation on the number of equity awards that an individual may be granted on an annual basis.  ¶43.  In March 2006, the Board, at which time included defendants Barnum, Exon and McKnight, sought and received approval from Quiksilver's shareholders to

---

[3] All paragraph ("¶") references herein are to the Amended Complaint.

[4] The term "Individual Defendants" refers to Robert B. McKnight Jr. ("McKnight"), William M. Barnum ("Barnum"), Joseph F. Berardino ("Berardino"), James G. Ellis ("Ellis"), Charles S. Exon ("Exon"), M. Steven Langman ("Langman"), Robert L. Mettler ("Mettler"), Paul C. Speaker ("Speaker") and Andrew S. Sweet ("Sweet").

[5] McKnight and Barnum were on the Board when the 2000 Plan was adopted.  ¶¶16-17.

amend the 2000 Plan to increase the per-person annual limit from 400,000 to 800,000.  ¶¶16, 17, 20, 43.  Specifically, the 2000 Plan states that "[n]o person participating in the [2000] Plan may receive Awards[6] for more than 800,000 shares of Common Stock in the aggregate per calendar year" (the "Limit").  ¶37.  Thus, an award of more than 800,000 RSUs to any one person during a calendar year necessarily violates the express terms of the 2000 Plan.  *Id.*

In 2011, the Board sought shareholder approval to amend the 2000 Plan to increase the reserve of common stock available for issuance thereunder (the "2011 Amendment").  ¶38.  Indeed, the Quiksilver proxy statement disseminated in connection with the 2011 Amendment specifically states that the Limit remained at 800,000 shares of common stock in the aggregate per calendar year.  *Id.*  The Individual Defendants were on the Board at the time 2000 Plan was amended in 2011.  ¶¶16-24.  The 2011 Amendment, including the Limit, was approved by Quiksilver's shareholders at the Company's annual meeting on March 22, 2011. ¶39.

**C.    The Improper 2011 Grants**

Despite the clear and unambiguous Limit, the Company's February 8, 2012 Form DEF 14A (the "2012 Proxy") disclosed that on June 13, 2011, the Compensation Committee, defendants Berardino, Barnum and Mettler, granted defendant McKnight 2,000,000 RSUs and Quiksilver officers Pierre Agnes ("Agnes") and Craig Stevenson ("Stevenson") 1,000,000 RSUs each (the "2011 Grants").  ¶¶4, 40.  The award of 2,000,000 RSUs to McKnight exceeded the Limit by 1,200,000 and each award of 1,000,000 RSUs granted to Agnes and Stevenson exceeded the Limit by 200,000.  ¶41.  Berardino, Barnum and Mettler, as members of the Compensation Committee, knew the Limit, yet they knowingly violated the Limit by granting these excessive awards to McKnight, Agnes and Stevenson.  ¶42.

---

[6] The 2000 Plan defines "Award" as "any of the following stock or stock-based awards authorized for issuance or grant under the Plan: stock option, stock appreciation right, Restricted Stock or Restricted Stock Unit award." ¶37.

### D.   The Individual Defendants' Attempt to "Fix" the Grants and Reveal the Secret Amendment to the Plan

On October 29, 2012, Plaintiff filed the Complaint alleging, *inter alia*, the members of the Compensation Committee breached their fiduciary duties and wasted corporate assets by granting McKnight, Agnes and Stevenson an aggregate of 1.6 million RSUs in excess of the Limit and in deliberate violation of the 2000 Plan. ¶46.  Two weeks later, on November 13, 2012, in direct response to the Complaint, the Company filed with the SEC a Form 8-K (the "8-K") stating that in February 2012, without seeking or obtaining shareholder approval or even making any public disclosure, the Board had "formally" amended the 2000 Plan to eliminate the Limit "for awards that were not intended to be exempt from Section 162(m) of the…[Internal Revenue] Code [of 1986]…and not designed to be deductible by the Company for tax purposes" (the "Secret Amendment").  ¶47.  The 8-K further stated that "[i]n adopting the…[Secret] [A]mendment, our Board of Directors provided it was effective as of June 13, 2011 (the date of the…2011 Grants)," thereby retroactively applying the Secret Amendment to the 2011 Grants.  *Id*.

The 2000 Plan provides, however, that "stockholder approval will be required for any amendment to the [2000] Plan that would (i) materially increase the benefits accruing to…Participants under the [2000] Plan[.]"  ¶49.  As discussed herein, the Secret Amendment adopted by the Board effectively eliminated the Limit by providing the Board with the ability to designate certain awards as non-exempt from Section 162(m) of the Code and thus not subject to the Limit.   The Secret Amendment was in clear violation of the 2000 Plan because it "materially increase[d] the benefits" accruing to participants, by allowing the Compensation Committee to grant and participants  to receive unlimited awards rather than being limited to 800,000 units per calendar year.  ¶50.  As such, the Secret Amendment is *ultra vires* and invalid because it required Quiksilver shareholders to approve this amendment prior to its adoption, which the Board neither sought nor obtained.  *Id*.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### E. The Cancellation of the 2011 Grants and New Improper Grant to McKnight

According to the 8-K, on November 13, 2012, McKnight, Agnes and Stevenson surrendered, and the Company cancelled, the RSUs granted on June 13, 2011 in excess of the Limit.  ¶51.  Specifically, the 8-K stated that "McKnight, Stevenson and Agnes surrendered 1,200,000, 200,000 and 200,000 of the RSUs they received in the…2011 Grants." *Id*.   Following the cancellation and surrender, the 8-K stated that the Compensation Committee, defendants Barnum, Berardino and Mettler, granted to McKnight, Agnes and Stevenson 1,200,000, 200,000 and 200,000 RSUs, respectively, under substantially similar terms as those of the 2011 Grants. ¶52.  Because the Secret Amendment is not a valid, the November 13, 2012 grant of 1,200,000 RSUs to defendant McKnight (the "2012 Grant") still violated the 2000 Plan because it exceeded the Limit by 400,000 units.  ¶53.

