UNITED  STATES  DISTRICT  COURT

FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

| | |
|---|---|
| PATRICIA STOCKMAN-SANN, Derivatively on Behalf of QUIKSILVER, INC., | CASE NO. SACV 12-1882 AG (JPRx) |
| Plaintiff, | [IN CHAMBERS] OMNIBUS ORDER RE DEFENDANTS' MOTION TO STAY AND MOTIONS TO DISMISS |
| v. | |
| ROBERT B. MCKNIGHT, JR., et al. | |
| Defendants, | |
| and | |
| QUIKSILVER, INC., a Delaware Corporation, | |
| Nominal Defendant. | |

Plaintiff in this derivative shareholder action alleges that a corporate compensation committee improperly granted restricted stock units to corporate executives and the board of directors attempted to cover up the violation.  Plaintiff Patricia Stockman-Sann ("Stockman-Sann" or "Plaintiff") filed a Corrected Verified Amended Shareholder Derivative Complaint ("CAC") against the individual members of the Quiksilver, Inc. Board of Directors and nominal defendant Quiksilver, Inc. ("Quiksilver" or "the Company").  (CAC, Dkt. No. 16.)

Quiksilver now files a Motion to Dismiss based on demand futility. (Quiksilver's Motion to Dismiss, Dkt. No. 21.)  The individual Defendant Board Members also move to dismiss the CAC, and move to stay the case pending the resolution of similar state court proceedings. (Defendant Board Members' Motion to Dismiss, Dkt No. 20; Defendant Board Members' Motion to Stay, Dkt. No. 37.)  At the hearing on this matter, Defendants submitted on the Court's tentative ruling.  The Court GRANTS Quiksilver's Motion to Dismiss, and DENIES the individual Defendants' Motion to Stay.  The individual Defendants' Motion to Dismiss is GRANTED to the extent it joined Quiksilver's Motion to Dismiss based on demand futility.

**BACKGROUND**

Quiksilver is a Delaware corporation with its principal place of business in Huntington Beach, CA.  (CAC, Dkt. No. 16, ¶ 15.)  At the time this lawsuit was filed, the Quiksilver Board of Directors (the "Board") had two inside directors, Co-Founder, President, CEO and Chairman Robert B. McKnight, Jr. ("McKnight"), and Chief Administrative Officer Charles S. Exon.  It also had seven outside directors: William M. Barnum, Jr., Joseph F. Berardino, James G. Ellis, M. Steven Langman, Robert L. Mettler, Paul C. Speaker, and Andrew W. Sweet.  (*Id.* at ¶¶ 16-24.)  Three members of the Board—Barnum, Berardino, and Mettler—served on the Board's Compensation Committee during the time of the purported wrongdoing.  (*Id.* ¶ 31.)  Douglas K. Ammerman was originally alleged to have served on the Board and Compensation Committee during the applicable time frame, but he has since been voluntarily dismissed from the lawsuit. (Notice of Dismissal, Dkt. No. 19.)

Quiksilver's Board of Directors adopted the 2000 Stock Incentive Plan (the "2000 Plan") in February 2000.  It was approved by the Company's shareholders at the annual meeting the following month.  (CAC ¶ 34.)  The 2000 Plan states that "[n]o one person participating in the [2000] Plan may receive awards for more than 800,000 shares of Common Stock in the aggregate per calendar year."  (*Id.* ¶ 37.)  The 2000 Plan defines "Award" as "any of the following stock or stock-based awards authorized for issuance or grant under the Plan: stock

1    option, stock appreciation right, Restricted Stock or Restricted Stock Unit award." (*Id.*) The

2    Company issued a proxy statement on February 9, 2011, reiterating the purpose of the equity

3    award limit:

4           No participant in the 2000 Plan may receive Equity Awards under the 2000 Plan

5           for more than 800,000 shares of common stock in the aggregate per calendar year.

6           Stockholder approval of this Proposal will also constitute a re-approval of the

7           800,000 share-limitation for purposes of Section 162(m) of the Code.

8    (*Id.* ¶ 38 (quoting Form DEF 14A Proxy Statement, filed February 9, 2011).)

9           Plaintiff alleges that the Compensation Committee violated the 2000 Plan in June 2011

10   when it approved grants of restricted stock units ("RSUs") above the 2000 Plan's limits. (*Id.* ¶¶

11   2, 4.) Chief Executive Officer Robert B. McKnight, Jr. received a grant of 2,000,000 RSUs.