### F. The False and Materially Misleading 2012 Proxy

On February 8, 2012, the Company filed the 2012 Proxy that failed to disclose that the 2011 Grants as approved by Compensation Committee violated the 2000 Plan or that the Board violated the 2000 Plan by approving the Secret Amendment without first seeking or obtaining shareholder approval.  ¶54.  Indeed, the Board did not even publicly disclose the existence of the Secret Amendment until it filed the 8-K in November 2012 in response to the Complaint, nearly eight months after the fact.  *Id*.  The Board did not seek shareholder approval to increase the Limit, as required, because the 2012 Proxy was the first disclosure of the *ultra vires* 2011 Grants, and no reasonable stockholder would vote for an amendment to increase the Limit having just learned the Compensation Committee, whose members Barnum, Berardino and Mettler were up for re-election, had violated the 2000 Plan by making the 2011 Grants.  Nor would shareholders re-elect these individuals to the Board.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## III.   ARGUMENT

### A.   Legal Standards Applicable to the Court's Demand Futility Analysis

As Quiksilver concedes, Quiksilver is a Delaware corporation; therefore, demand futility under Rule 23.1 is governed by Delaware law.  *See Kamen v. Kemper Fin. Serv*., 500 U.S. 90, 96-97 (1991) (stating that demand futility is evaluated under the law of the state of incorporation).  Delaware law provides two tests for demand futility, and the existence, or non-existence, of action by a company's board of directors determines which test applies.  Here, under either test, demand is excused as futile.

When a plaintiff challenges a decision of the board in place at the time the complaint is filed, "a plaintiff must allege particularized facts creating a reasonable doubt that (1) the directors are disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 990 (9th Cir. 1999) (quoting *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984)); *see also Ryan*, 918 A.2d at 354-55.  The demand futility test enunciated in *Aronson* is disjunctive.  "If a derivative plaintiff can demonstrate a reasonable doubt as to the first or second prong of the *Aronson* test, then he has demonstrated that demand would have been futile."  *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995).   Where a plaintiff adequately alleges that defendants committed unauthorized acts, such as engaging in *ultra vires* conduct or, as here, violating the non-discretionary terms of a company's stock option plan, the second prong of the *Aronson* test is met.  *See Sanders*, 1999 WL 1044880, at *5 (demand held futile under *Aronson's* second prong where majority of board violated the non-discretionary terms of a shareholder-approved stock option plan); *Ryan*, 918 A.2d at 354 (same).

In the absence of board action, the court applies the "*Rales*" test.  *See Rales v. Blasband*, 634 A.2d 927, 934-37 (Del. 1993). Under the *Rales* test, demand is

excused when a plaintiff pleads particularized facts creating "a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934. [7]   If a complaint satisfies the "reasonable doubt" standard under either test, demand will be excused as futile.  *Conrad v. Blank*, 940 A.2d 28, 37 (Del. Ch. 2007); *Strougo v. Carroll*, No. 8040, 1991 WL 9978, at *4 (Del. Ch. Jan. 29, 1991). Therefore, as discussed below, demand is futile whether evaluated under the *Rales* or *Aronson* test.

The reasonable doubt inquiry under both *Rales* and *Aronson* is fact-intensive and turns on the totality of the circumstances in each particular case. *Brehm v. Eisner*, 746 A.2d 244, 268 (Del. 2000) (Hartnett, J., concurring) ("Because of the absence of a precise formula in [Delaware Court of Chancery] Rule 23.1 for pleading compliance with the demand requirement, the sufficiency of a complaint under Rule 23.1 is determined on the basis of the facts of each case.").  The reasonable doubt standard is not a restrictive evidentiary test; the plaintiff is not required to plead evidence, and the Court should not weigh evidence at this stage of the proceedings. *See Pogostin v. Rice*, 480 A.2d 619, 625 (Del. 1984); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Heineman v. Datapoint*, 611 A.2d 950, 953 (Del. 1992) ("[A]t this juncture, the Court is not engaged in a weighing of evidence"); *Brehm*, 746 A.2d at 254 ("[T]he pleader is not required to plead evidence").  A plaintiff need not plead factual allegations that conclusively demonstrate that the Board was "incapable" of considering a demand; rather, Plaintiff need only plead allegations that, in their totality, create a reasonable doubt that a majority of the directors would have been

---

[7] The test for demand futility articulated in *Rales* essentially eliminates inquiry into the second prong of *Aronson*.  *See Lola Cars Intern. Ltd. v. Krohn Racing, LLC*, Nos. 4479-VCN, 4886-VCN, 2009 WL 4052681, at *7 n.34 (Del. Ch. Nov. 12, 2009) ("The *Rales* test essentially eliminates inquiry into the second *Aronson* prong and focuses entirely upon the first.");  *Khanna v. McMinn*, No. 20545-NC, 2006 WL 1388744, at *12 (Del. Ch. May 9, 2006) (where particularized facts created a reasonable doubt that a majority of the directors are independent and disinterested, demand futility under *Rales* or the first prong *of Aronson* will be met).

independent and disinterested when considering the demand. *Brehm*, 746 A.2d at 268.[8]   All reasonable inferences must be drawn in the light most favorable to plaintiff.  *Cendant*, 189 F.R.D. at 127; *see also Lynch v. Rawls*, 429 F. App'x 641, 643-44 (9th Cir. 2011) (overturning the dismissal of a derivative action where the district court "drew inferences in favor of Defendants rather than Plaintiffs, resolved factual inconsistencies without discovery, and analyzed Plaintiffs' allegations individually rather than collectively.").