12   President of Quiksilver Europe Pierre Agnes ("Agnes") and President of Quiksilver Americas

13   Craig Stevenson ("Stevenson") each received 1,000,000 RSUs. (*Id.* ¶¶ 40-41.) Plaintiff filed a

14   verified shareholder derivative complaint on October 29, 2012, alleging that by granting the

15   RSUs, the Compensation Committee members breached their fiduciary duties and wasted

16   corporate assets, resulting in the unjust enrichment of McKnight, Agnes, and Stevenson. (*Id.* ¶

17   46.) Further, Plaintiff claims that the Board breached its fiduciary duties by disseminating a

18   2012 proxy statement (the "2012 Proxy") with false or misleading information in violation of

19   Section 14(a) of the Securities and Exchange Act. (*Id.*)

20          Following the filing of Plaintiff's initial Complaint on October 29, 2012 (Verified Comp.

21   Dkt. No. 1), Quiksilver filed a Form 8-K with the SEC on November 13, 2012. (CAC ¶ 47.)

22   The 8-K stated that in February 2012, the Board unilaterally amended the 2000 Plan "to clarify

23   that the 162(m) Limit did not apply to any award not intended to be exempt from section 162(m)

24   of the Code" and made the amendment retroactive to the June 2011 date of the RSU grants. (*Id.*

25   ¶¶ 47-48.) Plaintiff claims that the Board's amendment violated the 2000 Plan, which allegedly

26   requires stockholder approval where the amendment "materially increase[s] the benefits accruing

27   to . . . Participants under the [2000] Plan . . . ." (*Id.* ¶ 49-50 (quoting portion of the 2000 Plan, at

28   26).) The 8-K also states that on November 13, 2012, McKnight, Agnes, and Stevenson

surrendered the excess amounts of awarded RSUs.  (*Id.* ¶ 51.)  The Company then cancelled the excess awards.  (*Id.*)  The 8-K states that the Compensation Committee granted new awards in the same amounts and under substantially similar terms as the RSUs that were surrendered.  (*Id.* ¶ 52)  According to the 8-K, the new grants were "not intended to be exempt from Section 162(m) of the Code and are not designed to be deductible by the Company for tax purposes."  (*Id.*)

Quiksilver and the individual Defendant Board members now move to dismiss the Corrected Verified Amended Shareholder Derivative Complaint under Federal Rule of Civil Procedure 23.1, or, in the alternative, Rule 12(b)(6).

**PRELIMINARY MATTERS**

Quiksilver asks the Court to consider five items under the doctrine of incorporation by reference concerning its Motion to Dismiss: (1) Quiksilver's November 2012 Form 8-K; (2) Exhibit 10.2 to the 8-K; (3) Exhibit 10.3 to the 8-K; (4) Quiksilver's 2011 Proxy; and (5) Quiksilver's 2012 Proxy.  (Quiksilver's Request for Judicial Notice, Dkt. No. 21-8, at 1.) Because Plaintiff's CAC references these documents and quotes from them, they are appropriate for consideration under the doctrine of incorporation by reference.  (*See, e.g.*, CAC, at ¶ 38 (quoting 2011 Proxy); ¶¶ 48, 51 (quoting Form 8-K); ¶ 56 (quoting 2012 Proxy).)

The Individual Defendants ask the Court to take judicial notice of five items concerning their Motion to Stay: (1) Quicksilver's February 2012 Proxy; (2) Quicksilver's November 2012 Form 8-K; (3) the Verified Amended Derivative and Class Action Complaint ("CAC") in *Astor BK Realty Trust v. McKnight*, Case No. 30-2012-00603315-CU-MC-CJC, filed in Orange County Superior Court; (4) the Form 4 filed by Defendant McKnight in January 2013; and (5) Quicksilver's February 2013 Proxy.

Items 1 and 2 are referenced in the CAC, so the Court may consider these items under the doctrine of incorporation by reference without taking judicial notice.  (*See, e.g.*, CAC ¶¶ 6, 56-61.)  Judicial notice is appropriate for Item 3, the CAC, because it is a court filing and a public

record.  *See Burbank-Glendale-Pasadena Airport Authority v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) (taking judicial notice of filings in state court proceedings).  But the Court does not take judicial notice of facts asserted within the CAC.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (holding that courts may take judicial notice of  "*undisputed* matters of public record," but generally may not take judicial notice of "*disputed* facts stated in public records.").  The Court need not take judicial notice of the other items, as they were only used by Defendants in their description of the background facts and were not necessary for deciding the Motion to Stay.

## 1.   MOTION TO STAY

Defendants filed a Motion to Stay this case pending the outcome of *Astor BK Realty Trust v. McKnight*, Case No. 30-2012-00603315-CU-MC-CJC (the "State Action"), an Orange County Superior Court case also involving Quicksilver's 2011 stock grants and related actions.  In the alternative, Defendants ask the Court to stay this case until after a Quicksilver shareholders meeting scheduled for March 19, 2013.  Defendants argue this shorter stay is appropriate because voting at the meeting may moot some of Plaintiff's claims.  The request for this shorter stay is now moot because the Court has continued the hearing on Defendants' pending Motion to Dismiss until March 25, 2013 for reasons of calendar management unrelated to Defendants' Motion to Stay.  Thus, the Court only analyzes Defendants' Motion to Stay in favor of the State Action.  The Court DENIES this request.

### 1.1   Stays of Proceedings under the *Colorado River* Decision

In *Colorado River Water Conservation District v. United States*, the Supreme Court held that federal courts may abstain from exercising their jurisdiction in favor of parallel state proceedings if doing so would serve the interests of "[w]ise judicial administration, giving regard to the conservation of judicial resources and comprehensive disposition of litigation."