Two kinds of allegations exist from which the Court may determine that there is a reasonable doubt regarding the disinterestedness of a director.  First, while the mere threat of personal liability is not sufficient, reasonable doubt as to the disinterestedness of a director is created when the particularized allegations in the complaint present a substantial likelihood of liability on the part of a director. *See Ryan*, 918 A.2d at 355 (finding a substantial likelihood of director liability where complaint alleged directors violated shareholder-approved equity plans). Second, a reasonable doubt exists regarding a director's disinterestedness if the plaintiff alleges that the director has received a personal financial benefit from the alleged misconduct which is not equally shared by the stockholders.  *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1002 (N.D. Cal. 2007) (citing *Rales*, 634 A.2d at 936); *see also Pogostin*, 480 A.2d at 624 (citing *Aronson*, 473 A.2d at 812); *Ryan*, 918 A.2d at 355-56 (stating that a board member's acceptance of manipulated stock options raised a reasonable doubt as to that board member's disinterestedness).

**B.    There Is a Reasonable Doubt That a Majority of the Board is Incapable of Considering a Pre-Suit Demand**

Plaintiff did not make a pre-suit demand on the Board because, as a matter of law, no demand was required.  Quiksilver had a nine-member Board at the time the

---

[8] *See also Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990) ("the question is whether the accumulation of all factors creates the reasonable doubt to which *Aronson* refers"); *In re Cendant Corp., Sec. Litig.*, 189 F.R.D. 117, 128 (D.N.J. 1999) ("the trial court must not rely on any one factor but examine the totality of circumstances and consider all of the relevant factors") (citing *Harris*, 582 A.2d at 229).

Action was commenced, therefore, Plaintiff need only allege a reasonable doubt that five of the Individual Defendants are not disinterested and/or independent.   ¶71. *Beam v. Stewart*, 845 A.2d 1040, 1046 n.8 (Del. 2004) (citing *Beneville v. York*, 769 A.2d 80, 85-86 (Del. Ch. 2000)); *see also Ryan*, 918 A.2d at 355.  Here, Plaintiff has pled with sufficient particularity that demand is excused as to the entire Board. Specifically, demand is excused as to each of the Individual Defendants because they approved the Secret Amendment to the 2000 Plan in blatant violation of its clear and unambiguous language that any amendment which "materially increased" the benefits to participants thereunder required a vote of the Quiksilver's shareholders. This decision is an *ultra vires* act which is not protected under the business judgment rule.  *See Sanders*, 1999 WL 1044880, at \*\*4-5; *Ryan*, 918 A.2d at 355.  Moreover, the entire Board then issued the false and misleading 2012 Proxy, which is also an act not protected by the business judgment rule.  Demand is further excused as to defendants Barnum, Berardino and Mettler because they were the members of the Compensation Committee that violated the 2000 Plan by knowingly granting the improper 2012 Grant; as to McKnight because he received the improper 2012 Grant; and as to defendants McKnight and Exon because their positions as corporate officers of Quiksilver renders each of them legally incapable of acting independently to consider a demand.  In sum, the Amended Complaint alleges that a majority of the Board is legally incapable of considering a demand.

### 1.    Demand is Excused Under *Aronson*

#### a.    Demand is Excused Under the Second Prong of *Aronson* Because the Entire Board's Decision to Approve the Secret Amendment Which Eliminated the Limit is an *Ultra Vires* Act Which is Not Protected Under the Business Judgment Rule

Demand is excused because the entire Board adopted the Secret Amendment without first seeking or obtaining shareholder approval as required by the 2000 Plan which raises a reasonable doubt that the Board exercised valid business judgment. *Sanders*, 1999 WL 1044880, at \*5.   *Sanders* is directly on point.   In *Sanders*,

plaintiffs brought a derivative action alleging breaches of fiduciary duties and corporate waste against directors who approved equity grants to certain individuals in excess of the amount of shares they were specifically authorized to grant pursuant to the company's equity plan. *Id.* at *1. The court found that demand was futile as to those directors who had granted awards in excess of the plan's limit in violation of the plan, finding that the equity plan's language was "clear and unequivocal" as it contained a specified total share limit. *Id*. at *7. The *Sanders* Court squarely held that allegations that a director failed comply with the express provisions of a shareholder-approved equity plan excuses demand under the second prong of *Aronson* because there is a reasonable doubt that such an act is a valid exercise of business judgment. *Id*. at *5. Indeed, *Sanders* made clear that "a single act that clearly violates the unambiguous provision" of the plan, excuses demand as to the violators. *Id*. at *7. Specifically, in finding that demand was futile, the court noted that "with the shareholder franchise often quite dispersed, **it is critical as a matter of governance policy that this Court ensure that these compensation plans when approved by shareholders are administered in strict accordance with the terms of the Plan and as the shareholders had the right to anticipate.**" *Id.* at *12 (emphasis added).

Similarly, in *Ryan*, Chancellor Chandler excused demand as futile under the second prong of *Aronson* where the complaint alleged that the director defendants exceeded the shareholders' grant of express authority by violating the provisions of the corporation's equity plans. *Ryan*, 918 A.2d at 354-55. Indeed, Delaware law is clear – when a plaintiff alleges that directors violated a shareholder-approved equity plan, "[a]ny action of the board that falls outside the rather broad scope of its authority is not entitled to the protection of the business judgment rule and demand is excused." *Cal Pub. Emps. Ret. Sys. v. Coulter*, No. 19191, 2002 Del. Ch. LEXIS 144, at *40 (Del. Ch. Dec. 18, 2002) *See also*; *Lynch*, 429 F. App'x at 644 (finding demand excused as futile because plaintiff pled specific violations of shareholder-

approved equity plans and specific public disclosures which raised a reasonable doubt that the business judgment rule would not apply").