424 U.S. 800, 817 (1976). *Colorado River* applies to stays as well as abstentions.  The Ninth

Circuit has held that "the *Colorado River* doctrine is a narrow exception to 'the virtually

unflagging obligation of the federal courts to exercise the jurisdiction given them.'"  *Holder v.*

*Holder*, 305 F.3d 854, 867 (9th Cir. 2002) (quoting *Colorado River*, 424 U.S. at 817)).  A

*Colorado River* stay is appropriate only in "exceptional circumstances." *Id.*

If the federal and state actions are "sufficiently parallel," the Court determines whether a

stay is appropriate by balancing seven non-exclusive factors. *Holder v. Holder*, 305 F.3d at 870.

The balancing of the factors should be "heavily weighted in favor of exercising jurisdiction." *In*

*re Countrywide Fin. Corp. Derivative Litig.*, 542 F. Supp. 2d 1160, 1170 (C.D. Cal. 2008)

(quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983)).

### 1.2    *Colorado River* Stays of Claims Subject to Exclusive Federal Jurisdiction

Applying *Colorado River,* the Ninth Circuit has held that when a claim involves exclusive

questions of federal law, courts lack *any* discretion to issue a stay in deference to a parallel state

court action. *Silberkleit v. Kantrowitz*, 713 F.2d 433, 435-36 (1983) (A "district court has no

discretion to stay proceedings as to claims within exclusive federal jurisdiction under the

[*Colorado River*] wise judicial administration exception.");  *Minucci v. Agrama*, 868 F.2d 1113,

1115 (9th Cir. 1989) (quoting *Silberkleit*); *Intel Corp. v. Advanced Micro Devices, Inc.*, 12 F.3d

908, 913 (9th Cir. 1993) ("[T]he circuit courts, and the Ninth Circuit in particular, have

uniformly held that a district court may not grant a stay in this context [where copyright claims

are subject to exclusive federal jurisdiction].") (citing *Silberkleit* and *Minucci*); *see also Krieger*

*v. Atheros Comms., Inc.*, 776 F. Supp. 2d 1053, 1058 (N.D. Cal. 2011) (refusing to stay claims

under the Exchange Act pending state proceedings because "district courts lack discretion to stay

proceedings as to claims within exclusive federal jurisdiction.").

Plaintiff argues that the bright line rule these cases establish precludes the Court from

staying the Exchange Act claim, which is subject to exclusive federal jurisdiction.  15 U.S.C. §

78aa(a).  Defendants respond with *McCreary v. Celera Corporation*, an unpublished opinion

1   from the Northern District of California which concluded that a *Colorado River* stay was within

2   its discretion even though plaintiffs asserted an Exchange Act claim subject to exclusive federal

3   jurisdiction. No. 11-1618 SC, 2011 WL 1399263, at *4 (N.D. Cal. April 13, 2011) (relying

4   heavily on *International Jensen Inc. v. Emerson Radio Corp.,* No. 96 C 2816, 1996 WL 494273

5   (N.D. Ill. Aug. 27, 1996)).  The *McCreary* court held that the Ninth Circuit bar on using

6   *Colorado River* stays for claims was inapplicable because the plaintiffs' Exchange Act claim

7   was "duplicative" of a Delaware state law claim asserted in state court.  *Id.*

8         The Court agrees with Defendants that the corresponding federal and state claims in

9   *McCreary* are similar to those alleged in this case.  But the Court is not persuaded that *McCreary*

10   creates a viable exception to this Circuit's well-settled rule that courts may not stay claims that

11   are subject to exclusive federal jurisdiction under *Colorado River*.  Thus, a *Colorado River* stay

12   is inappropriate for the federal claim in this case.

13

14       **1.3**    **Application of the Seven-Factor Test**

15

16         In their Reply, Defendants ask for a *Colorado River* stay of only the state claims, as an

17   alternative to staying the entire case.  The Court finds that the Delaware state claims in this case

18   are sufficiently parallel to those in the State Action.  Thus, the appropriateness of a stay of the

19   state claims depends upon the outcome of the Ninth Circuit's seven-factor balancing test.  Those

20   factors include:

21         (1) whether the state court first assumed jurisdiction over property; (2)

22         inconvenience of the federal forum; (3) the desirability of avoiding piecemeal

23         litigation; (4) the order in which jurisdiction was obtained by the concurrent

24         forums; (5) whether federal law or state law provides the rule of decision on the

25         merits; (6) whether the state court proceedings are inadequate to protect the federal

26         litigant's rights; (7) whether exercising jurisdiction would promote forum

27         shopping.

28

1    *Holder*, 305 F.3d at 870.  The parties agree that factors one and two are not relevant in this case,

2    and the Court does not consider these factors in its analysis.

3         The third factor, avoiding piecemeal litigation, is neutral.  Staying the state claims would

4    prevent some overlap with the state claims in the State Action.  But splitting the federal claim in

5    this case from the state claims hardly furthers the goal of avoiding piecemeal litigation.

6         The fourth factor, the order in which jurisdiction was obtained by the concurrent forums,

7    is also neutral.  The State Action was filed 19 days before the federal suit, but this short

8    difference in timing is not enough to weigh in favor of staying the case.  *See Brown v. Moll*, No.