Here, the Amended Complaint pleads particularized allegations that: (1) Quiksilver's shareholder-approved 2000 Plan contains an unambiguous and non-discretionary restriction on amendments to the 2000 Plan that *requires* "stockholder approval [] for any amendment to the [2000] Plan that would [] materially increase the benefits accruing to...Participants under the [2000] Plan" (¶49); and (2) the Individual Defendants, as members of the Board, adopted the Secret Amendment to eliminate the Limit without seeking or obtaining necessary shareholder approval. ¶¶6, 47.  There is no dispute that the entire Board approved the Secret Amendment or that the 2000 Plan specifically states that shareholder approval is required for an amendment that "materially increases" benefits to its participants.  ¶49.  In fact, the Individual Defendants have a history of *properly* seeking shareholder approval for amendments to the 2000 Plan that, when adopted, would materially increase the benefits to its participants. ¶¶38, 45.  For example, in 2006, the Quiksilver Board (which included Barnum, Exon and McKnight) sought shareholder approval to increase the 2000 Plan's previous per-person annual limit from 400,000 to the current 800,000 Limit and even described the Limit as a "principal feature" of the 2000 Plan. ¶38.  Again, in 2011, the Board sought shareholder approval to increase the 2000 Plan's overall shares available to be used for equity awards. ¶38.  Thus, just as in the past and as required by the clear language of the 2000 Plan, Quiksilver's shareholders were required to approve any subsequent amendment to the 2000 Plan, like the Secret Amendment, which "materially increases" benefits to its participants. The Board's decision to unilaterally increase the Limit without necessary shareholder approval was not a valid exercise of their business judgment, excusing demand as futile.

Quiksilver's attempt to spin the Secret Amendment as a mere "clarification" of the 2000 Plan rings completely hollow. Nom. Def. Memo at 18. The Secret

Amendment effectively eliminated the Limit in clear violation of the 2000 Plan by providing the Board with the unfettered discretion to grant awards in excess of the Limit for grants that it purportedly did not intend to be exempt from Section 162(m) of the Tax Code.  Furthermore, not only did the Board violate the 2000 Plan by adopting the Secret Amendment, but, even more egregious, they adopted the bogus Secret Amendment in an attempt to cover-up their breaches of fiduciary duty for granting the improper 2011 Grants that exceeded the Limit.  At the time the Board adopted the Secret Amendment in February 2012, the Individual Defendants surely knew that the 2011 Grants were in violation of the 2000 Plan because they adopted the Secret Amendment and then retroactively applied it to the 2011 Grants which were made eight months earlier.  As the *Ryan* Court held, such misconduct does not deserve protection under the business judgment rule, stating that:

> I am unable to fathom a situation where the deliberate violation of a shareholder approved stock option plan and false disclosures, obviously intended to mislead shareholders into thinking that the directors complied honestly with the shareholder-approved option plan, is anything but an act of bad faith.  It certainly cannot be said to amount to faithful and devoted conduct of a loyal fiduciary.  Well-pleaded allegations of such conduct are sufficient, in my opinion, to rebut the business judgment rule and to survive a motion to dismiss.

*Ryan*, 918 A.2d at 358.

In sum, the Board's decision to adopt the Secret Amendment is *ultra vires*. [9] *see Solomon v. Armstrong*, 747 A.2d 1098, 1114 n.45 (Del. Ch. 1999) (*ultra vires* acts are those that are "contrary to the basic principles of fiduciary law" or "for which no implicit authority may be rationally surmised."); *Coulter*, 2002 Del. Ch.

---

[9] Quiksilver incorrectly argues that a Staff Interpretation Letter issued by NASDAQ permitted the Board to adopt the Secret Amendment without shareholder approval. Nom. Def. Memo at 19-20.  Quiksilver's argument fails for two reasons.  First, the specific language of the 2000 Plan, which requires stockholder approval for any amendment to the 2000 Plan that would "materially increase the benefits accruing to…Participants," supersedes the Staff Interpretation Letter.  Second, as Quiksilver acknowledges, the Company is traded on the NYSE, not NASDAQ, making the letter inapplicable.  Nom. Def. Mem. at 20; ¶15.

1   LEXIS 144, at **39-40 (acting outside limit of authority granted by shareholders is

2   *ultra vires*).[10]   As in *Sanders*, "the [Individual Defendants] violated an express [2000

3   Plan] provision."   *Sanders*, 1999 WL 1044880, at *5.   Plaintiff has "sufficiently

4   pleaded facts which cast doubt that the board's alleged acts could be the result of a

5   valid exercise of business judgment.  Therefore, demand is excused." *Id.*

### b.   Demand is Excused Under the Second Prong of *Aronson* Because Issuance of the False and Misleading 2012 Proxy Was Not a Valid Exercise of Business Judgment

8        The Amended Complaint alleges that the Individual Defendants, as members

9   of the Board, deliberately and knowingly made false and misleading

10  misrepresentations in the 2012 Proxy.  Specifically, the 2012 Proxy is false and

11  misleading in several aspects, leaving shareholders either uninformed or

12  misinformed as to, *inter alia*: (i) the Board's failure to disclose that the 2011 Grants

13  violated the express and unambiguous terms of the 2000 Plan; and (ii) the Board's

14  failure to disclose the existence of the Secret Amendment, which violated the 2000

15  Plan because the Board approved it without first seeking or obtaining shareholder

16  approval. ¶¶10, 54, 57-59.   A reasonable shareholder would want to know that the

17  Company had violated the Limit by making the 2011 Grants, which is not disclosed

18  in the 2012 Proxy, and that the Board adopted the Secret Amendment, which is

19  likewise not disclosed in the 2012 Proxy.  ¶58.