9    09-05881, 2010 WL 2898324, at *3 (N.D. Cal. July 21, 2010) ("[T]he fact that the now-

10   consolidated state court action commenced a few weeks earlier than this case does not weigh in

11   favor of a stay.").  It also appears that the cases are at a similar stage of litigation.  In this case,

12   the parties have briefed motions to dismiss and Defendants state that the parties have briefed a

13   demurrer in the State Action.  (*See* Defendants' Reply Memorandum in Support of Motion to

14   Stay, Dkt. No. 51, at 6:22-25.)

15        The fifth factor, whether federal law or state law provides the rule of decision on the

16   merits, weighs against a stay.  The case involves federal law and Delaware law.  There are no

17   California law claims, and Defendants have not given any reason why a California state court

18   has a more vested interest in adjudicating the Delaware law claims than the federal court.  This

19   factor weighs against a stay.

20        The sixth factor, whether the state court proceedings are inadequate to protect the federal

21   litigant's rights, is neutral.  Plaintiff claims that the State Action would be inadequate for two

22   reasons: (1) Plaintiff cannot plead the Exchange Act claim in state court and (2) the Exchange

23   Act claim is subject to a different standard than the corresponding Delaware state law claim.

24   Defendants persuasively argue that the same standards apply.  Thus, although there might be

25   some differences, it appears unlikely that the state court proceedings would be *inadequate* to

26   protect Plaintiff's rights.  This factor is therefore neutral.

27        The seventh factor, whether exercising jurisdiction would promote forum shopping, is

28   also neutral.  Both parties accuse each other of forum shopping, but the evidence they provide is

1 unconvincing.  The mere fact that Plaintiff filed this action 19 days after the State Action was

2 filed does not strongly suggest forum shopping.  And, even though the actions are similar, the

3 presence of the exclusively federal claim gives Plaintiff a legitimate reason to come to federal

4 court.  Plaintiff's allegations that Defendants were forum shopping derives from the parties'

5 complex web of motions and attorney emails.  The Court is not persuaded.  This factor is

6 therefore neutral.

7      Courts balance these factors "heavily weighted in favor of exercising jurisdiction."  *In re*

8 *Countrywide Fin. Corp. Derivative Litig.*, 542 F. Supp. 2d at 1170.  Defendants have not shown

9 that these factors favor a *Colorado River* stay of the state law claims.

10      The Court DENIES Defendants' Motion to Stay.

11

12 **2.**     **QUIKSILVER'S MOTION TO DISMISS**

13

14     **2.1**     **Legal Standard for Motion to Dismiss Under F.R.C.P. 23.1**

15

16      Under Federal Rule of Civil Procedure 23.1, a shareholder seeking to vindicate the

17 interests of a corporation through a derivative suit must allege "with particularity: (A) any effort

18 by the plaintiff to obtain the desired action from the directors or comparable authority and, if

19 necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or

20 not making the effort."   Fed. R. Civ. P. 23.1(b)(3).  In other words, a shareholder must, before

21 bringing a shareholder's derivative lawsuit, "demand action from the corporation's directors or

22 plead with particularity the reasons why such demand would have been futile."  *In re Silicon*

23 *Graphics Inc. Sec. Litig.*, 183 F.3d 970, 989 (9th Cir. 1990), *abrogated on other grounds as*

24 *recognized in South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  "Rule 23.1

25 imposes only a pleading requirement with regard to demand; the substantive demand

26 requirement is an issue of state law."  *Potter v. Hughes*, 546 F.3d 1051, 1054 n.1 (9th Cir. 2008)

27 (citing *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1463 n.10 (9th Cir. 1995).  This issue of

28 demand futility is the focus of Quicksilver's Motion to Dismiss.

Rule 23.1 governs procedure, but the applicable substantive law is determined by the law of the forum state. *In re Sagent Tech, Inc. Deriv. Litig.*, 278 F. Supp. 2d 1079, 1086 (N.D. Cal. 2003). In this case, California is the forum state. California follows the "internal affairs" doctrine. *See id.* at 1086-87. Under the internal affairs doctrine, courts look to the laws of the company's state of incorporation in corporate law matters. *Id.* Here, Quiksilver is a Delaware corporation, so Delaware law applies in determining whether demand would be futile.

Under Delaware law, "[d]emand is not excused solely because the directors would be deciding to sue themselves." *In re Citigroup Inc. Shareholder Derivative Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009) (citation omitted). Rather, courts applying Delaware law are to use one of two tests to determine demand futility. Under Delaware law, the demand futility analysis must be conducted on a claim-by-claim basis. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003). To demonstrate futility where the challenged action is one undertaken by the full board of directors, a Court must use the two-prong test enunciated in *Aronson v. Lewis,* 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)). *Id.* But the *Rales* test applies "where the subject of the derivative [claim] is not a business decision of the [full] board . . . ." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

In applying the reasonable doubt standard under both *Aronson* and *Rales* at the pleading stage, the Court "is not engaged in a weighing of evidence." *Heineman v. Datapoint*, 611 A.2d 950, 953 (Del. 1992) *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). The Court instead looks to the totality of the circumstances of the particularized facts alleged to determine if a reasonable doubt exists as to whether the majority of directors would have been disinterested and independent when considering a demand. *In re Cendant Corp., Sec. Litig.,* 189 F.R.D. 117, 128 (D.N.J. 1999) (holding that "the trial court must not rely on any one factor but examine the totality of circumstances and consider all of the relevant factors") (citing *Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990)).