20

21

---

22  [10] Quiksilver's reliance on *In re InfoUSA S'holders Litig.*, No. 1956-CC, 2007 WL
23  3325921 (Del. Ch. Aug. 20, 2007) for the proposition that Plaintiff simply claims the
    Secret Amendment was *ultra vires* is misplaced.  In fact, *InfoUSA* supports a finding
    that demand is futile because in that case, the court stated that while alleging an act is
24  *ultra vires* does not *per se* demonstrate futility, "demand will be excused if a
    majority of the board that allegedly pursued the *ultra vires* action remains on the
25  board at the time demand is made."  *Id.* at 988.  Here, each Board member that
    approved the Secret Amendment was on the Board at the time the Action was filed.
26  Because the business judgment rule does not provide protection for directors when
    the challenged act or decision is *ultra vires* or otherwise in bad faith, demand is
27  excused.  *See Parnes v. Bally Entertainment Corp.*, 722 A.2d 1243, 1246 (Del. 1999)
    (internal quotations omitted) (The business judgment presumption is rebutted "where
28  the decision under attack is so far beyond the bounds of reasonable judgment that it
    seems essentially inexplicable on any ground other than bad faith.").

The Individual Defendants acted in bad faith by filing and disseminating to shareholders the 2012 Proxy, which is conduct not protected by the business judgment rule.  In February 2012, Quiksilver issued the 2012 Proxy which disclosed the 2011 Grants for the first time and sought shareholder approval of an amendment to the 2000 Plan to increase the overall limit.  Also in February 2012, the Board adopted the Secret Amendment but did not disclose this amendment to shareholders. Why didn't the Board simply ask Quiksilver's shareholders to vote on an amendment in the 2012 Proxy to increase the Limit? Because any shareholder reading the 2012 Proxy would easily be able to notice and would certainly be confused by a Board proposal seeking approval to increase the Limit while the same proxy also states that the Board had granted the 2011 Grants eight months prior which exceeded the Limit. So instead of being honest and truthful as the directors of any Delaware corporation are required to, the Board decided to adopt the Secret Amendment to cover up their breaches of fiduciary.  Indeed, any reasonable stockholder would not re-elect directors who had participated in such misconduct.

It is well-settled that such false and misleading disclosures constitute bad faith conduct that is not protected by the business judgment rule, thereby excusing demand.  *See*, e.g., *Ryan*, 918 A.2d at 358 (finding demand futile where directors violated the corporation's equity plan and then made false disclosures to its shareholders); *Zoran*, 511 F. Supp. 2d at 1017 (finding defendants' conduct not protected by the business judgment rule where the defendants "falsely represented to shareholders that the company was complying with the plan by preparing and signing financial statements and proxy statements.").

Quiksilver argues that Plaintiff cannot allege "a lack of business judgment that would support demand futility under the second part of the *Aronson* test" because there is "no reasonable connection between the alleged disclosure deficiencies and the alleged harm – the election of directors." Nom. Def. Memo at 21-22.  Quiksilver is flat-out wrong.   Courts routinely find that directors' violation of a shareholder-

approved compensation plan is material information, particularly in advance of a shareholder vote on the reelection of board members.  *See*, *e.g.*, *Weiss v. Swanson*, 948 A.2d 433, 443 (Del. Ch. 2008) (concluding that the directors' practice of granting options in violation of shareholder-approved stock plans was material information for a shareholder "in deciding whether to approve the option plans or reelect board members."); *Belova v. Sharp*, 07-299, No. 07-299, 2008 WL 700961, at *7 (D. Or. Mar. 13, 2008) ("If defendants had not falsely stated in…proxy statements that stock options were being granted properly under the plans, and that directors were complying with the terms of the plans that the shareholder's approved, shareholders would have voted those board members out, and the board members, would no longer have had the means to grant more backdated stock options."); *In re Maxim Integrated Products, Inc. Derivative Litig.*, 574 F. Supp. 2d 1046, 1066 (N.D. Cal. 2008) ("The Court finds Plaintiffs have sufficiently alleged that the misrepresentations in the proxy statements caused the shareholders to grant proxies they would not have otherwise…Defendants were at least negligent in preparing the proxy statements and…this negligence was an essential link in accomplishing further backdating transactions which harmed the Company."); *Zoran*, 511 F. Supp. 2d at 1015 (holding that board of directors' misrepresentation that it was complying with stock option plan was material information in the context of an election of directors because "a reasonable shareholder would certainly want to know that the board was feathering the nests of insiders via backdated stock options to the detriment of stockholders at large.").Thus, demand is excused under the second prong of *Aronson*.

### 2.    Demand is Also Excused Under *Rales*

Even though demand is clearly excused as to the entire nine-member Board under *Aronson*, as discussed *supra*, a majority of the Board is also incapable of considering a demand under *Rales*.  *Rales*, 634 A.2d at 934 (finding that when a plaintiff is not challenging a decision of the board in place at the time the complaint is filed, a plaintiff must "create reasonable doubt that, as of the time the complaint is

1   filed, the board of directors could have properly exercised its independent and

2   disinterested business judgment in responding to a demand."); *see also Ryan*, 918

3   A.2d at 353 (applying *Rales*).  Specifically, demand is excused as to Compensation

4   Committee members Barnum, Berardino and Mettler for approving the 2012 Grant

5   in direct violation of the 2000 Plan; as to McKnight for receiving the improper 2012

6   Grant; and as to McKnight and Exon who lack the ability to independently consider

7   a demand due to their positions as officers of Quiksilver.

8             **a.    There is a Reasonable Doubt Regarding the
              Disinterestedness of Defendants Barnum, Berardino**
9             **and Mettler Because They Face a Substantial**
              **Likelihood of Liability for Approving the 2012 Grant**
10

11        Defendants Barnum, Berardino and Mettler are not disinterested because these

12   individuals face a substantial likelihood of liability for their misconduct by

13   approving the 2012 Grant.  These defendants were the members of the Compensation

14   Committee who were directly responsible for approving the 2012 Grant which

15   clearly violated the express terms of the 2000 Plan.  Delaware law is clear that a

16   director who violates a shareholder-approved equity plan is substantially likely to be

17   held personally liable for breaching his fiduciary duties, disqualifying that director

18   from disinterestedly considering a pre-suit demand.  *Sanders*, 1999 WL 1044880, at

19   **6-8.  Thus, defendants Barnum, Berardino and Mettler are substantially likely to

20   be held liable for breaching their fiduciary duties for approving the 2012 Grant,

21   which renders each of them incapable of considering a demand.