In her Corrected Amended Complaint, Plaintiff asserts seven claims: (1) Defendants Barnum, Berardino, and Mettler breached their fiduciary duties of loyalty and good faith by

granting the RSUs in 2011; (2) the Board members breached their fiduciary duties of loyalty and good faith by approving the Amendment of the 2000 Plan; (3) Defendants Barnum, Berardino, and Mettler breached their fiduciary duties of loyalty and good faith by granting RSUs to McKnight in November 2012; (4) the Board members breached their fiducary duties of loyalty and good faith by disseminating false and misleading statements in the 2012 Proxy; (5) Defendants Barnum, Berardino, and Mettler wasted corporate assets by granting the disputed RSUs; (6) the Board violated Section 14(a) of the Securities Exchange Act by issuing the 2012 Proxy; and (7) McKnight was unjustly enriched by receiving the RSUs. (*Id.* ¶¶ 22-27.) Plaintiff dropped her unjust enrichment claims against Agnes and Stevenson because they previously surrendered their excess stock awards.

Although demand futility analyses are conducted on a claim-by-claim analysis, many of the instant claims challenge the same decisions or activities. For the sake of judicial economy, the Court will group these claims together in analyzing demand futility. Claims 1, 3, and 5 each challenge the actions of the Compensation Committee comprised of Defendants Barnum, Berardino, and Mettler. (CAC ¶¶ 73-76, 82-86, 91-94.) Claim 7 alleges that McKnight was unjustly enriched by, presumably, the Compensation Committee's grant of RSUs in 2012. (*Id.* ¶¶ 100-103.) Because these claims do not involve action by the full Board, the *Rales* test for demand futility applies. Claims 2, 4, and 6 each relate to actions taken by the Board. (*Id.* ¶¶ 77-81, 87-90, 95-99.) Thus, the Court applies the *Aronson* test to these claims.

## 2.2   Whether Demand Was Excused for Claims Challenging the Actions of the Compensation Committee

In considering Claims 1, 3, 5, and 7, the Court applies the *Rales* test. Under the *Rales* test, the Court "must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934. "A director is

considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Id.* at 936.  "As explained in *Aronson*, '[i]ndependence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences.'" *Id.* (quoting *Aronson*, 473 A.2d at 815). Thus, under the *Rales* test, the Court must determine whether each of the nine Board members could have exercised their independent business judgment in responding to a demand challenging the Compensation Committee's actions.

### 2.2.1   Whether Demand Was Excused as to McKnight

Plaintiff argues demand was excused as to McKnight "because he is directly interested in his *ultra vires* award of restricted stock units in violation of the 2000 Plan."  (CAC ¶ 71b.) Quiksilver initially argued that demand should not be excused as to McKnight because he has "no risk of liability for his actions related to the decision to enter into these transactions, let alone a substantial one."  (Quiksilver's Motion to Dismiss, at 13:5-6.)  But in its Reply, Quiksilver acknowledges McKnight "would qualify as interested due to his receipt of the RSU grants at issue . . . ."  (Quiksilver's Reply, at 3:20-21.)

Plaintiff alleges with sufficient particularity that McKnight would receive a personal financial benefit that was not made available to other stockholders, thus making him interested in the Compensation Committee's decisions to grant the RSUs.  Demand was therefore excused as to McKnight.

### 2.2.2   Whether Demand Was Excused as to Exon

Plaintiff contends that demand was excused as to Defendant Exon "because his principal professional occupation is his employment as Chief Administrative Officer, Secretary and General Counsel of the Company, pursuant to which he reports directly to [ ] McKnight and stands to earn millions of dollars in salary, bonuses and other compensation, all of which must

1    be approved by the Compensation Committee . . . ."  (CAC ¶ 71c.)  To support this position,

2    Plaintiff cites *MCG Capital Corp. v. Maginn*, 2010 WL 1782271 (Del. Ch. May 5, 2010).

3    (Plaintiff's Opposition ("Opp'n"), at 24:16 n.13.)  In *MCG*, the court stated that "[t]here may be

4    a reasonable doubt about a director's independence if his or her continued employment and

5    compensation can be affected by the directors who received the challenged benefit."  *Id.* at *20.

6    Plaintiff contends that because "the Compensation Committee requests defendant McKnight's

7    input regarding his assessment of each individual executive officer's performance during the

8    year and a recommendation regarding the amount restricted stock unit awards to each executive

9    officer[,]" he can "affect" Exon's salary or continued employment.  (Opp'n, at 24:16 n.13; CAC

10   ¶ 71b.)