22        The Amended Complaint alleges with particularity that Barnum, Berardino

23   and Mettler were the members of the Compensation Committee who made the *ultra*

24   *vires* 2012 Grant of 1,200,000 restricted stock units to defendant McKnight in

25   violation of the 2000 Plan.  ¶¶7, 17-18, 22, 52.  Barnum, Berardino and Mettler were

26   well aware of the terms of the 2000 Plan and that the Limit stood at 800,000

27   restricted stock units.  ¶¶ 17-18, 22.  Barnum, Berardino and Mettler violated the

28   2000 Plan when they decided to approve the 2012 Grant, which exceeded the clear

and unequivocal Limit as set forth in the 2000 Plan.  Thus, under the express terms of the 2000 Plan, the Compensation Committee was not authorized to grant any equity awards in excess of 800,000 per person annually.  Barnum, Berardino and Mettler are each substantially likely to be held liable for violating the clear terms of the 2000 Plan, and therefore these individuals are unable to impartially consider a pre-suit demand.

The Compensation Committee's violation of the 2000 Plan here is nearly identical to the directors' violation of a company equity plan in *Sanders* in which the Delaware Chancery Court excused demand as to those directors.  In *Sanders*, plaintiffs brought a derivative action alleging breaches of fiduciary duties and corporate waste against directors who approved equity grants to certain individuals in excess of the amount of shares they were specifically authorized to grant pursuant to the company's equity plan.  *Sanders*, 1999 WL 1044880, at *1.  The *Sanders* Court ruled that demand was futile as to those directors who had granted awards in excess of the plan's limit in violation of the plan, finding that the equity plan's language was "clear and unequivocal" as it contained a specified total share limit. *Id*. at *7.  Indeed, the *Sanders* Court made clear that "a single act that clearly violates the unambiguous provision" of the plan, excuses demand as to the violators.  *Id*. at *7.[11]

Similarly, the collection of opinions issued by the Delaware Chancery Court and by courts across the country relating to the backdating of stock options is particularly instructive in the case *sub judice*.  For example, in the seminal *Ryan* decision, the plaintiff alleged that the compensation committee members breached their fiduciary duties by granting stock options at prices in violation of the clear

---

[11] Quiksilver's feeble attempt to distinguish *Sanders* from the facts here is entirely baseless. *See* Nom. Def. Memo at 17.  The holding in *Sanders* is clear; when directors approve equity awards which violate the express limit allowed under the plan, regardless of how many they granted or whether or not they actually vested or were exercised, it is an *ultra vires* act that is not protected under the business judgment rule.

terms of the equity plan which required that grants made thereunder be priced at a specific amount. *Ryan*, 918 A.2d at 354.  The Chancery Court, relying upon the *Sanders*, found that demand was futile as to those director defendants who granted the stock options at prices in violation of the equity plan.  *Id.*  The *Ryan* Court concluded that, as a result of the foregoing, the compensation committee members had violated their express authority as set forth in the shareholder-approved equity plan, and therefore, each faced, at the very least, a substantial likelihood of liability for breaching their fiduciary duties.  *Id.* at 355-56 (citation omitted).  Other courts considering the same allegations of directors violating the express terms of shareholder-approved equity plans uniformly concluded that such acts create a substantial likelihood of liability rendering demand futile as those directors.  *See Conrad*, 940 A.2d at 40 (finding demand futile as to compensation committee members who violated the terms of the company's stock option plan); *In re THQ, Inc. Derivative Litig.*, No. BC 357600, 2007 WL 4990689, at *4 (Cal. Super. Ct. Oct. 11, 2007) (same); *Edmonds v. Getty*, 524 F. Supp. 2d 1267, 1277 (W.D. Wash. 2007) (same); *Belova*, 2008 WL 700961, at *11 (same); *In re Computer Scis. Corp. Derivative Litig.*, 244 F.R.D. 580 at 591 (9th Cir. 2009) (same); *In re Atmel Corp. Derivative Litig.*, No. 06-4592, 2008 U.S. Dist. LEXIS 91909, at **19-22 (N.D. Cal. June 25, 2008).

The Court should conclude the same here.  Barnum, Berardino and Mettler were responsible for approving the 2012 Grant which violated the 2000 Plan's "clear" and "unambiguous" limitation as to the number of shares the Compensation Committee was authorized to award.  Thus, the direct participation by Barnum, Berardino and Mettler in granting and approving the 2012 Grant in violation of the 2000 Plan renders each of these individuals substantially likely to be held liable for their breaches of fiduciary duties, and therefore unable to impartially consider a pre-suit demand.  *Seminaris*, 662 A.2d at 1354 (citing *Aronson*, 473 A.2d at 815); *Ryan*, 918 A.2d at 356 (finding that the allegations in the complaint were sufficient to

1  excused demand under *Rales* as to the members of the Compensation Committee

2  who granted stock options in violation of a shareholder-approved stock plan);

3  *Conrad*, 940 A.2d at 38-41 (same); *Atmel*, 2008 U.S. Dist. LEXIS 91909, at **19-24

4  (same). [12]

5          **b.      There is a Reasonable Doubt Regarding the**
                **Disinterestedness of Defendant McKnight Due to His**
6              **Receipt of the Improper 2012 Grant**

7          McKnight cannot disinterestedly consider a demand because he received the

8  improper 2012 Grant.  A director is deemed "interested" if he "has received, or is

9  entitled to receive, a personal financial benefit from the challenged transaction which

10  is not equally shared by the stockholders."  *See Pogostin*, 480 A.2d at 624; *see also*