11          But in *MCG*, the court held that demand was not futile because the plaintiff did not allege

12   that the directors could have been removed unilaterally by the executive whose actions were

13   being challenged.  *MCG Capital*, 2010 WL 1782271, at *20.  Further, the court opined that, even

14   if the directors could be unilaterally removed, the complaint "failed to allege facts that

15   demonstrate the threatened loss of compensation would have disabled either [of the directors']

16   judgment."  *Id.*  To show lack of independence for a threatened loss of compensation, the court

17   required a showing that the loss of compensation would be "personally material" to the directors.

18   *Id.*; *see also In re Sagent*, 278 F. Supp. 2d at 1089 (concluding that plaintiffs failed to adequately

19   allege defendants were "not independent from other board members who have the ability to

20   control their employment and compensation, based solely on their positions and the monetary

21   compensation they received in connection with their duties as, respectively, an employee of and

22   a consultant to [the defendant corporation]").

23          Here, beyond the allegation that McKnight provides input to the Compensation

24   Committee, Plaintiff does not allege particularized facts that would create a reasonable doubt as

25   to Exon's ability to exercise sound judgment upon a demand.  Plaintiff also does not allege how

26   the loss of compensation would be personally material to Exon, a corporate executive.

27   *Compare MCG Capital*, 2010 WL 1782271, at *20 (holding threatened loss of compensation not

28   material to two Harvard business professors who also received $100,000 for board membership).

1   Further, demand futility "cannot be pled merely on the basis of allegations that directors acted or

2   would act to preserve their positions." *In re Sargent*, 278 F. Supp. 2d at 1089 (citing *Grobow v.*

3   *Perot*, 539 A.2d 180, 188 (Del. 1988), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d

4   244 (Del. 2000)).  "If these allegations were sufficient to show lack of independence, every

5   inside director would be disabled from considering a pre-suit demand."  *Id.*  Thus, Plaintiff has

6   not alleged with sufficient particularity that Exon was either interested or lacking independence

7   such that he could not consider a demand.

8        Plaintiff also contends Exon, as well as McKnight, Langman, and Sweet, are not

9   independent because "the Company does not consider them to be independent pursuant to the

10  listing standards of the [New York Stock Exchange ("NYSE")] and the Company's corporate

11  governance guidelines."  (*Id.* ¶ 71e.)   The independence standards of the NYSE and the

12  independence standards for demand futility analyses are unrelated.  *Compare* NYSE Listed

13  Company Manual § 303A.02 (2009) (considering directors to be independent "unless the board

14  of directors affirmatively determines that the director has no material relationship with the listed

15  company") *with Rales*, 634 A.2d at 936 (holding that a director lacks independence if he is

16  "beholden" to an interested director or "so under [another's] influence that [his or her] discretion

17  would be sterilized").  Because independence has different meanings under the NYSE standards

18  and demand futility analyses, the Court does not consider the NYSE designation of Exon,

19  Langman, or Sweet in its determination of independence.

20       At the hearing on this matter, Plaintiff identified additional cases not cited in her

21  Opposition.  These new cases do not persuade the Court to revisit its tentative ruling that

22  Plaintiff has failed to demonstrate demand futility as to Exon.  Thus, the Court finds that

23  Plaintiff has not alleged with sufficient particularity that demand would have been futile as to

24  Defendant Exon.

25

26

27

28

### 2.2.3   Whether Demand Was Excused as to Langman and Sweet

Plaintiff argues that demand would have been futile as to Defendants Langman and Sweet "because they are Managing Directors of Rhône and are on the boards of managers of various Rhône affiliates, and as such they cannot disinterestedly and independently consider a demand to institute litigation against one another . . . ." (CAC ¶ 71d.)   Plaintiff claims that Rhône, a private equity firm, owns approximately 29.8% of Quiksilver's outstanding common stock.  (*Id.* ¶ 21.)

This allegation does not satisfy the particularity requirement of Federal Rule 23.1. Plaintiff does not explain how Langman's and Sweet's outside positions would create reasonable doubt as to their independence or disinterest in considering a demand related to the grant of RSUs by the Compensation Committee.  "[T]o render a director unable to consider demand, a relationship must be of a bias-producing nature. Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." *Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004).  Plaintiff has not alleged particularized facts that would indicate bias.  Thus, demand futility as not been adequately pleaded as to Defendants Langman and Sweet.

The Court also rejects Plaintiff's argument that demand would be futile as to Langman and Sweet because of their listing status with the NYSE for the reasons given in Section 2.1.2 of this order.

### 2.2.4   Whether Demand Was Excused as to Speaker and Ellis

Plaintiff does not allege any particularized facts that demand would have been futile as to Defendants Speaker and Ellis in relation to the grants of the RSUs.  Rather, Plaintiff alleges demand futility as to the amendment of the 2000 Plan and dissemination of the proxy statements. (CAC ¶¶ 71f, 71g.)  Because demand futility analyses are conducted on a claim-by-claim basis,

and Plaintiff makes no effort to allege demand futility as to Speaker and Ellis for the RSU grants, the Court finds that demand was not excused.