11  *Kaufman v. Belmont*, 479 A.2d 282, 288 (Del. Ch. 1984) (holding that the plaintiff

12  created a reasonable doubt as to disinterestedness of directors who were "major

13  beneficiaries" of the challenged transaction).  Delaware law is clear that a director's

14  receipt of equity awards in violation of a shareholder-approved equity plan raises a

15  reasonable doubt as to that director's disinterestedness for purposes of demand

16  futility.  In such circumstances, the Delaware Chancery Court has held that directors

17  "have a strong financial incentive to maintain the status quo by not authorizing any

18  corrective action that would devalue their current holdings or cause them to disgorge

19

20  ------------------------------------
    [12]  Ignoring the particularized allegations of the Amended Complaint, Quiksilver

21  makes the weak argument that "mere membership on a compensation committee" is
    not sufficient to excuse demand, relying upon three cases in support of its argument,
22  all of which are wholly inapplicable here.  Nom. Def. Memo at 12.  In *In re MIPS*
    *Techs., Inc. Derivative Litig.*, 542 F. Supp. 2d 968 (N.D. Cal. 2008), the court stated
23  "[k]nowingly granting or approving stock options can render a director interested,"
    and only dismissed the case because plaintiff was unable to point to specific option
24  grants the director granted or approved.  *Id.* at 977.  The plaintiff in *In re Verisign,*
    *Inc., Derivative Litig.*, 531 F. Supp. 2d 1173 (N.D. Cal. 2007) similarly failed to
25  allege particularized facts about committee members' roles and conduct related to
    the alleged wrongdoing.  *Id.* at 1194.  In fact, certain defendants were alleged to have
26  served on the committees however they joined the board after the alleged
    wrongdoing had occurred, and no facts were alleged "explaining the role, if any, that
27  each director played in the alleged wrongdoing."  *Id.*  Similarly, the court in *In re*
    *CNET Networks, Inc. S'holder Derivative Litig.*, 483 F. Supp. 2d 947 (N.D. Cal.
28  2007) dismissed the complaint after concluding that it was unclear from plaintiff's
    allegations whether the directors had actually made the relevant decisions.  *Id.* at
    965.

improperly obtained profits.  This creates an unacceptable conflict that restricts them from evaluating the litigation independently."  *Conrad*, 940 A.2d at 38; *see also Zoran*, 511 F. Supp. 2d at 1003 ("[I]f plaintiffs can plead with particularity that the directors received [improper awards], those directors will be considered interested."); *In re Computer Scis. Corp. Derivative Litig.*, No. 06-5288, 2007 U.S. Dist. LEXIS 25414, at *24 (C.D. Cal. Mar. 27, 2007) ("By receiving a personal financial benefit from the [improper equity awards] that is not equally shared by the stockholders, he is potentially facing a 'materially detrimental impact' caused by liability or required restitution for the [improper equity awards] that is not shared by the corporation or its stockholders"); *Ryan*, 918 A.2d at 355 (holding that a board member's acceptance of [improper awards] raises a reason to doubt that director's disinterestedness); *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 591 n.72 (Del. Ch. 2007) (same); *Edmonds*, 524 F. Supp. 2d at 1276 (same); *THQ*, 2007 WL 4990689, at *4 ("whether he knew [that the award was improper] is irrelevant to whether he received a personal financial benefit from the challenged transactions.").

Here, McKnight received 1,200,000 RSUs in November 2012 – *i.e.*, 400,000 more RSUs than authorized under the 2000 Plan.  ¶¶7, 52, 71(b).  Clearly, the benefit of receiving 400,000 *ultra vires* RSUs was not equally shared with Quiksilver shareholders.  *See Zoran*, 511 F. Supp. 2d at 1002-03 ("directors receiving backdated stock options receive a benefit not shared by stockholders").  Defendants spill much ink arguing that McKnight did not receive any improper benefit because the 2012 Grant has not fully vested and cannot be exercised at the present time.  Nom. Def. Memo at 1, 4, 11, 14.  Delaware courts have consistently rejected this same argument as a board member's acceptance of an improper equity award – whether or not it could or was actually exercised – raises a reason to doubt that director's disinterestedness.  See *Ryan*, 918 A.2d at 355.  Thus, as a matter of law, McKnight's receipt of the 2012 Grant raises a reasonable doubt regarding his disinterestedness, excusing demand as futile.  *See*, *e.g.*, *Conrad*, 940 A.2d at 38 ("the court observes

that the two directors who allegedly received backdated options…are clearly not disinterested under *Rales*"); *Atmel*, 2008 U.S. Dist. LEXIS 91909, at *19 ("Plaintiffs have alleged that [defendants] received…backdated stock options…which provided them with a benefit not equally shared with Atmel shareholders.  These allegations are sufficient to raise a reasonable doubt as to their disinterestedness."); *Zoran*, 511 F. Supp. 2d at 1003 ("if plaintiffs can plead with particularity that the directors received backdated grants, those directors will be considered interested").

### c.    Defendants McKnight and Exon are Not Disinterested Due to Their Positions as Quiksilver Executives

Defendants McKnight and Exon cannot consider a demand due to the substantial compensation they earn by virtue of McKnight's position as Quiksilver's CEO and Exon's position as CAO, Secretary and General Counsel.  As the Delaware Supreme Court has explained: "there is a reasonable doubt that [an employee-director] can be expected to act independently considering his substantial financial stake in maintaining his current offices."  *Rales*, 634 A.2d at 937.  A reasonable doubt is raised regarding the independence of a director whose positions with the corporation constitutes his principal employment and means of earning a living.  *See Mizel v. Connelly*, No. 16638, 1999 WL 550369, at *3 (Del. Ch. July 22, 1999) ("Since [employee-directors] each derive their principal income from their employment at [the corporation], it is doubtful that they can consider the demand on its merits without also pondering whether an affirmative vote would endanger their continued employment.").  At the time this suit was commenced, McKnight's principal professional occupation was his position as Quiksilver's CEO.   ¶16.  Likewise, Exon's principal professional occupation was his position as Quiksilver's CAO, Secretary and General Counsel.  ¶20.  Both McKnight and Exon stood to earn millions of dollars in annual salary, bonuses, and other compensation, which necessarily raises a reasonable doubt as to their independence.  *See*, *e.g.*, *In re Goldman Sachs Group, Inc. S'holder Litig.*, No. 5215-VCG, 2011 WL 4826104, at