### 2.2.5   Conclusion

The Court finds that demand was excused as to McKnight in relation to the claims involving the Compensation Committee's grants of RSUs.  But demand was not excused as to Exon, Langman, Sweet, Speaker, and Ellis, who, collectively, comprise a majority of the nine-member Board.  Therefore, the Court need not consider demand futility as to the three members of the Compensation Committee because, even if demand were found to be futile as to these three members, a majority of the directors still could have heard the demand.  Thus, Plaintiff has not satisfied the demand requirements of Federal Rule of Civil Procedure 23.1(b)(3) as to Claims 1, 3, 5, and 7 of the Corrected Amended Complaint.

The Court GRANTS Quiksilver's Motion to Dismiss Claims 1, 3, 5, and 7.

### 2.3   Whether Demand Was Excused as to Claims Regarding the Plan Amendment and Dissemination of the 2012 Proxy

In considering demand futility as to Claims 2, 4, and 6, the Court uses the two-prong *Aronson* test because these claims challenge actions by the full board.  Under the *Aronson* test, the Court must decide whether "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  *Aronson*, 473 A.2d at 814.  The test is disjunctive, "[i]f a derivative plaintiff can demonstrate a reasonable doubt as to the first or second prong of the Aronson test, then he has demonstrated that demand would have been futile."  *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995).

In the Opposition, Plaintiff only discusses demand futility under *Rales* and the second prong of the *Aronson* test for Claims 2, 4, and 6.  Under the first prong of *Aronson*, demand

1    would not be excused because a majority of the Board was disinterested and independent for the

2    reasons explained in detail in Section 2.2.  Further, "[t]he mere threat of personal liability for

3    approving a questioned transaction, standing alone, is insufficient to challenge the independence

4    or disinterestedness of directors."  *Aronson*, 473 A.2d at 815.  The Court now focuses on the

5    second *Aronson* prong involving the business judgment rule.

6

7         **2.3.1   Whether Demand Was Excused For the Entire Board for Amendment**

8                  **of the 2000 Plan**

9

10        Plaintiff argues that demand was excused as to the full Board "because they secretly

11   adopted the Amendment without first seeking or obtaining shareholder approval as required by

12   the 2000 Plan, which is likewise not protected by the business judgment rule and subjects all of

13   the directors to a substantial likelihood of liability for breaching their fiduciary duties of loyalty

14   and good faith . . . ."  (CAC ¶ 71f.)  Plaintiff claims that the amendment was a "knowing" and

15   "direct violation of the 2000 Plan and therefore is not protected by the business judgment rule."

16   (*Id.* ¶¶ 79, 80.)

17        In amending the 2000 Plan, the Board allegedly eliminated the Plan's limit "for awards

18   that were not intended to be exempt from Section 162(m) of the . . . Code . . . and not designed

19   to be deductible by the Company for tax purposes.  (*Id.* ¶ 47.)  The Form 8-K further stated that

20   "[i]n adopting the . . . amendment, our Board of Directors provided it was effective as of June

21   13, 2011 (the date of the June 2011 Grants)," making the amendment retroactive.  (*Id.* ¶ 48;

22   Decl. of Brian Neach, Ex. 1, at 4.)

23        The provision of the 2000 Plan that Plaintiff argues prohibits the Board's unilateral

24   amendment states:

25              In addition, stockholder approval will be required for any amendment to the

26              Plan that would (i) materially increase the benefits accruing to the

27              Optionees and Participants under the Plan, . . . then to the extend required

28              by applicable law, or deemed necessary or advisable by the Plan

1          Administrator or the Board of Directors, such amendment shall be subject

2              to stockholder approval.

3   (CAC, Ex. A at 26 (¶ 6.3 of the 2000 Plan).)  Based on this provision, Plaintiff claims that the

4   amendment was *ultra vires* and not subject to the protection of the business judgment rule.

5          The business judgment rule "is a presumption that in making a business decision the

6   directors of a corporation acted on an informed basis, in good faith and in the honest belief that

7   the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812 (citing

8   *Kaplan v. Centex Corp.*, 284 A.2d 119, 124 (Del. Ch. 1971).  "Absent an abuse of discretion,

9   that judgment will be respected by the courts. The burden is on the party challenging the

10  decision to establish facts rebutting the presumption." *Id.*  To gain the protections of the rule,

11  directors have a duty to become informed before making a business decision using all material

12  information reasonably available to them. *Id.*  After becoming informed, "they must then act

13  with requisite care in the discharge of their duties." *Id.*  Under the business judgment rule,

14  "director liability is predicated upon concepts of gross negligence." *Id.*

15         Plaintiff cites two cases to support her position that the decision to amend the 2000 Plan

16  was not protected by the business judgment rule.  Neither case is on point.  In *Sanders v. Wang*,

17  1999 WL 1044880 (Del. Ch. Nov. 8, 1999), the Delaware Chancery Court excused demand to

18  the members of a compensation committee in a derivative action alleging breaches of fiduciary

19  duties and waste of corporate assets where equity grants of millions of shares of common stock

20  were made in excess of the company's plan. *Id.* at *1.  An early vesting provision was triggered

21  because the stock was trading at a high price, and the executives gained over $1 billion in stock.

22  *Id.* at *3.  The court found that demand was excused as to the compensation committee members

23  because the plaintiffs alleged that the grants were made in direct violation of an "express" and

24  "unambiguous" term of the equity plan. *Id.* at *4-5.