1  *7 (Del. Ch. Oct. 12, 2011) (holding that for demand futility purposes "it can be

2  assumed that Blankfein and Cohn, as officials of Goldman, would be found to …lack

3  independence"); *In re Dow Chem. Co. Derivative Litig.*, No. 4349-CC, 2010 WL

4  66769, at *1 n.3 (Del. Ch. Jan. 11, 2010)  ("In any event, defendants concede that

5  Allemang 'does not qualify as 'independent'… because of his former service as a

6  Dow officer.'").

7          Delaware law is clear that McKnight and Exon's status as "employee

8  director[s]" disqualify them from being independent, especially since it would be

9  impossible for McKnight and Exon not to be biased or influenced by the very fact

10  that their annual compensation must be approved by the Compensation Committee,

11  Barnum, Berardino and Mettler, all of whom are interested in this Action.  ¶77(b)-

12  (c); Section III.B.2.a. Under such circumstances, because McKnight and Exon

13  cannot "be expected to act independently considering [their] substantial financial

14  stake in maintaining [their] current office," there exists a reasonable doubt as a

15  matter of law regarding their independence from the other directors who control their

16  compensation.[13]  *See Rales*, 634 A.2d at 937 (holding that a director who is also

17  ───────────────

[13] Quiksilver incorrectly cite to *Jones ex rel. CSK Auto Corp.*, 503 F. Supp. 2d 1325,
18  1338 n.5 (D. Ariz. 2007) for the proposition that "the mere fact that the
[Compensation] Committee controls McKnight and Exon's salary does not, without
more, call into question their independence." Nom. Def. Memo at 13.  In *Jenkins*,
19  plaintiff only alleged that the  CEO's compensation was  controlled by the
compensation committee as a basis for demand futility.  *Id.* at 1338.  The Amended
20  Complaint alleges "more," specifically that: (i) Exon's principal occupation is the
CAO, Secretary and General Counsel of the Company and he reports directly to
21  McKnight, who is not independent and who determines Exon's compensation (¶¶20,
71(c)); and (ii) McKnight provides input to the Compensation Committee regarding
22  the amount of RSUs to award to each executive officer and had input into the *ultra
vires* award of RSUs to Agnes and Stevenson in 2011 in violation of the 2000 Plan
23  (¶¶16, 17(b)).  The Delaware Court of Chancery has stated "[t]here may be a
reasonable doubt about a director's independence if his or her continued employment
24  and compensation can be affected by the directors who received the challenged
benefit." *MCG Capital Corp. v. Maginn*, No. 4521–CC, 2010 WL 1782271, at *20
25  (Del. Ch. May 05, 2010). Exon's salary is "affected" by McKnight, who received the
*ultra vires* 2012 Grant, and such allegations are enough to raise a reasonable doubt
26  about his ability to objectively entertain a demand.  McKnight engaged in
wrongdoing as and earns substantial compensation as an executive officer of the
27  Company, thus excusing a demand.  *See In re Adolor Corp. Derivative Litig.*, No.
04-3649, 2009 WL 1325738, at *8 (E.D. Pa. May 12, 2009) (finding that the CEO
28  lacked independence because he engaged in the wrongdoing, "served as the face of

1    President and CEO cannot be expected to act independently of the other directors);

2    *Robotti & Co., LLC v. Liddell*, No. 3128-VCN, 2010 WL 157474, at *13 (Del. Ch.

3    Jan 14, 2010) (the court held that it was "skeptical" of a CEO's ability to objectively

4    evaluate a demand where the CEO's compensation was controlled by an interested

5    director).  The overwhelming authority, including the considerable salaries received

6    by McKnight and Exon and their positions as executive officers of Quiksilver, create

7    a reasonable doubt that either could independently consider a demand.[14]

8    **IV.   CONCLUSION**

9         For the foregoing reasons, Plaintiff respectfully requests that the Court enter

10   an order denying Nominal Defendant's Motion to Dismiss.

11   Dated:  February 15, 2013                Respectfully submitted,

12                                            **KESSLER TOPAZ
                                                MELTZER & CHECK, LLP**
13
                                             /s/ Eric L. Zagar
14                                           Eric L. Zagar (250519)
                                             Robin Winchester
15                                           Kristen L. Ross
                                             280 King of Prussia Road
16                                           Radnor, PA 19087
                                             Telephone:  (610) 667-7706
17                                           Fax:  (267) 948-2512

18                                           -and-

19                                           Ramzi Abadou (222567)
                                             One Sansome Street, Suite 1850
20                                           San Francisco, CA 94104
                                             Telephone:  (415) 400-3000
21                                           Fax:  (415) 400-3001

22                                           *Counsel for Plaintiff*

23   the company" and "received substantial compensation in 2003, earning $536,202 in
     salary, and 150,000 stock options.").  Simply put, Quiksilver does not and cannot
24   cite any authority to support its argument that Exon and McKnight are independent.

25   [14] Quiksilver excluded McKnight, Exon, Langman and Sweet from the list of
     directors deemed "independent" under the NYSE listing standards.  ¶71(e).  This
26   exclusion constitutes an admission that these directors are not independent under and
     establishes that these directors lack independence for purposes of demand futility.
27   *See In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1080-81
     (C.D. Cal. 2008) (citing admissions in the company's SEC filings regarding director
28   independence and finding two "insider directors" not independent for purposes of
     demand futility).