25         Here, for the purposes of demand futility analysis, Plaintiff has not shown that the

26  amendment provision is so clear, unequivocal, or unambiguous that the Board's actions violated

27  the business judgment rule.  The provision states that if shareholder approval is required for any

28  the listed types of amendments.  (*See* CAC, Ex. A at 26 (¶ 6.3 of the 2000 Plan).)  But it also

18

contains an escape valve.  (*See id.* (suggesting that the Board can decide when to require shareholder approval).)  In sum, the provision is unclear.  Indeed, interpretation of the provision governing amendments appears to be a prime scenario for the exercise of business judgment.  *Cf. In re Citigroup Inc. Shareholder Derivative Litig.*, 964 A.2d at 121 (holding that demand based on potential personal director liability is excused "only in the rare case when a plaintiff is able to show director conduct that is 'so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists'") (quoting *Aronson*, 473 A.2d at 815).

Plaintiff also cites *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007).  (Opp'n, at 12.)  In *Ryan*, a shareholder filed a derivative action that alleged that board members breached their fiduciary duties by engaging in the dubious practice of issuing backdated stock options in "clear" violation of the shareholder-approved stock option plan.  *Id.* at 346.  Again, like in *Sanders*, the case involved obvious violations of clear provisions.  Here, that is not the case.  Plaintiff does not have specific and particularized factual allegations of activity so egregious that the protections of the business judgment rule should be lost.  *But see Ryan*, 918 A.2d at 355 (opining that the plaintiff pointed to enough "specific grants, specific language in option plans, specific public disclosures, and supporting empirical analysis to allege knowing and purposeful violations of shareholder plans and intentionally fraudulent public disclosures" to survive a motion to dismiss).

The Court finds that the Plaintiff has not adequately alleged demand futility as to the Board regarding the allegedly improper amendment.

### 2.3.2   Whether Demand Is Excused as to the Entire Board for the 2012 Proxy Statement

The Court will consider Claims 4 and 6 together as they both relate to the allegedly false or misleading 2012 Proxy.  Plaintiff claims that demand was excused as to the entire Board "because they approved and disseminated the false 2012 Proxy, which is likewise not protected

1  by the business judgment rule and subjects all of the directors to a substantial likelihood of

2  liability for breaching their fiduciary duties of loyalty and good faith and violating Section

3  14(a)."  (CAC ¶ 71g.)  According to Plaintiff, the 2012 Proxy was false and misleading because

4  it left shareholders

5         either uninformed or misinformed as to, *inter alia*: (I) the Board's failure to

6         disclose that the 2011 Grants violated the express and unambiguous terms

7         of the 2000 Plan; and (ii) the Board's failure to disclose the existence of the

8         Secret Amendment, which violated the 2000 Plan because the Board

9         approved it without first seeking or obtaining shareholder approval.

10  (Opp'n, at 15 (citing CAC ¶¶ 10, 54, 57-59).)  Plaintiff further contends that a reasonable

11  shareholder would want to know if the 2000 Plan was violated and that the Board amended the

12  2000 Plan.  (CAC ¶ 58.)

13        Plaintiff cites *Weiss v. Swanson*, 948 A.2d 433 (Del. Ch. 2008) to support her argument.

14  (Opp'n, at 17:2.)  In *Weiss*, the court considered a board's routine practice of granting "spring-

15  loaded" or "bullet-dodging" options by timing the grants with the release of earnings reports, a

16  practice in direct contradiction with the incentive plans in place.  *Id.* at 443.  The court held that

17  "it is reasonable to infer that stockholders would consider the practice of timing options

18  described in the complaint to be important in deciding whether to approve the option plans or to

19  reelect board members."  *Id.*  But the court did find that the directors "never disclosed this

20  practice in the plans themselves, subsequent proxy statements, or SEC filings describing the

21  option grants" and intended to circumvent the plans in violation of their fiduciary duties.  *Id.*

22        This case is distinguishable from *Weiss.*  Unlike the complete non-disclosure in *Weiss*, the

23  Quiksilver grants and amendments at issue here were disclosed in the Form 8-K.  (*See* Decl. of

24  Brian Neach, Exhs. 1-3 (Form 8-K and attached exhibits).)  Moreover, given the ambiguity in

25  the provision of the 2000 Plan, the amendment was likely protected by the business judgment

26  rule.  The amendment is unlike the grants of spring-loaded and bullet-dodging grants that went

27  undisclosed in *Weiss*, which the Court found directly contradicted the incentive plan.  Plaintiff

28  has not overcome the presumptions of the business judgment rule.

1    The Court DISMISSES Claims 4 and 6 for Plaintiff's failure to adequately plead demand

2 futility.

3 **DISPOSITION**

4

5    The Court DENIES Defendants' Motion to Stay.  The Court GRANTS Defendant

6 Quiksilver's Motion to Dismiss as to all claims.  The Court has not determined that amendment

7 would be futile.  *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1006 (9th Cir. 2008).  Any

8 amended complaint must be filed within 30 days of this Order.

9

10 IT IS SO ORDERED.

11 DATED: March 25, 2013

12    _____
                          Andrew J. Guilford
13                     United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28